1  MICHAEL E. MOLLAND (State Bar No. 111830)
   DANIEL JOHNSON, JR. (State Bar No. 57409)
2  BRETT M. SCHUMAN (State Bar No. 189247)
   GREGG P. YATES (State Bar No. 224641)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel:  415.442.1000
5  Fax:  415.442.1001
   E-mail:  mmolland@morganlewis.com
6  E-mail:  djjohnson@morganlewis.com
   E-mail:  bschuman@morganlewis.com
7
   Attorneys for Plaintiff and Counterclaim-Defendant
8  NXP SEMICONDUCTORS USA, INC.

9

10               UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13  NXP SEMICONDUCTORS USA, INC.,          Case No. C 08-0775 JW
    a Delaware corporation,
14                                          **DECLARATION OF BRETT M.**
                    Plaintiff,             **SCHUMAN IN SUPPORT OF NXP'S**
15                                          **MOTION FOR PARTIAL SUMMARY**
                                            **JUDGMENT**
16          v.

17  LSI CORPORATION d/b/a LSI LOGIC         Hearing Date:    October 27, 2008
    CORPORATION, a Delaware corporation,    Time:            9:00 a.m.
18  and AGERE SYSTEMS, INC., a Delaware     Judge:           Hon. James Ware
    corporation
19
                    Defendant.
20

21  AGERE SYSTEMS, INC., a Delaware
    Corporation,
22                    Counterclaimant

23          v.

24  NXP SEMICONDUCTORS USA, INC., a
    Delaware corporation
25
                    Counterclaim-Defendant.
26

27

28

MORGAN, LEWIS &
  BOCKIUS LLP
ATTORNEYS AT LAW

DB2/20754132.1

1          **DECLARATION OF BRETT M. SCHUMAN**

2          I, Brett M. Schuman, declare:

3          1.      I am a partner with the law firm of Morgan, Lewis & Bockius LLP, counsel for

4    plaintiff NXP Semiconductors USA, Inc.  I have personal knowledge of the facts contained in this

5    declaration and, if called as a witness, would and could competently testify to them.

6          2.      Attached hereto as Exhibit 1 is a true and accurate copy of a letter and complaint

7    from counsel for LSI Corporation and Agere Systems, Inc. to the U.S. International Trade

8    Commission, dated April 18, 2008.

9          3.      Attached hereto as Exhibit 2 is a true and accurate copy of Doc. No. 1, Complaint,

10   *Agere Systems Inc., et al. v. Atmel Corp.,* 292-cv-00864-LDD, (E.D. Pa. Feb. 20, 2002).

11         4.      Attached hereto as Exhibit 3 is a true and accurate copy of *Agere Systems Inc. v.*

12   *Atmel Corp.,* No. 02-864, 2005 WL 2994702 at *16-17 (E.D. Pa. Aug. 17, 2005).

13         5.      Attached hereto as Exhibit 4 is a true and accurate copy of excerpts from Doc. No.

14   322, Amended Transcript of Proceedings held on 03/15/05, *Agere Systems Inc., et al. v. Atmel*

15   *Corp.,* 2:02-cv-00864-LDD (E.D. Pa. Mar. 22, 2005).

16         6.      Attached hereto as Exhibit 5 is a true and accurate copy of Doc. No. 334, Civil

17   Judgment, *Agere Systems Inc., et al. v. Atmel Corp.,* 2:02-cv-00864-LDD (E.D. Pa. Mar. 29,

18   2005).

19         7.      Attached hereto as Exhibit 6 is a true and accurate copy of Doc. No. 365, Order,

20   *Agere Systems Inc., et al. v. Atmel Corp.,* 2:02-cv-00864-LDD, (E.D. Pa. Dec. 13, 2005).

21         8.      Attached hereto as Exhibit 7 is a true and accurate copy of Doc. No. 433, Order,

22   *Agere Systems Inc., et al. v. Atmel Corp.,* 2:02-cv-00864-LDD (E.D. Pa. Mar. 29, 2005).

23         9.      Attached hereto as Exhibit 8 is a true and accurate copy of excerpts from Doc. No.

24   333, Trial Transcript of Proceedings held on 03/22/05, *Agere Systems Inc., et al.* v. *Atmel Corp.,*

25   2:02-cv-00864-LDD (E.D. Pa. Mar. 24, 2005).

26         10.     Attached hereto as Exhibit 9 is a true and accurate copy of *Asustek Computer Inc.*

27   *v. Ricoh Co., Ltd.,* 2007 U.S. Dist. LEXIS 86302 (N.D. Cal. Nov. 21, 2007).

28

Morgan, Lewis &
Bockius LLP
Attorneys At Law

DB2/20754132.1

1

DECLARATION OF BRETT M. SCHUMAN IN SUPPORT OF
NXP'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1    11.    Attached hereto as Exhibit 10 is a true and accurate copy of *Truth Hardware Corp.*

2  *v. Ashland*, 2003 WL 22005839 (D. Del. 2003).

3    12.    Attached hereto as Exhibit 11 is a true and accurate copy of *Purdue Pharma L.P.*

4  *v. Teva Pharmaceuticals USA, Inc.*, 2004 WL 1444883 (S.D.N.Y. 2004).

5    I declare under penalty of perjury under the laws of the United States that the foregoing is

6  true and correct.

7    Executed this 8th day of July, 2008, in San Francisco, CA.

8

9                    /s/ Brett M. Schuman
                     Brett M. Schuman
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

DB2/20754132.1

2

DECLARATION OF BRETT M. SCHUMAN IN SUPPORT OF
NXP'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 1



**ADDUCI MASTRIANI & SCHAUMBERG LLP**

ATTORNEYS AT LAW
1200 SEVENTEENTH STREET, N.W. WASHINGTON, DC 20036
Tel:(202) 467-6300  Fax:(202) 466-2006  Web:www.adduci.com

V JAMES ADDUCI II

LOUIS S MASTRIANI

TOM M SCHAUMBERG

HARVEY B FOX

WILL E LEONARD

MUNFORD PAGE HALL II

MICHAEL L DOANE

SARAH E HAMBLIN

WILLIAM C SJOBERG

THOMAS J O'CONNELL

ANDREA B STEVENS

IAN A TARONJI *

JAMIE D UNDERWOOD

PATRICIA LARIOS *

QIAN SHENG *

DAVID H HOLLANDER JR

GREGORY F GEARY

OF COUNSEL

ROBERT A WESTERLUND

DAVID G POSZ

JAMES E BARLOW °

JAMES TAYLOR JR

GREGORY C ANTHES

JOHN C STEINBERGER

PAUL G HEGLAND

*admitted to a bar other
than DC; practice limited
to federal courts & agencies

AFFILIATE

AMSS TRADE SERVICES LLC

CARLOS MOORE, PRESIDENT

April 18, 2008

CPI: 08-224

The Honorable Marilyn R. Abbott
Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, DC 20436

DOCKET NUMBER
2615
Office of the
Secretary
Int'l Trade Commission
2008 APR 18 PM 4: 07
RECEIVED OFC OF THE SECRETARY US INT'L TRADE COMM

Re:    Certain Semiconductor Integrated Circuits Using
        Tungsten Metalliation And Products Containing
        Same, Inv. No. 337-TA-_____

Dear Secretary Abbott:

        Enclosed for filing on behalf of Complainants LSI Corporation and Agere Systems Inc. (collectively "LSI") are documents in support of LSI's request that the Commission commence an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended. A request for confidential treatment of Confidential Exhibits 3, 51 and Confidential Appendix C is included with this letter.

        Accordingly, Complainant's submit the following documents for filing:

        1.    An original and twelve (12) copies of the verified Non-Confidential Complaint and an original and six (6) copies of the accompanying exhibits, with the Confidential Exhibits segregated from the other material submitted (original and one (1) copy unbound, without tabs). (Commission Rules 201.6(c), 210.4(f)(3)(i) and 210.8(a));

        2.    Eighteen (18) additional copies of both the Non-Confidential Complaint and accompanying Non-Confidential exhibits for service upon each proposed respondent. (Commission Rules 210.4(f)(3)(i), 210.8(a) and 210.11(a));

        3.    Eighteen (18) additional copies of the Confidential Exhibits;

        4.    Certified copy of U.S. Patent No. 5,227,335 ("the '335 patent") in the original Complaint and legible copies of the patent included in all copies of the Complaint as Exhibit 1;

The Honorable Marilyn R. Abbott
April 18, 2008
Page 2

5.    Certified copies of the assignments involving the patent-at-issue as an Exhibit in the original Complaint and legible copies included in all copies of the Complaint as Exhibit 2;

6.    One (1) uncertified copy and three (3) additional copies (on cd-rom) of the prosecution history of the '335 patent (Appendix A)  (Commission Rule 210.12(c)(2)). The certified copy of the prosecution history has been requested from the U.S. Patent and Trademark Office and will be provided upon receipt;

7.    Four (4) copies on (cd-rom) of each reference document identified in the prosecution history of the patent-at-issue (Appendix B).  (Commission Rule 210.12(c)(3));

9.    Four (4) copies of LSI standard license agreements (Confidential Appendix C) (Commission Rule 210.12(c)(1);

10.    One (1) additional copy of the Complaint and the accompanying non-confidential exhibits for service upon each of the Embassies of Japan, Switzerland, The Netherlands, the Taipei Economic and Cultural Representative Office and The Peoples Republic of China in Washington, DC  (19 C.F.R. §§ 210.8(a) and 210.11(a)(1); and

11.    A certification below pursuant to Commission Rules 201.6(b) and 210.5(d) requesting confidential treatment of Exhibits 3, 51 and Confidential Appendix C.

In accordance with Commission Rules 201.6 and 210.5, 19 C.F.R. §§ 201.6 and 210.5, LSI Corporation and Agere Systems Inc. request confidential treatment of the business information contained in Confidential Exhibits 3, 51 and Confidential Appendix C.

The information for which confidential treatment is sought is proprietary commercial information not otherwise publicly available.  Specifically, Confidential Exhibit 3 contains proprietary commercial information regarding LSI's list of licensees to the patent-at-issue. Confidential Exhibit 51 contains proprietary commercial information regarding LSI's investments in the domestic industry.  Confidential Appendix C contains copies of confidential license agreements involving the patent-at-issue.

The information described above qualifies as confidential business information pursuant to Rule 201.6(a) because:

a.    it is not available to the public;

b.    unauthorized disclosure of such information could cause substantial harm to the competitive position of LSI; and

The Honorable Marilyn R. Abbott
April 18, 2008
Page 3

    c.      its disclosure could impair the Commission's ability to obtain information necessary to perform its statutory function.

Thank you for your attention to this matter.

Respectfully submitted,

Louis S. Mastriani

LMS:ech
Enclosures
AGERE700008

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, DC

IN THE MATTER OF

CERTAIN SEMICONDUCTOR
INTEGRATED CIRCUITS USING
TUNGSTEN METALLIZATION AND
PRODUCTS CONTAINING SAME

Inv. No. 337-TA-____

## COMPLAINT UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED

### COMPLAINANTS

LSI Corporation
1621 Barber Lane
Milpitas, California 95035
(800) 372-2447

Agere Systems Inc.
1110 American Parkway NE
Allentown, Pennsylvania 18109
(610) 712-1011

### COUNSEL FOR COMPLAINANTS

Louis S. Mastriani
Sarah E. Hamblin
David H. Hollander
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, DC 20036
Telephone:    (202) 467-6300
Facsimile:    (202) 466-2006

David E. Sipiora
TOWNSEND AND TOWNSEND AND CREW LLP
1200 17th Street, Suite 2700
Denver, Colorado 80202
Telephone:    (303) 571-4000
Facsimile:    (303) 571-4321

### PROPOSED RESPONDENTS

United Microelectronics Corporation
No 3 Li-Hsin 2nd Road
Hsinchu Science Park
Hsinchu-Chu City
Taiwan

Integrated Device Technology, Inc.
6024 Silver Creek Valley Road
San Jose, California 95138

AMIC Technology Corporation
No. 2 Li-Hsin 6th Road,
Science-Based Industrial Park,
Hsinchu
Taiwan

Cypress Semiconductor Corporation
198 Champion Court
San Jose, California 95134

Elpida Memory, Inc.
Sumitomo Seimei Yaesu Building
3rd Floor 2-1 Yaesu 2-chome Chuo-ku,
Tokyo 104-0028
Japan

Iris Sockel Mitrakos
TOWNSEND AND TOWNSEND AND CREW LLP
12730 High Bluff Drive, Suite 400
San Diego, California 92130
Telephone:    (858) 350-6100
Facsimile:    (858) 350-6111

Jonathan D. Link
TOWNSEND AND TOWNSEND AND CREW LLP
1301 K Street, N.W.
Ninth Floor, East Tower
Washington, DC 20005
Telephone:    (202) 481-9900
Facsimile:    (202) 481-3972

Tali L. Alban
TOWNSEND AND TOWNSEND AND CREW LLP
2 Embarcadero Center, 8th Floor
San Francisco, California 94111
Telephone:    (415) 576-0200
Facsimile:    (415) 576-0300

Freescale Semiconductor, Inc.
6501 William Cannon Drive West
Austin, Texas 78735

Grace Semiconductor Manufacturing
Corporation
1399 Zu Chong Zhi Road
Zhangjiang Hi-Tech Park
Shanghai 201203
People's Republic of China

Microchip Technology, Inc.
2355 West Chandler Boulevard
Chandler, Arizona 85224

Micronas Semiconductor Holding, AG
Technopark Technoparkstrasse 1
Zurich, 8005
Switzerland

National Semiconductor Corporation
2900 Semiconductor Drive
Santa Clara, California 95052

Nanya Technology Corporation
HWA Ya Technology Park
669 Fu Hsing 3rd Road
Kueishan, Taoyuan County
Taiwan

NXP B.V.
High Tech Campus 60
Eindhoven, 5656
Netherlands

ON Semiconductor Corporation
5005 East McDowell Road
Phoenix, Arizona 85008

Powerchip Semiconductor Corporation
No 12 Li-Hsin Road
1 Hsinchu Science-Based Industrial Park
Hsinchu
Taiwan

ProMOS Technologies, Inc.
19 Li-Hsin Road Hsinchu Science-Based
Industrial Park
Hsinchu
Taiwan

Spansion, Inc.
915 DeGuigne Drive, P.O. Box 3453
Sunnyvale, California 94088-3453

STMicroelectronics NV
39 Chemin du Champ des Filles Plan-Les-
    Quates C P 21
Geneva, 1228
Switzerland

Vanguard International Semiconductor
    Corporation
Headquarter, Fab 1
123 Park Avenue-3rd
Hsinchu Science Park
Hsinchu
Taiwan 30077

## Index of Nonconfidential Exhibits

| Exhibit Number | Item |
| --- | --- |
| 1 | Certified copy of US Patent 5,227,335 |
| 2 | US Patent 5,227,335 assignments to Agere |
| 4 | Claim chart for Physical Exhibit 1 |
| 5 | Claim chart for Physical Exhibit 2 |
| 6 | Claim chart for Physical Exhibit 3 |
| 7 | Claim chart for Physical Exhibit 4 |
| 8 | Claim chart for Physical Exhibit 5 |
| 9 | Claim chart for Physical Exhibit 6 |
| 10 | Claim chart for Physical Exhibit 7 |
| 11 | Claim chart for Physical Exhibit 8 |
| 12 | Claim chart for Physical Exhibit 9 |
| 13 | Claim chart for Physical Exhibit 10 |
| 14 | Claim chart for Physical Exhibit 11 |
| 15 | Claim chart for Physical Exhibit 12 |
| 16 | Claim chart for Physical Exhibit 13 |
| 17 | Claim chart for Physical Exhibit 14 |
| 18 | Claim chart for Physical Exhibit 15 |
| 19 | Claim chart for Physical Exhibit 16 |
| 20 | Claim chart for Physical Exhibit 17 |
| 21 | Claim chart for Physical Exhibit 18 |
| 22 | Claim chart for Physical Exhibit 19 |
| 23 | Claim chart for Physical Exhibit 20 |
| 24 | Claim chart for Physical Exhibit 21 |
| 25 | Claim chart for Physical Exhibit 22 |

i

| Exhibit Number | Item |
|---|---|
| 26 | Claim chart for Physical Exhibit 23 |
| 27 | Claim chart for Physical Exhibit 24 |
| 28 | Claim chart for Physical Exhibit 25 |
| 29 | Claim chart for Physical Exhibit 26 |
| 30 | Declaration of Dr Paul S. Ho |
| 31 | Declaration of Catherine M. Marshott |
| 32 | Declaration of William H. Stinebaugh |
| 33 | Press releases and Photographs of accused UMC products |
| 34 | Photographs of accused IDT products |
| 35 | AMIC webpage, IC Insight reports for third parties and Photographs of accused AMIC product |
| 36 | Photographs of accused Cypress product |
| 37 | Photographs of accused Elpida products |
| 38 | Photographs of accused Freescale products |
| 39 | Press Release and photographs of accused Grace product |
| 40 | Photographs of accused Microchip product |
| 41 | IC Insight Report and Photographs of accused Micronas product |
| 42 | Photographs of accused Nanya products |
| 43 | Photographs of accused National product |
| 44 | Photographs of accused NXP product |
| 45 | Photographs of accused ON Semi products |
| 46 | IC Insight Report and Photographs of accused Powerchip product |
| 47 | Photographs of accused ProMOS product |
| 48 | Photographs of accused Spansion products |

| Exhibit Number | Item |
|---|---|
| 49 | Photographs of accused STMicro products |
| 50 | IC Insight report and photographs of accused Vanguard product |

## Index of Confidential Exhibits

| Exhibit Number | Item |
|---|---|
| 3 | List of Licensees |
| 51 | Details of licensing expenditures |

## Index of Appendices

| A | Prosecution History of U.S. Patent 5,227,335 |
|---|---|
| B | Patent and Technical References |
| C | Confidential Representative License Agreements |

## Index of Physical Exhibits

| Exhibit Number | Item |
|---|---|
| 1 | UMC  Accused Device |
| 2 | UMC Accused Device |
| 3 | IDT  Accused Device |
| 4 | IDT Accused Device |
| 5 | AMIC Accused Device |
| 6 | Cypress Accused Device |
| 7 | Cypress Accused Device |
| 8 | Elpida Accused Device |
| 9 | Elpida Accused Device |
| 10 | Freescale Accused Device |
| 11 | Freescale Accused Device |

iii

| Exhibit Number | Item |
|---|---|
| 12 | Grace Accused Device |
| 13 | Microchip Accused Device |
| 14 | Micronas Accused Device |
| 15 | Nanya Accused Device |
| 16 | Nanya  Accused Device |
| 17 | National Accused Device |
| 18 | NXP Accused Device |
| 19 | ON Semi Accused Device |
| 20 | ON Semi Accused Device |
| 21 | Powerchip Accused Device |
| 22 | ProMOS  Accused Device |
| 23 | Spansion  Accused Device |
| 24 | Spansion Accused Device |
| 25 | STMicro Accused Device |
| 26 | Vanguard Accused Device |

## **Table of Contents**

I.      INTRODUCTION ................................................................................................ 1

II.     THE PARTIES ................................................................................................... 2

      A.      Complainants ......................................................................................... 2

      B.      Proposed Respondents ........................................................................... 3

III.    THE TECHNOLOGY AND PRODUCTS AT ISSUE .................................... 7

IV.     THE PATENT AT ISSUE ................................................................................ 9

      A.      United States Patent No. 5,227,335 ...................................................... 9

      B.      Foreign Counterpart Patents ................................................................ 10

      C.      Licenses Under the Patents .................................................................. 10

      D.      Non-Technical Description of the '335 Patent ..................................... 11

V.      UNLAWFUL AND UNFAIR ACTS OF THE  RESPONDENTS –
        PATENT INFRINGEMENT ........................................................................... 11

VI.     SPECIFIC INSTANCES OF IMPORTATION AND SALE ........................... 20

VII.    THE DOMESTIC INDUSTRY ...................................................................... 32

VIII.   RELATED LITIGATION ............................................................................... 34

IX.     RELIEF ............................................................................................................ 36

## I.    **INTRODUCTION**

1.    This Complaint is filed by LSI Corporation ("LSI") and its wholly owned subsidiary Agere Systems Inc. ("Agere") (collectively "Complainants" or "LSI"), pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based upon the unlawful importation into the United States, the sale for importation and the sale within the United States after importation of certain semiconductor integrated circuits devices using tungsten metallization and products containing same.  Proposed respondents are United Microelectronics Corp.; Integrated Device Technology, Inc.; AMIC Technology Corp.; Cypress Semiconductor Corp.; Elpida Memory, Inc.; Freescale Semiconductor, Inc.; Grace Semiconductor Manufacturing Corp.; Microchip Technology, Inc.; Micronas Semiconductor Holding, AG; Nanya Technology Corp.; National Semiconductor Corp.; NXP BV; ON Semiconductor Corp.; Powerchip Semiconductor; ProMOS Technologies, Inc.; Spansion, Inc.; STMicroelectronics NV; and Vanguard International Semiconductor Corp.   These semiconductor integrated circuit devices are made by a method that infringes the claims of U.S. Patent No. 5,227,335 (the "'335 patent").

2.    Complainants seek, as relief, a permanent exclusion order barring from entry into the United States semiconductor integrated circuit devices using tungsten metallization made by a method that infringes the asserted method claims and products containing same.  Complainants also seek, as relief, cease and desist orders prohibiting the importation, sale, offer for sale, advertising, or the soliciting of the sale of semiconductor devices encompassed by the claims of the '335 patent and products containing same.

## II.    THE PARTIES

### A.    Complainants

3.    LSI is a Delaware corporation having its principal place of business at 1621 Barber Lane, Milpitas, California. LSI was formed in April 2007 as a result of a merger between LSI Logic Corporation and Agere. Historically, LSI has been a leading innovator in the semiconductor industry with a record of designing a number of industry "firsts" including the world's first digital signal processor. Today, LSI is a leading provider of innovative silicon, systems and software technologies that are responsible for products that seamlessly bring people, information and digital content together. LSI manufactures and sells a broad portfolio of products including custom and standard product integrated circuits ("ICs"), adapters, and systems and software for the storage and networking markets. LSI is a global leader in semiconductors and software solutions for storage and networking markets.

4.    Agere is a Delaware corporation having its principal place of business at 110 American Parkway NE, Allentown, Pennsylvania. Agere is a successor-in-interest of Lucent Technologies, Inc., which itself was a successor-in-interest of American Telephone and Telegraph Company ("AT&T"). In connection with its formation in 2001, Agere was assigned a significant portion of AT&T's patent portfolio for semiconductive devices and the rights to collect royalties under those patents. This patent portfolio was created as a result of the research efforts of AT&T Bell Laboratories -- one of the largest and most respected research facilities in the world. Agere's patent portfolio consists of thousands of patents (containing tens of thousands of individual inventions) and is unparalleled within the industry in terms of its depth and breadth of coverage for semiconductive devices. Dozens of manufacturers of semiconductor products throughout the world have taken licenses under this portfolio. Although Agere sold more than

2

one billion dollars worth of products last year, the Bell Labs semiconductor patent portfolio (and the licensing revenue it generates) represents one of Agere's most important corporate assets.

**B.    Proposed Respondents**

United Microelectronics Corp.

5.    On information and belief, United Microelectronics Corp. ("UMC") is a corporation organized under the laws of Taiwan with its principal place of business at No. 3 Li-Hsin 2nd Road, Hsinchu Science Park, Hsinchu, Taiwan.  On information and belief, UMC is a manufacturer and importer of semiconductor devices that are sold under the brand names of other companies.

Integrated Device Technology, Inc.

6.    On information and belief, Integrated Device Technology, Inc. ("IDT") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 6024 Silver Creek Valley Road, San Jose, California.  On information and belief, IDT is a manufacturer and importer of semiconductor devices.

AMIC Technology Corp.

7.    On information and belief, AMIC Technology Corp. ("AMIC") is a corporation organized under the laws of Taiwan with its principal place of business at No. 2 Li-Hsin Road 6, Science Based Industrial Park, Hsinchu, Taiwan.  On information and belief, AMIC is a manufacturer and importer of semiconductor devices.

Cypress Semiconductor Corp.

8.    On information and belief, Cypress Semiconductor Corp. ("Cypress") is a corporation organized under the laws of the State of Delaware with its principal place of business at 198 Champion Court, San Jose, California.  On information and belief, Cypress is a manufacturer and importer of semiconductor devices.

3

Elpida Memory, Inc.

9.      On information and belief, Elpida Memory, Inc. ("Elpida") is a corporation organized under the laws of Japan with its principal place of business at Sumitomo Seimei Yaesu Building, 3rd Floor, 2-1 Yaesu 2-chome Chuo-ku, Tokyo, Japan.  On information and belief, Elpida is a manufacturer and importer of semiconductor devices.

Freescale Semiconductor, Inc.

10.     On information and belief, Freescale Semiconductor, Inc. ("Freescale") is a corporation organized under the laws of the State of Delaware with its principal place of business at 6501 William Cannon Drive West, Austin, Texas.  On information and belief, Freescale is a manufacturer and importer of semiconductor devices.

Grace Semiconductor Manufacturing Corp.

11.     On information and belief, Grace Semiconductor Manufacturing Corp. ("Grace") is a corporation organized under the laws of China with its principal place of business at 1399 Zu Chong Zhi Road, Zhangjiang Hi-Tech Park, Shanghai, China.  On information and belief, Grace is a manufacturer and importer of semiconductor devices that are sold under the brand names of other companies.

Microchip Technology, Inc.

12.     On information and belief, Microchip Technology, Inc. ("Microchip") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 2355 West Chandler Boulevard, Chandler, Arizona.  On information and belief, Microchip is a manufacturer and importer of semiconductor devices.

4

Micronas Semiconductor Holding AG

13.    On information and belief, Micronas Semiconductor Holding AG ("Micronas") is a corporation organized under the laws of Switzerland with its principal place of business located at Technopark Technopartstrasse 1, Zurich, Switzerland.  On information and belief, Micronas is a manufacturer and importer of semiconductor devices.

Nanya Technology Corp.

14.    On information and belief, Nanya Technology Corp. ("Nanya") is a corporation organized under the laws of Taiwan with its principal place of business located at HWA YA Technology Park, 669 Fu Hsing 3rd Road, Kueishan Taoyuan, Taiwan.  On information and belief, Nanya is a manufacturer and importer of semiconductor devices.

National Semiconductor

15.    On information and belief, National Semiconductor ("National") is a corporation organized under the laws of the State of Delaware with a principal place of business located at 2900 Semiconductor Dr., Santa Clara, California.  On information and belief, National is a manufacturer and importer of semiconductor devices.

NXP B.V.

16.    On information and belief, NXP B.V. ("NXP") is a corporation organized under the laws of the Netherlands with its principal place of business located at High Tech Campus 60, Eindhoven, Netherlands.  On information and belief, NXP is a manufacturer and importer of semiconductor devices.

ON Semiconductor Corp.

17.    On information and belief, ON Semiconductor Corp. ("ON Semi") is a corporation organized under the laws of the State of Delaware with its principal place of business

located at 5005 East McDowell Road, Phoenix, Arizona. On information and belief, ON Semi is a manufacturer and importer of semiconductor devices.

Powerchip Semiconductor

18.    On information and belief, Powerchip Semiconductor ("Powerchip") is a corporation organized under the laws of Taiwan with its principal place of business at No. 12 Li-Hsin Road, 1 Science-Based Industrial Park, Hsinchu, Taiwan. On information and belief, Powerchip is a manufacturer and importer of semiconductor devices.

ProMOS Technologies, Inc.

19.    On information and belief, ProMOS Technologies, Inc. ("ProMOS") is a corporation organized under the laws of Taiwan with its principal place of business located at 19 Li-Hsin Road Hsinchu Science Park, Hsinchu, Taiwan. On information and belief, ProMOS is a manufacturer and importer of semiconductor devices.

Spansion, Inc.

20.    On information and belief, Spansion, Inc. ("Spansion") is a corporation organized under the laws of the State of Delaware with its principal place of business at 915 Deguigne Drive, Sunnyvale, California. On information and belief, Spansion is a manufacturer and importer of semiconductor devices.

STMicroelectronics NV

21.    On information and belief, STMicroelectronics NV ("STMicro") is a corporation organized under the laws of the Netherlands with its principal place of business located at 39 Chemin du Champ des Filles Plan-Les-Ouates C P 21, Geneva, Switzerland. On information and belief, STMicro is a manufacturer and importer of semiconductor devices.

<u>Vanguard International Semiconductor Corp.</u>

22.    On information and belief, Vanguard International Semiconductor Corp. ("Vanguard") is a corporation organized under the laws of Taiwan with its principal place of business at 129 Park Avenue-3rd, Hsinchu Science Park, Hsinchu, Taiwan. On information and belief, Vanguard is a manufacturer and importer of semiconductor devices that are sold under the brand names of other companies.

## III.    THE TECHNOLOGY AND PRODUCTS AT ISSUE

23.    The products at issue are semiconductor devices manufactured with tungsten (symbolized by the letter "W" on the periodic table) metal that is adhered to an underlying dielectric layer by a conducting glue layer comprised of at least one member selected from a group consisting of conducting nitrides. The tungsten may be used for interconnects between metal lines or levels that connect integrated circuits that form semiconductor devices. The interconnects are the lines and windows (also called vias) used to connect devices within semiconductor chips. Vias may sometimes be visualized as cylinders that are filled with a metal so that integrated circuit devices located at different locations on a semiconductive substrate can be electrically connected. As the components of the integrated circuits continue to decrease in size, so do the dimensions of the interconnects. While historically aluminum metal generally has performed adequately to fill contact windows/vias and facilitate electrical connectivity between metal levels, it has become more difficult to fill windows/vias with sputtered aluminum at sub-micron (a micron is .000001 meters) or less geometries.

24.    Early tungsten metallization technology was developed and used to address these scaling challenges. Depositing tungsten using a process called chemical vapor deposition (CVD) provided advantages of low-stress, conformal step-coverage, good electromigration resistance,

and good thermal stability. Because CVD-tungsten films generally have a higher resistivity than aluminum (i.e., are not as conductive as aluminum), they often are confined to usage in contact windows/vias or as an interconnect between levels with a short wiring distance (e.g., local interconnect).

25.    Early applications of tungsten CVD deposition often featured either selective or blanket CVD-W films. Selective tungsten might be deposited only on exposed silicon dielectric surfaces, such as in contact windows. Problems with defects in the vias, such as encroachment and tunnels ("wormholes") eventually led to the more accepted method of blanket tungsten films with etch back. Early etch back involved blanket etch back to remove the tungsten films everywhere but within the contacts, sometimes with aid of a sacrificial layer. Another common etch back technique is use of chemical mechanical planarization (CMP). While the process of CVD deposition and etch back is conceptually simple, tungsten does not adhere well to the silicon dielectric and practical problems can arise, such as the tungsten film peeling off the dielectric.

26.    A glue layer, in the form of a layer of material deposited prior to the tungsten and which has good adhesion both to the underlying dielectric layer and to the tungsten, can be used to solve these problems. Many glue layers, however, are relatively thick, which is undesirable because during the etch back step undercutting of the tungsten layer occurs if, as is often the case, the glue layer etches more rapidly than does the tungsten. The undercutting may make subsequent processing very difficult. For example, voids may be left in the oxide and in subsequent metallizations after metal deposition.

27.    To solve this problem, a film comprising a conducting nitride such as titanium nitride ("TiN") is deposited as a glue layer. Tungsten then can be blanket deposited with good

8

adhesion over a dielectric covering a portion of a silicon surface. The TiN provides good adhesion down to thicknesses as small as approximately 3 nm. Thus, adhesion with a thin glue layer can be achieved.

28.    Since at least the early 1990s, the manufacturing of IC devices with smaller geometries has moved toward using tungsten. It is now the standard practice of the semiconductor industry to deposit tungsten using a chemical vapor deposition process. In addition, it is the standard practice of the semiconductor industry to deposit a glue layer containing titanium nitride that serves to cause the deposited tungsten to adhere to the underlying dielectric. IC devices using the foregoing method of tungsten metallization are found in a wide array of products, including cell phones, electronic control units (ECU) for automotives, memory devices, such as DRAM and SDRAM, electronic keyboards, computers, digital cameras, wireless LAN access devices, image sensors, radios, video game consoles, and liquid crystal displays.

## IV.    THE PATENT AT ISSUE

### A.    United States Patent No. 5,227,335

29.    The patent at issue is U.S. Patent No. 5,227,335, entitled "Tungsten Metallization." A certified copy of the '335 patent is attached to the Complaint as Exhibit 1.

30.    The '335 patent issued on July 13, 1993, based on an application (Application Serial No. 517,973) filed on April 30, 1990, which is a continuation of Serial No. 338,473 filed on April 14, 1989, now abandoned, which is a continuation of Serial No. 929,043 filed on November 10, 1986, now abandoned. The '335 patent will expire on July 13, 2010.

31.    Lowell H. Holschwandner and Virendra V.S. Rana are the named inventors of the '335 patent. Complainant Agere is, and at all times relevant to this action was, owner by

9

assignment of all right, title and interest to the '335 patent. Certified copies of the assignments are attached to the Complaint as Exhibit 2.

32.     Together with this Complaint, Complainants have filed an uncertified copy and three (3) additional copies of the prosecution history of the '335 patent as Appendix A. A certified copy of the prosecution history of the '335 patent has been ordered and will be filed when received. Complainants have filed four (4) copies of each patent and technical reference identified in the '335 patent as Appendix B.

**B.     Foreign Counterpart Patents**

33.     The foreign counterpart patents are as follows:

| U.S. Patent No. | Country | Filed Date | Issue Date | Foreign Patent No. |
|---|---|---|---|---|
| 5,227,335 | Germany | 11/4/1987 | 3/28/1992 | EP0267730 |
| | France | 11/4/1987 | 3/28/1992 | EP0267730 |
| | Italy | 11/4/1987 | 3/28/1992 | EP0267730 |
| | Great Britain | 11/4/1987 | 3/28/1992 | EP0267730 |
| | Japan | 11/10/1987 | 4/17/1998 | JP2770945 |

34.     There are no other foreign patents or foreign patent applications pending, filed, abandoned, withdrawn or rejected relating to the '335 patent.

**C.     Licenses Under the Patents**

35.     Complainant LSI, through its wholly owned subsidiary Agere and Agere's predecessors-in-interest, has extensively licensed the '335 patent. A list of the licensees is attached as Confidential Exhibit 3.

36.     Pursuant to 19 C.F.R. § 210.12(c)(1), three copies of each representative license agreement are filed herewith as Confidential Appendix C.

**D.**    **Non-Technical Description of the '335 Patent**

37.    The '335 patent is directed to a process of fabricating semiconductor integrated circuit devices. The process includes patterning a dielectric layer to form holes which expose the underlying material, which is comprised of an electrically conducting material. The process further includes depositing a glue layer that covers the dielectric and exposed underlying material. The process further includes depositing a tungsten layer by chemical vapor deposition, which covers the glue layer on the dielectric and exposed material. The glue layer is comprised of at least one member selected from a group of conducting nitrides.

**V.    UNLAWFUL AND UNFAIR ACTS OF THE RESPONDENTS – PATENT INFRINGEMENT**

UMC

38.    On information and belief, UMC unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include a MIPS 64 CPU (UMC part no. SR71010A) and a Virtex-E Extended Memory FPGA ("Field Programmable Gate Array") (UMC part no. XCV405E) that use tungsten metallization, as is demonstrated, in part, by having $0.50\mu m$ or smaller line-widths. Samples of these infringing products are submitted with this Complaint as Physical Exhibits 1 and 2, respectively. Claim charts that apply Claim 1 of the '335 patent to these infringing products are attached hereto as Exhibit 4 and Exhibit 5, respectively. Further discovery may reveal that additional claims of the '335 patent are infringed by these accused products and that other UMC products infringe the claims of the '335 patent.

IDT

39.    On information and belief, IDT unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least

11

independent Claim 1 of the '335 patent. Such infringing products include a synchronous SRAM (static random access memory) (IDT part no. 71V546S100PF) and a 32 bit microprocessor system-on-chip (IDT part no. 79RC32T355) that use tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths. Samples of these infringing products are submitted with this Complaint as Physical Exhibits 3 and 4, respectively. Claim charts that apply Claim 1 of the '335 patent to these infringing devices, are attached hereto as Exhibit 6 and Exhibit 7, respectively. Further discovery may reveal that additional claims of the '335 patent are infringed by these accused products and that other IDT products infringe the claims of the '335 patent.

AMIC

40.     On information and belief, AMIC unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include an AMIC 2 Mbit Low Power SRAM (LP62S2048X-70LLT) that uses tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths. A sample of this infringing product is submitted with this Complaint as Physical Exhibit 5. A claim chart that applies Claim 1 of the '335 patent to the infringing product is attached hereto as Exhibit 8. Further discovery may reveal that additional claims of the '335 patent are infringed by this accused products and that other AMIC products infringe the claims of the '335 patent.

Cypress

41.     On information and belief, Cypress unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include a flash

programmable clock generator (Cypress part no. CY22381FC) and a programmable system on chip (Cypress part no. CY8C21434) that use tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths. Samples of these infringing devices are submitted with this Complaint as Physical Exhibits 6 and 7, respectively. Claim charts that apply Claim 1 of the '335 patent to these infringing products are attached hereto as Exhibit 9 and Exhibit 10, respectively. Further discovery may reveal that additional claims of the '335 patent are infringed by these accused products and that other Cypress products infringe the claims of the '335 patent.

Elpida

42.    On information and belief, Elpida unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include 512 Mbit DDR2 SDRAMs (Elpida part nos. EDE5116AJBG-6E-E and EDD5108AFTA) that use tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths. Samples of these infringing devices are submitted with this Complaint as Physical Exhibits 8 and 9, respectively. Claim charts that apply Claim 1 of the '335 patent to these infringing products are attached hereto as Exhibit 11 and Exhibit 12, respectively. Further discovery may reveal that additional claims of the '335 patent are infringed by these accused products and that other UMC products infringe the claims of the '335 patent.

Freescale

43.    On information and belief, Freescale unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include a 32 bit Communication Processor (Freescale part no. MPC857DSLCVR66B) and a 32 bit 4k SRAM

13

(Freescale part no. MCF5407AI162) that use tungsten metallization, as is demonstrated, in part, by having 0.50µm or smaller line-widths. Samples of these infringing products are submitted with this Complaint as Physical Exhibits 10 and 11, respectively. Claim charts that apply Claim 1 of the '335 patent to these infringing products are attached hereto as Exhibit 13 and Exhibit 14, respectively. Further discovery may reveal that additional claims of the '335 patent are infringed by these accused products and that other Freescale products infringe the claims of the '335 patent.

Grace

44.     On information and belief, Grace unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include a 16 Mbit (x8/x16) Concurrent SuperFlash Memory (part no. SST36VF1601E) that uses tungsten metallization, as is demonstrated, in part, by having 0.50µm or smaller line-widths. A sample of this infringing product is submitted with this Complaint as Physical Exhibit 12. A claim chart that applies Claim 1 of the '335 patent to this infringing product is attached hereto as Exhibit 15. Further discovery may reveal that additional claims of the '335 patent are infringed by this infringing product and other Grace products infringe the claims of the '335 patent.

Microchip

45.     On information and belief, Microchip unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include an enhanced FLASH microcontroller with 10 bit A/D (Microchip part no. PIC18F452-E/PT) that uses tungsten metallization, as is demonstrated, in part, by having 0.50µm or smaller line-widths. A

sample of this infringing product is submitted with this Complaint as Physical Exhibit 13. A claim chart that applies Claim 1 of the '335 patent to this infringing product is attached hereto as Exhibit 16. Further discovery may reveal that additional claims of the '335 patent are infringed by this accused product and that other Microchip products infringe the claims of the '335 patent.

Micronas

46.     On information and belief, Micronas unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include a MPEG 1/2 Layer 2/3 Audio Decoder (Micronas part no. MAS3507DG10) that uses tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths. A sample of this infringing product is submitted with this Complaint as Physical Exhibit 14. A claim chart that applies Claim 1 of the '335 patent to this infringing product is attached hereto as Exhibit 17. Further discovery may reveal that additional claims of the '335 patent are infringed by this accused product and that other Micronas products infringe the claims of the '335 patent.

Nanya

47.     On information and belief, Nanya unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include a 256 Mb DDR SDRAM (Nanya part no. NT5DS16M16CT-6K) and a 512 Mb DDR2 SDRAM (Nanya part no. NT5TU64M8AE-37B) that use tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths. Samples of these infringing products are submitted with this Complaint as Physical Exhibits 15 and 16. Claim charts that apply Claim 1 of the '335 patent to these infringing products are attached hereto as Exhibits 18 and Exhibit 19, respectively. Further

discovery may reveal that additional claims of the '335 patent are infringed by these accused products and that other Nanya products infringe the claims of the '335 patent.

National

48.    On information and belief, National unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent. Such infringing products include a 12 bit, 66 MSPS, 350 MH Bandwidth A/D Converter with Internal Sample-and-Hold (National part no. ADC12L066CIVY) that uses tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths. A sample of this infringing product is submitted with this Complaint as Physical Exhibit 17. A claim chart that applies Claim 1 of the '335 patent to this infringing product is attached hereto as Exhibit 20. Further discovery may reveal that additional claims of the '335 patent are infringed by this accused product and that other National products infringe the claims of the '335 patent.

NXP

49.    On information and belief, NXP unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuit devices that infringe at least independent Claim 1 of the '335 patent. Such infringing products include a UHF Power LDMOS Transistor (NXP part no. BLF4G22LS) that uses tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths. A sample of this infringing product is submitted with this Complaint as Physical Exhibit 18. A claim chart that applies Claim 1 of the '335 patent to this infringing product is attached hereto as Exhibit 21. Further discovery may reveal that additional claims of the '335 patent are infringed by this accused product and that other NXP products infringe the claims of the '335 patent.

16

ON Semi

50.     On information and belief, ON Semi unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent.   Such infringing products include a 3.3V LVTTL/LVCMOS to Differential LVPECL Translator MC100EPT (ON Semi part no. MC100EPT 23 DTG) and a 2.5V/3.3V 12 Gb/s Differential Clock/Data SmartGate with CML Output and Internal Termination (ON Semi part no. NB7L86MMNG) that use tungsten metallization, as is demonstrated, in part, by having 0.50µm or smaller line-widths.  Samples of these infringing products are submitted with this Complaint as Physical Exhibits 19 and 20. Claim charts that apply Claim 1 of the '335 patent to these infringing products, are attached hereto as Exhibit 22 and Exhibit 23, respectively.  Further discovery may reveal that additional claims of the '335 patent are infringed by these accused products and that other ON Semi products infringe the claims of the '335 patent.

Powerchip

51.     On information and belief, Powerchip unlawfully sells for importation, imports, or sells after importation into the United States memory devices semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent.  Such infringing products include a memory device (Powerchip part no. P2V64540BTP-7A) that uses tungsten metallization, as is demonstrated, in part, by having 0.50µm or smaller line-widths.  A sample of this infringing product is submitted with this Complaint as Physical Exhibit 21.  A claim chart that applies Claim 1 of the '335 patent to this infringing product is attached hereto as Exhibit 24. Further discovery may reveal that additional claims of the '335 patent are infringed by this accused product and that other Powerchip products infringe the claims of the '335 patent.

17

ProMOS

52.    On information and belief, ProMOS unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent.  Such infringing products include a 256 MB DRAM (ProMOS part no. V58C2256164SAT6) that uses tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths.  A sample of this infringing product is submitted with this Complaint as Physical Exhibit 22.  A claim chart that applies Claim 1 of the '335 patent to this infringing product is attached hereto as Exhibit 25.  Further discovery may reveal that additional claims of the '335 patent are infringed by this accused product and that other ProMOS products infringe the claims of the '335 patent.

Spansion

53.    On information and belief, Spansion unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent.  Such infringing products include 64 Mb CMOS 3.0 Volt-only Simultaneous Read/Write Flash Memory (Spansion part no. S29JL064H70TA100) and a 1 G Mirro Bit NOR Flash (Spansion part no. S29GL01GP12TFI02) that use tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths.  Samples of these infringing products are submitted with this Complaint as Physical Exhibits 23 and 24, respectively.  Claim charts that apply Claim 1 of the '335 patent to these infringing products are attached hereto as Exhibit 26 and Exhibit 27, respectively.  Further discovery may reveal that additional claims of the '335 patent are infringed by these accused products and that other Spansion products infringe the claims of the '335 patent.

STMicro

54.    On information and belief, STMicro unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent.  Such infringing products include a TDMI 16/32-Bit MCY with Flash, USD, CAN 5 Times, ADC 10 Communications Interface (STMicro part no. STR710FZ2T6 MCU ARM 7) that uses tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths.  A sample of this infringing product is submitted with this Complaint as Physical Exhibit 25.  A claim chart that applies Claim 1 of the '335 patent to the infringing product is attached hereto as Exhibit 28.  Further discovery may reveal that additional claims of the '335 patent are infringed by this accused product and that other STMicro products infringe the claims of the '335 patent.

Vanguard

55.    On information and belief, Vanguard unlawfully sells for importation, imports, or sells after importation into the United States semiconductor integrated circuits that infringe at least independent Claim 1 of the '335 patent.   Such infringing products include a CMPS Dynamic RAM (Vanguard part no. VG2617400DJ-6) that uses tungsten metallization, as is demonstrated, in part, by having 0.50μm or smaller line-widths.  A sample of this infringing product is submitted with this Complaint as Physical Exhibit 26.  A claim chart that applies Claim 1 of the '335 patent to this infringing device is attached hereto as Exhibit 29.  Further discovery may reveal that additional claims of the '335 patent are infringed by this accused product and that other Vanguard products infringe the claims of the '335 patent.

56.    The claim charts attached at Exhibits 4 through 29 are supported by the accompanying Declarations of Dr. Paul S. Ho attached hereto as Exhibit 30, Catherine M. Marshott attached hereto as Exhibit 31, and William H. Stinebaugh attached hereto as Exhibit 32.

## VI.    SPECIFIC INSTANCES OF IMPORTATION AND SALE

UMC

57.    On information and belief, UMC manufactures infringing semiconductor integrated circuits.  On information and belief, UMC imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits.    The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

58.    As described in the Declaration of Catherine M. Marshott, Exhibit 31 ("Marshott Decl."), on March 19, 2008, Complainants purchased in the United States, representative samples of infringing UMC semiconductor integrated circuits, a MIPS 64 CPU and Virtex-E Extended Memory FPGA, which UMC manufactures for Sandcraft and Xilinx, examples of which are attached as Physical Exhibits 1 and 2, respectively.  Attached as Exhibit 33 are press releases demonstrating UMC's foundry relationship with Sandcraft and Xilinx, and photographs of Physical Exhibits 1 and 2 showing that they are marked "Korea" and "Taiwan," respectively, as the countries of origin. On information and belief, Physical Exhibits 1 and 2 were imported into the United States and then sold after importation. (*See* Marshott Decl, ¶¶ 2-5.)

IDT

59.    On information and belief, IDT manufactures infringing semiconductor integrated circuits.  On information and belief, IDT imports into the United States, sells for importation into

the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

60.    As described in the Marshott Decl., on March 11, 2008, Complainants purchased in the United States, representative samples of infringing IDT semiconductor integrated circuits, a synchronous SRAM and 32 bit microprocessor system-on-chip examples of which are attached as Physical Exhibits 3 and 4, respectively. Attached as Exhibit 34 are photographs of Physical Exhibits 3 and 4 showing that they are marked "Korea" and "Malaysia" respectively, as the countries of origin. On information and belief, Physical Exhibits 3 and 4 were imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 6-7.)

AMIC

61.    On information and belief, AMIC manufactures infringing semiconductor integrated circuits. On information and belief, AMIC imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

62.    As described in the Marshott Decl., on March 27, 2008, Complainants purchased in the United States representative samples of infringing AMIC semiconductor integrated circuits, a 2 Mbit Low Power SRAM, an example of which is attached as Physical Exhibit 5. Physical Exhibit 5 was manufactured abroad, as AMIC only uses third party fabrication facilities outside the United States. Attached as Exhibit 35 are photographs of Physical Exhibit 5, AMIC web

21

page listing the third parties used by AMIC, and the IC Insight's report for each of those third parties. On information and belief, Physical Exhibit 5 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 10-11.)

Cypress

63.    On information and belief, Cypress manufactures infringing semiconductor integrated circuits. On information and belief, Cypress imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits.    The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

64.    As described in the Marshott Decl., on March 11, 2008, Complainants purchased in the United States representative samples of infringing Cypress semiconductor integrated circuits, a flash programmable clock generator, and programmable system on chip, examples of which are attached as Physical Exhibits 6 and 7. Attached as Exhibit 36 are photographs of Physical Exhibits 6 and 7 showing that they are marked "Philippines" and "Korea," respectively, as the countries of origin. On information and belief, Physical Exhibits 6 and 7 were imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 12 -15.)

Elpida

65.    On information and belief, Elpida manufactures infringing semiconductor integrated circuits. On information and belief, Elpida imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits.    The specific instance of importation of infringing

22

semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

66.     As described in the Marshott Decl., on December 12 and 14, 2007, Complainants purchased in the United States representative samples of infringing Elpida semiconductor integrated circuits, 512 Mbit DDR2 SDRAMs, examples of which are attached as Physical Exhibits 8 and 9. Attached as Exhibit 37 are photographs of Physical Exhibits 8 and 9 showing that they are marked "Taiwan" as country of origin. On information and belief, Physical Exhibits 8 and 9 were imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 16-19.)

Freescale

67.     On information and belief, Freescale manufactures infringing semiconductor integrated circuits. On information and belief, Freescale imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits.     The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

68.     As described in the Marshott Decl., on January 21, 2008, Complainants purchased in the United States representative samples of infringing Freescale semiconductor integrated circuits, a 32 bit Communication Processor and 32 bit 4k SRAM, examples of which are attached as Physical Exhibits 10 and 11, respectively. Attached as Exhibit 38 are photographs of Physical Exhibits 10 and 11, showing that they are marked "Malaysia" and "Korea," respectively. On information and belief, Physical Exhibits 10 and 11 were imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 20 - 23.)

Grace

69.     On information and belief, Grace manufactures infringing semiconductor integrated circuits.  On information and belief, Grace imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits.   The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

70.     As described in the Marshott Decl., on March 31, 2008, Complainants purchased in the United States representative samples of infringing Grace semiconductor integrated circuits, a 16 Mbit (x8/x16) Concurrent SuperFlash Memory, which it manufactured for SST, an example of which is attached as Physical Exhibit 12.   Attached as Exhibit 39 is a press release demonstrating Grace's foundry relationship with SST and photographs of Physical Exhibit 12 that shows it is marked "Taiwan" as country of origin.   On information and belief, Physical Exhibit  12 was imported into the United States and then sold after importation.  (*See* Marshott Decl. at ¶¶ 24-25.)

Microchip

71.     On information and belief, Microchip manufactures infringing semiconductor integrated circuits.  On information and belief, Microchip imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits.   The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

72.     As described in the Marshott Decl., on March 19, 2008, Complainants purchased in the United States representative samples of infringing Microchip semiconductor integrated circuits, an enhanced FLASH microcontroller with 10 bit A/D, an example of which is attached as Physical Exhibit 13. Attached as Exhibit 40 are photographs of Physical Exhibit 13 showing that it is marked "Thailand" as the country of origin. On information and belief, Physical Exhibit 13 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 26-27.)

Micronas

73.     On information and belief, Micronas manufactures infringing semiconductor integrated circuits. On information and belief, Micronas imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

74.     As described in the Marshott Decl., on March 17, 2008, Complainants purchased in the United States representative samples of infringing Micronas semiconductor integrated circuits, a MPEG 1/2 Layer 2/3 Audio Decoder (Micronas part no. MAS3507DG10), an example of which is attached as Physical Exhibit 14. Physical Exhibit 14 does not have country of origin markings, however, on information and belief, Physical Exhibit 14 was manufactured in Germany because Micronas only has fabrication facilities in Germany. Attached as Exhibit 41 are photographs of Physical Exhibit 14 and an IC Insight's report for Micronas. On information and belief, Physical Exhibit 14 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 28-29.)

Nanya

75. On information and belief, Nanya manufactures infringing semiconductor integrated circuits. On information and belief, Micronas imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

76. As described in the Marshott Decl., on March 19 and March 27, 2008, Complainants purchased in the United States representative samples of infringing Nanya semiconductor integrated circuits, a 256 Mb DDR SDRAM, and 512 Mb DDR2 SDRAM, examples of which are attached as Physical Exhibits 15 and 16, respectively. Attached as Exhibit 42 are photographs of Physical Exhibits 15 and 16 showing that they are marked "Singapore" and "Taiwan," respectively, as the countries of origin. On information and belief, Physical Exhibits 15 and 16 were imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 30-33.)

National

77. On information and belief, National manufactures infringing semiconductor integrated circuits. On information and belief, National imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

78.     As described in the Marshott Decl., on March 31, 2008, Complainants purchased in the United States representative samples of infringing National semiconductor integrated circuits, a 2 bit, 66 MSPS, 350 MH Bandwidth A/D Converter with Internal Sample-and-Hold, an example of which is attached as Physical Exhibit 17. Attached as Exhibit 43 are photographs of Physical Exhibit 17 showing that it is marked "Hong Kong" as the country of origin. On information and belief, Physical Exhibit 17 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 34-35.)

NXP

79.     On information and belief, NXP manufactures infringing semiconductor integrated circuits. On information and belief, NXP imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

80.     As described in the Marshott Decl., on March 31, 2008, Complainants purchased in the United States representative samples of infringing NXP semiconductor integrated circuits, a HF Power LDMOS Transistor, an example of which is attached as Physical Exhibit 18. Attached as Exhibit 44 are photographs of Physical Exhibit 18 showing that it is marked "Philippines" as country of origin. On information and belief, Physical Exhibit 18 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 36-37.)

ON Semi

81.     On information and belief, ON Semi manufactures infringing semiconductor integrated circuits. On information and belief, ON Semi imports into the United States, sells for

importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

82. As described in the Marshott Decl., on March 12 and March 19, 2008, Complainants purchased in the United States representative samples of infringing ON Semi semiconductor integrated circuits, 3.3V LVTTL/LVCMOS to Differential LVPECL Translator MC100EPT and 2.5V/3.3V 12 Gb/s Differential Clock/Data SmartGate with CML Output and Internal Termination, examples of which are attached as Physical Exhibits 19 and 20, respectively. Attached as Exhibit 45 are photographs of Physical Exhibits 19 and 20, showing that they are, based on the ON Semi product schedule, marked "Philippines" and "Thailand," respectively, as the countries of origin. On information and belief, Physical Exhibits 19 and 20 were imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 38-41.)

Powerchip

83. On information and belief, Powerchip manufactures infringing semiconductor integrated circuits. On information and belief, Powerchip imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

84. As described in the Marshott Decl., on March 19, 2008, Complainants purchased in the United States representative samples of an infringing Powerchip memory device

28

(Powerchip part no. P2V64540BTP-7A), an example of which is attached as Physical Exhibit 21. Physical Exhibit 21 does not have country of origin markings, however, on information and belief, Physical Exhibit 21 was manufactured in Taiwan because Powerchip only has fabrication facilities in Taiwan. Attached as Exhibit 46 are photographs of Physical Exhibit 21 and an IC Insight report for Powerchip. On information and belief, Physical Exhibit 21 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 42-43.)

ProMOS

85.    On information and belief, ProMOS manufactures infringing semiconductor integrated circuits. On information and belief, ProMOS imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

86.    As described in the Marshott Decl., on March 13, 2008, Complainants purchased in the United States representative samples of infringing ProMos semiconductor integrated circuits, a 256 MB DRAM, an example of which is attached as Physical Exhibit 22. Attached as Exhibit 47 are photographs of Physical Exhibit 22 showing that it is marked "Taiwan" as country of origin. On information and belief, Physical Exhibit 22 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 44-45.)

Spansion

87.    On information and belief, Spansion manufactures infringing semiconductor integrated circuits. On information and belief, Spansion imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing

semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

88. As described in the Marshott Decl., on January 21, 2008, Complainants purchased in the United States representative samples of infringing Spansion semiconductor integrated circuits, a 4 Mb CMOS 3.0 Volt-only Simultaneous Read/Write Flash Memory and 1 G Mirro Bit NOR Flash, examples of which are attached as Physical Exhibits 23 and 24, respectively. Attached as Exhibit 48 are photographs of Physical Exhibits 23 and 24 showing that they are marked "Thailand" and "Malaysia" as the country of origin. On information and belief, Physical Exhibits 23 and 24 were imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 46-49.)

STMicro

89. On information and belief, STMicro manufactures infringing semiconductor integrated circuits. On information and belief, STMicro imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

90. As described in the Marshott Decl., on March 21, 2008, Complainants purchased in the United States representative samples of infringing STMicro semiconductor integrated circuits, a TDMI 16/32-Bit MCY with Flash, USD, CAN 5 Times, ADC 10 Communications Interface, an example of which is attached as Physical Exhibit 25. Attached as Exhibit 49 are photographs of Physical Exhibit 25 showing that it is marked "Malta," as the country of origin.

On information and belief, Physical Exhibit 25 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 50-51.)

Vanguard

91.    On information and belief, Vanguard manufactures infringing semiconductor integrated circuits. On information and belief, Vanguard imports into the United States, sells for importation into the United States, and/or sells after importation into the United States infringing semiconductor integrated circuits. The specific instance of importation of infringing semiconductor integrated circuits set forth below is a representative example of the unlawful importation and/or sale after importation of infringing products.

92.    As described in the Marshott Decl., on March 19, 2008, Complainants purchased in the United States representative samples of infringing Vanguard semiconductor integrated circuits, a CMPS Dynamic RAM (Vanguard part no. VG2617400DJ-6), an example of which is attached as Physical Exhibit 26. Physical Exhibit 26 does not have country of origin markings, however, on information and belief, Physical Exhibit 26 was manufactured in Taiwan because Vanguard only has fabrication facilities in Taiwan. Attached as Exhibit 50 are photographs of the Physical Exhibit 26 and an IC Insight report for Vanguard. On information and belief, Physical Exhibit 26 was imported into the United States and then sold after importation. (*See* Marshott Decl. at ¶¶ 52-53.)

93.    The accused products for all Proposed Respondents are believed to fall within at least the following classifications of the Harmonized Tariff Schedules of the United States: 8542 (electronic integrated circuits and micro assemblies), *et seq.*, for instance 8542.13 (electronic integrated circuits and microassemblies: metal oxide semiconductors), 8542.21.80

31

(microprocessors, controllers, application-specific integrated circuits (ASICs), and programmable logic arrays) and 8542.21.70 (electronic microassemblies).

## VII.    THE DOMESTIC INDUSTRY

94.    A domestic industry as defined by 19 U.S.C.§ 1337(a)(3) exists with respect to Complainants' activities in the United States that exploit the '335 Patent through their substantial investment in licensing, including reverse engineering activities in support of Complainants' licensing program. These investments date back many years and continue today.

95.    Inasmuch as a domestic industry is established based on Complainants' licensing operations, Complainants are not required to establish that LSI's semiconductor products practice the '335 Patent.

96.    There is a long and storied history to the intellectual property organizations within the predecessor LSI companies. These companies include AT&T, Lucent, and Agere. Due to consent decrees with U.S. antitrust authorities signed in the 1950's, the technological leaders in semiconductor innovation and production, including AT&T, were not permitted to enforce patent rights against rival companies throughout the 1960's and 1970's. Instead, AT&T put in place liberal licensing policies that are widely credited with the rapid growth and pace of innovation in the early phase of the semiconductor industry's development. Since the 1970's, the predecessor LSI companies have been actively licensing intellectual property developed by their respective research and development organizations. The most notable of these research organizations is the world-renowned Bell Laboratories. Bell Laboratories is credited with inventions such as lasers, optical communications, cellular telephone technology, communications satellites, and of course, the transistor. The history of innovation in semiconductor technology within LSI's predecessor

companies has led to one of the largest and most respected patent portfolios in the world, and includes the Holschwandner '335 Patent.

97.    To protect and exploit its patent portfolio, including the '335 Patent, LSI and its predecessor companies have created and maintained a formal intellectual property organization. These organizations have had a similar licensing philosophy, largely similar licensing model and similar organizational structure.  LSI and its predecessors have created highly efficient and effective licensing organizations that implement and utilize all critical licensing functions in-house.  Patent creation, patent portfolio management and mining, technical analysis and reverse engineering, patent assertion, licensing, litigation support, business planning, accounting, and operations, are done and have all been performed in-house.  The '335 Patent has been widely licensed by LSI and its predecessors.  A list of current licensees under the '335 Patent is set forth in Confidential Exhibit 3.

98.    Complainants' intellectual property licensing department presently employs approximately fifty (50) people.   These personnel represent the following organizational functions: operations, patent assertion, patent mining and management, legal support, licensing, technical analysis and reverse engineering, business planning and administration.  All of these personnel contribute to licensing the entire LSI portfolio, including the Holschwandner '335 Patent.  This department is headquartered in Allentown, PA, but has individuals located in Milpitas, California, Berkeley Heights, NJ, Colorado Spring, Colorado and Longmont, Colorado. In addition to these administrative offices, the organization maintains a sophisticated laboratory housing extensive and expensive analytical equipment located in Allentown, Pennsylvania that is dedicated to technical analysis and reverse engineering of third party devices.

99.    All relevant licenses to the '335 Patent granted to date cover LSI's semiconductor patent portfolio. The '335 Patent is a key semiconductor process patent in the LSI semiconductor portfolio. The '335 Patent has been specifically asserted during license negotiations, the results of which have been that licensees elect to take a license under LSI's semiconductor patent portfolio.

100.    Complainants have made substantial investments in the United States in the exploitation of the '335 Patent through licensing, including related technical analysis and patent-related reverse engineering. A number of Complainants' employees in the United States are dedicated to the analysis of third party products, identification of potential licensees, the negotiation of licenses and the subsequent monitoring of such licenses. Confidential Exhibit 51 sets forth further details regarding these expenditures.

101.    Complainants have also made substantial investments in the United States in the exploitation of the '335 Patent through patent infringement litigations wherein that patent has been asserted. Many of those litigations have resulted in license agreements that include the '335 Patent as part of the licensed LSI semiconductor portfolio. Confidential Exhibit 51 sets forth further details regarding these expenditures.

## VIII.    RELATED LITIGATION

102.    On May 23, 2001, an affiliate of Agere, Agere Systems Guardian Corp., brought an action against Proxim Corporation and alleged infringement of the '335 Patent in the United States District Court for the District of Delaware. *Agere Systems v. Proxim, Inc.*, Civil Action No. 01-339-RRM (D. Del.). The action resulted in a settlement and license of the '335 Patent by Agere to Proxim.

34

103.   On February 20, 2002, Agere brought an action against Atmel Corporation for infringement of, among other patents, the '335 Patent in the United States District Court for Eastern District of Pennsylvania. *Agere Systems Inc. v. Atmel Corporation*, Civil Action No. 2:02-cv-864 (E.D. Pa.). The action resulted in settlement and license of the '335 Patent by Agere to Atmel.

104.   On July 22, 2003, Agere brought an action against Intersil Corporation and Globespan Virata Inc. and alleged infringement of the '335 Patent in the United States District Court for the District of Delaware. *Agere Systems Inc. et al. v. Intersil Corporation, et al.*, Civil Action No. 03-737-JJF (D. Del.). The action resulted in a settlement and license of the '335 Patent by Agere to the Defendants.

105.   On May 2, 2006, Agere commenced suit against Samsung Electronics Company, Ltd. ("Samsung") for breach of a patent cross license agreement. *Agere Systems Inc., v. Samsung Electronics Company, Ltd*, Civil Action No. 2:06-cv-00185 (E.D. Tex.). In the action, Agere has identified the '335 Patent as one of the patents that Samsung has infringed and as to which continuing liability exists. The action is now stayed pending appeal of an order denying Samsung's motion to compel arbitration.

106.   In October 2007, Agere engaged in private arbitration with Rohm Co. Ltd. ("Rohm") concerning the terms of a patent cross-license agreement between Agere and Rohm. Among others, the '335 Patent was litigated. With respect to a single Rohm chip, the Arbitrator found in favor of Rohm.

107.   On February 1, 2008, NXP B.V. brought an action against LSI Corporation for a declaration of non-infringement/invalidity of, among others, the '335 Patent in the United States

35

District Court for Northern District of California. *NXP Semiconductors USA, Inc. v LSI Corporation*, Civil Action No. 5:08-cv-775 (N.D. Cal.). The action is pending.

108.    On April 18, 2008, or imminently thereafter, Complainants will be filing an action against all Respondents identified herein, alleging infringement of the '335 Patent in the United States District Court for Eastern District of Texas.

109.    The '335 Patent has not been the subject of any other court or agency litigation.

## IX.    **RELIEF**

WHEREFORE, Complainants respectfully request that the United States International Trade Commission:

(a)    institute an immediate investigation pursuant to Section 337(b)(1) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, into the violations by proposed Respondents of Section 337 arising from the importation into the United States, and/or sale for importation and/or sale within the United States after importation, of proposed Respondents' semiconductor IC devices and products containing same made by a method that infringes one or more claims of U.S. Patent No. 5,227,335.

(b)    schedule and conduct a hearing, pursuant to Section 337(c), for purposes of receiving evidence and hearing argument concerning whether there has been a violation of Section 337 and, following the hearing, determine that there has been a violation of Section 337.

(c)    issue a permanent exclusion order, pursuant to Section 337(d), excluding from entry into the United States all semiconductor IC devices and products containing same, made by a method that infringes one or more claims of the '335 Patent.

(d)     issue a permanent order, pursuant to Section 337(f), directing proposed Respondents to cease and desist from importing, selling, offering for sale, using, demonstrating, promoting, marketing, and/or advertising in the United States, or otherwise transferring outside the United States for sale in the United States proposed Respondents' semiconductor IC devices and products containing same made by a method that infringes one or more claims of the '335 Patent.

(e)     grant all such other and further relief as it deems appropriate under the law, based upon the facts complained of herein and as determined by the investigation.

Dated: April 18, 2008            Respectfully submitted,

Louis S. Mastriani
Sarah E. Hamblin
David H. Hollander
ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.
1200 Seventeenth Street, N.W., Fifth Floor
Washington, DC 20036
Telephone:    (202) 467-6300
Facsimile:    (202) 466-2006

David E. Sipiora
TOWNSEND AND TOWNSEND AND CREW LLP
1200 17th Street, Suite 2700
Denver, Colorado 80202
Telephone:    (303) 571-4000
Facsimile:    (303) 571-4321

Iris Sockel Mitrakos
TOWNSEND AND TOWNSEND AND CREW LLP
12730 High Bluff Drive, Suite 400
San Diego, California 92130
Telephone:    (858) 350-6100
Facsimile:    (858) 350-6111

Jonathan D. Link
TOWNSEND AND TOWNSEND AND CREW LLP
Ninth Floor, East Tower
1301 K Street, N.W.
Washington, DC 20005
Telephone:   (202) 481-9900
Facsimile:   (202) 481-3972

Tali L. Alban
TOWNSEND AND TOWNSEND AND CREW LLP
2 Embarcadero Center, 8th Floor
San Francisco, California 94111
Telephone:   (415) 576-0200
Facsimile:   (415) 576-0300

*Counsel for LSI Corporation and Agere Systems Inc.*

AGERE700008-final

38

**VERIFICATION LSI CORPORATION AND AGERE SYSTEMS INC.**

I, ~~Warren Waskiewivk~~ , declare under penalty of perjury that the following statements are true:

1.    I am ~~Director of Licensing~~ for ~~LSI Corporation~~ and am duly authorized to sign this complaint on behalf of Complainants.

2.    I have read Complainants' COMPLAINT UNDER SECTION 337 OF THE TARIFF ACT OF 1930, AS AMENDED, and am aware of its contents.

3.    To the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions in the complaint have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

4.    The claims and other legal contentions in the complaint are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

5.    The complaint is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of the investigation.

Executed this ~~14th~~ day of April 2008.

Name ~~Warren K. Waskiewicz~~
Title ~~Director of Licensing, LSI~~

# EXHIBIT 2



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA



```
--------------------------------------------X
                                            :
AGERE SYSTEMS INC. and AGERE               :
SYSTEMS GUARDIAN CORPORATION,              :        Civil Action No. ___02cv864___
                                            :
            Plaintiffs,                     :
                                            :
      v.                                    :        JURY TRIAL DEMANDED
                                            :
ATMEL CORPORATION,                          :                    FILED
                                            :                FEB 2 0 2002
            Defendant.                      :          MICHAEL E. KUNZ, Clerk
--------------------------------------------X       By_____ Dep. Clerk
```

### COMPLAINT

Plaintiffs Agere Systems Inc. and Agere Systems Guardian Corporation

(collectively "Agere"), for their Complaint against defendant Atmel Corporation ("Atmel"),

hereby allege as follows:

### The Parties

1.     Agere Systems Inc. is a corporation organized under the laws of the State

of Delaware, with its principal place of business at 555 Union Blvd., Allentown, Pennsylvania

18109.

2.     Agere Systems Guardian Corporation is a corporation organized under the

laws of the State of Delaware, with its principal place of business at 9333 South John Young

Parkway, Orlando, Florida 32819-8698. Agere Systems Guardian Corporation is a wholly-owned subsidiary of Agere Systems Inc.

3.     Agere, formerly the Microelectronics Division of Lucent Technologies Inc., is a world leader in the sales of semiconductor devices. Agere designs, develops, and manufactures semiconductor components, subsystems, and systems for use in a broad range of computer and communications equipment. The components, subsystems, and systems manufactured by Agere are the culmination of many years of research and development efforts by teams of highly skilled engineers and scientists as well as the substantial investment of resources by Agere.

4.     Upon information and belief, Atmel is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2325 Orchard Parkway, San Jose, California 95131.

5.     Upon information and belief, Atmel makes, uses, sells and offers for sale in the United States, and imports into the United States, semiconductor devices including integrated circuits such as logic, memory, communications circuits, and computer and electronic components.

<u>Nature of the Action</u>

6.     This is a civil action for the infringement of five United States Patents. This action is based upon the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

<u>Jurisdiction and Venue</u>

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.    This Court has personal jurisdiction over Atmel because, inter alia, Atmel conducts business in the Commonwealth of Pennsylvania, and because Atmel has infringed, contributed to the infringement of, and/or actively induced others to infringe Agere's patented inventions in this District as alleged in this Complaint. Moreover, Atmel continues to infringe, contribute to the infringement of, and/or actively induce others to infringe Agere's patented inventions in this District.

9.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400 (b) because Atmel has committed acts of infringement in this District and because Atmel is a corporation subject to personal jurisdiction in this District.

## The Patents

10.    United States Patent No. 5,102,827 ("the '827 patent"), entitled "Contact Metallization of Semiconductor Integrated-Circuit Devices," was duly and legally issued on April 7, 1992. A copy of the '827 patent is attached hereto as Exhibit A.

11.    United States Patent No. 5,149,672 ("the '672 patent"), entitled "Process for Fabricating Integrated Circuits Having Shallow Junctions," was duly and legally issued on September 22, 1992. A copy of the '672 patent is attached hereto as Exhibit B.

12.    United States Patent No. RE 34,269 ("the '269 patent"), entitled "Semiconductor Integrated Circuit Packages," was duly and legally issued on June 1, 1993. A copy of the '269 patent is attached hereto as Exhibit C.

13.    U.S. Patent No. 5,227,335 ("the '335 patent"), entitled "Tungsten Metallization," was duly and legally issued on July 13, 1993. A copy of the '335 patent is attached hereto as Exhibit D.

14.    United States Patent No. 6,323,126 ("the '126 patent"), entitled "Tungsten Formation Process," was duly and legally issued on November 27, 2001. A copy of the '126 patent is attached hereto as Exhibit E.

15.    The '827, '672, '269, '335, and '126 patents are collectively referred to as the "Patents-in-Suit."

16.    Agere owns the Patents-in-Suit, including the right to sue for past infringement.

### Acts Giving Rise to This Action

17.    Upon information and belief, Atmel infringed the Patents-in-Suit, and is continuing to infringe the Patents-in-Suit, under 35 U.S.C. § 271 by making, using, importing, offering for sale, and/or selling semiconductor devices incorporating and/or manufactured using technologies covered by the claims of the Patents-in-Suit.

18.    Agere has been irreparably harmed by Atmel's infringing activities and will continue to be irreparably harmed by those activities unless and until Atmel is enjoined by this Court. Agere does not have an adequate remedy at law.

19.    Upon information and belief, Atmel has had notice of the Patents-in-Suit. Atmel's infringement has been, and continues to be, willful. Atmel's conduct renders this case exceptional for purposes of 35 U.S.C. § 285.

## Prayer for Relief

**WHEREFORE**, Agere prays for judgment as follows:

      A.     That Atmel has willfully infringed the Patents-in-Suit;

      B.     That Atmel, its officers, agents, servants and employees, and those persons in active concert or participation with any of them, and their successors and assigns be permanently enjoined from infringement, inducement of infringement, and contributory infringement of each of the Patents-in-Suit, including but not limited to making, importing, using, offering for sale, or selling any devices or systems that infringe, or using processes that infringe, the Patents-in-Suit prior to the expiration dates of those patents;

      C.     That Agere be awarded damages adequate to compensate it for Atmel's infringement of the Patents-in-Suit, and that such damages be trebled and awarded to Agere with prejudgment interest;

      D.     That Agere be awarded the attorney fees, costs, and expenses that it incurs prosecuting this action; and

      E.     That Agere be awarded such other and further relief as this Court deems just and proper.

## JURY DEMAND

Agere demands a trial by jury on all issues triable of right by a jury.


Dated:  February 20, 2002                    Respectfully submitted,

                                             Paul J. Kennedy (Atty. I.D. No. 59291)
                                             PEPPER HAMILTON LLP
                                             3000 Two Logan Square
                                             Eighteenth and Arch Streets
                                             Philadelphia, Pennsylvania 19103-2799
                                             (215) 981-4194

                                             ATTORNEYS FOR PLAINTIFFS
                                             AGERE SYSTEMS INC. AND AGERE
                                             SYSTEMS GUARDIAN CORPORATION

*Of Counsel:*
John M. Desmarais
Gregory S. Arovas
Thomas D. Pease
Michael E. Stimson
Alan S. Kellman
KIRKLAND & ELLIS
Citigroup Center
153 East 53rd Street
New York, New York 10022
(212) 446-4800

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

⊞Agere Systems, Inc. v. Atmel Corp.
E.D.Pa.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
AGERE SYSTEMS, INC., Plaintiff,
v.
ATMEL CORPORATION, Defendant.
No. Civ.A. 02-CV-864.

Aug. 17, 2005.

*MEMORANDUM*

DAVIS, J.
*1 Presently before the Court are the Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial filed by Plaintiff Agere Systems, Inc. on April 5, 2005 (Doc. No. 335) and the Motion for Judgment as a Matter of Law filed by Defendant Atmel Corporation on April 5, 2005 (Doc. No. 336). For the reasons that follow, both parties' motions are GRANTED in part and DENIED in part. Specifically, Agere's motion for a new trial on the invalidity of the '827 patent is GRANTED and Atmel's motions for JMOL on the invalidity of the '126 patent as nonendable and the invalidity of the '335 patent as obvious are GRANTED. The Court DENIES the remainder of the parties' motions.

This case involves four patents procured from the United States Patent and Trademark Office ("USPTO") by Plaintiff Agere Systems, Inc. ("Agere"): U.S. Patent Nos. 5,227,335("the '335 patent" or "the Holschwander '335 patent"); 6,323,126 ("the '126 patent" or "the Chittipeddi patent"); 5,102,827 ("the '827 patent" or "the Chen patent"); and 34,269 ("the '269 patent"). The '335, '126, and the '827 patents each recite specific steps used in the process of semiconductor fabrication, the process by which a wafer of silicon, also known as a "substrate," is transformed into a semiconductor chip that can be used in a variety of electronic devices. The '269 patent recites a method for packaging semiconductor chips after they have been fabricated. Agere claimed at trial that Defendant Atmel Corporation ("Atmel") was willfully infringing its patents by making, using, importing, selling, and offering to sell semiconductor chips that were

fabricated or packaged using the steps and methods protected by those patents. Atmel claimed that it did not infringe Agere's patents because its fabrication and packaging processes fell outside the scope of Agere's asserted claims. Atmel further argued that the asserted claims were invalid for one or more of the following reasons: obviousness, anticipation by the prior art, indefiniteness, and lack of enablement.

After hearing approximately two and a half weeks of testimony, the jury in this matter deliberated for several days and returned a verdict as to Agere's assertion of the following claims against Atmel and Atmel's corresponding claims of non-infringement and invalidity: claims 1 through 6 and claim 11 of the '335 patent; claim 6 of the '126 patent; claims 1 through 3 of the '827 patent; and claims 6 and 9 of the '269 patent. The jury found that Atmel literally infringed all the asserted claims of the '335 patent; that the infringement was not willful; that claims 1 through 6 and claim 11 of the '335 patent were invalid as anticipated but not as obvious; and that claim 2 of the '335 patent was not invalid as indefinite. With respect to the '126 patent, the jury found that Atmel did not literally infringe claim 6; that claim 6 was invalid due to anticipation; and that claim 6 of the '126 patent was not invalid as indefinite or nonendable. The jury further found that Atmel literally infringed all the asserted claims of the '827 patent, but that the infringement was not willful and that the claims were invalid as obvious. Lastly, the jury found that Atmel did not literally infringe claims 6 and 9 of the '269 patent and that claim 6 of the '269 patent was invalid as anticipated

*2 Agere has moved for a new trial on several grounds, arguing that several of the jury's verdicts were against the weight of the evidence, that the court committed various prejudicial legal errors in admitting or failing to admit evidence, and that certain of the court's jury instructions were improper. Both parties have renewed their motions for judgment as a matter of law ("JMOL") made at the close of evidence at trial. Agere's motions relating to the Court's jury instruction and evidentiary rulings will be considered first. The Court will then, on a patent-by-patent basis, turn to each party's motions for JMOL and Agere's new trial motions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

I. AGERE'S MOTIONS FOR NEW TRIAL BASED ON ERRONEOUS JURY INSTRUCTIONS

Agere has moved for a new trial pursuant to Federal Rule of Civil Procedure 59 based on its contention that the Court's instructions to the jury were erroneous on the issues of invalidity and obviousness. Before the Court begins a discussion of the applicable standard of law and its specific instructions to the jury on those issues, a word on how those instructions were generated is in order. The Court charged the jury in this matter on March 21, 2005. On March 8, 2005, the parties submitted proposed jury instructions to the Court. *See* Doc. No. 293 (Jt. Proposed Jury Instructions dated Mar. 8, 2005). Consistent with the Court's policies and procedures, this submission contained the parties' agreed-upon points for charge, as well as disputed points for charge with support for each party's position on a particular issue. Before the Court instructed the jury, the parties and the Court agreed that the parties had preserved their objections to any instruction that they requested and were not given and that the jury would be given a written copy of the charge to guide their deliberations. 3/21/05 Tr. at 2-3. At the close of the Court's instruction, attorneys for both parties were invited to sidebar to register any further objections; as a result of these conversations, the Court issued several supplemental instructions to the jury, including instructions on obviousness. *Id.* at 65-66.

Where a party claims that a jury instruction was erroneous as a matter of law, the instruction is reviewed to determine "whether the charge, taken as a whole and viewed in light of the evidence, fairly and adequately submit[ted] the issues in the case to the jury ."*Link v. Mercedes-Benz of N. Am., Inc.,* 788 F.2d 918, 922 (3d Cir.1986). A court's review of a jury instruction should be undertaken with an eye towards the instructions in their totality and "not a particular sentence or paragraph in isolation."*In re Braen,* 900 F.2d 621, 626 (3d Cir.1990), *cert. denied,*498 U.S. 1066, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991). In addition to showing that the Court committed legal error in giving a certain instruction, a party must also show that the error had a prejudicial effect. *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1281 (Fed.Cir.2000). Prejudicial legal error exists where "it 'appears to the

court [that the error is] inconsistent with substantial justice." ' *Id.* at 1281 (citing Fed.R.Civ.P. 61).

A. The Court's instructions on invalidity were proper.

*3 Agere claims that the Court's instruction on the issue of invalidity amounted to prejudicial error because it failed to properly define the "clear and convincing" evidence standard and to properly inform the jury that each claim of Agere's patents is presumed valid under the law. The Court finds these contentions to be without merit.

It is well established that a patent is presumed valid under 35 U .S.C. § 282. According to the Federal Circuit, an attack on the validity of a patent is successful if proved by "clear and convincing evidence or its equivalent, by whatever form of words it may be expressed."*Am. Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied,*469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). A party has met the clear and convincing standard where it "places in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable."*Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (internal citation omitted) *cited in*Buildex Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1463 (Fed.Cir.1988). According to the Federal Circuit, the presumption of validity and the heightened burden of proving invalidity "are static and in reality different expressions of the same thing- a single hurdle to be cleared."*Chiron Corp. v. Genentech, Inc.,* 363 F.3d 1247, 1258 (Fed.Cir.2004).

The Court's jury instruction on the issue of the clear and convincing burden of proof with respect to invalidity began as follows, "you have to decide by clear and convincing evidence on a claim-by-claim basis whether any of the claims or certain of the claims of the patents in suit are invalid." 3/21/05 Tr. at 7. The Court went on to elucidate the clear and convincing evidence standard: "this is a *higher burden of proof* [than preponderance of the evidence]. It requires that you must be persuaded that what the party seeks to prove is highly probable. It's highly probable that what they seek to prove is true. And this standard applies to issues of willful infringement and invalidity." 3/21/05 Tr. at 9 (emphasis added). Later in its instruction, the Court reiterated that Atmel was required, in order to make a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

Page 3

showing of invalidity, to show by "clear and convincing evidence that a particular claim is invalid" and that "this defense must be considered on a *claim-by-claim, patent-by-patent basis."Id.* at 37, 39 (emphasis added); *seealso Id.* at 40, 41, 43, 47 (reiterating that clear and convincing standard applied to invalidity).

To begin, the plain text of the Court's instruction belies Agere's argument that the Court prejudicially understated the applicable burden of proof, as its instruction properly communicated to the jury the gravity of Atmel's burden, using language practically identical to the Supreme Court's in *Colorado v. New Mexico.*Given this clear explanation of the applicable burden of proof, Agere's argument that the Court erred in failing to explicitly instruct the jury that each individual patent claim is presumed valid must also fail, as the Federal Circuit has clearly held that a district court does not err failing to so instruct when the instruction on the burden of proof has been adequate.*Chiron Corp.,* 363 F.3d at 1259. Lastly, the Court clearly instructed the jury that Atmel was required to carry its burden on proof on each individual claim of each patent-in-suit, contradicting Agere's claim that the instruction somehow sanctioned the legally flawed argument that certain claims "rise and fall" with others.[FN1]

> FN1. Agere's motion for a new trial based on its claim that the Court erroneously allowed Atmel to make this argument before the jury is discussed at length later in his memorandum.

B. The Court's instructions on obviousness were proper.

*4 Agere also objects to the Court's instructions to the jury regarding the legal standard for obviousness and the necessary underlying factual determination of the existence of a motivation to combine. Agere further argues that the Court's failure provide the jury with Agere's proffered instruction on secondary considerations (or objective evidence) of non-obviousness was also prejudicial error. Again, the Court's review of its instruction reveals no error warranting a new trial on the issue on obviousness.

35 U.S.C. § 103 provides that a patent may not issue "if the differences between the subject matter sought

to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."35 U.S.C. § 103. The question of obviousness under this section is a question of law. *See, e.g.,Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Stevenson v. ITC,* 67 C.C.P.A. 109, 612 F.2d 546, 549 (C.C.P.A.1979). Underlying this legal conclusion are several factual issues that a finder of fact must resolve, namely (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) whatever objective evidence may be present as indicia of nonobviousness. *Graham,* 383 U.S. at 17. Where a party claims that an invention is obvious in view of a combination of pieces of prior art, that party cannot establish obviousness without "some suggestion, motivation, or teaching in the prior art that would have led a person of ordinary skill in the art to select the references and combine them in the way that would produce the claimed invention ."*Karsten Mfg. Corp. v. Cleveland Golf Co.,* 242 F.3d 1376, 1385 (Fed.Cir.2001). This requirement is designed to prevent a finder of fact from engaging in a hindsight-based analysis of the obviousness of a particular invention. *SeeRuiz v. AB Chance Co.,* 234 F.3d 654, 664-65 (Fed.Cir.2000).

Agere's first objection is that the Court failed to read a sentence in the parties' agreed-upon instruction to the jury on the issue of the motivation to combine. That sentence reads as follows: "It is not enough that all of the elements of a patent claim are found in the prior art if there is no suggestion or motivation in the prior art to combine those elements."Agere contends that the Court's omission of this sentence renders its instruction on the issue of obviousness legally deficient and requires a new trial on the issue of obviousness.

While it is true that the Court neglected to read this single sentence, it did instruct the jury as follows:

if you find the prior art shows each of the elements in the claim you have to determine whether it would have been obvious to a person of ordinary skill in the art to combine these elements in the same manner as the claim at issue. Combination of prior art references is improper unless the prior art suggests making the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

combination. It has to be motivation or suggestion or teaching of the desirability of making the specific combination of elements that was made. Obviousness is tested by the combined teachings that would have been suggested by one of ordinary skill in the art. And in determining obviousness you can't pick and choose among the individual elements of the assorted prior art references to create the claimed invention. Thus, Atmel must prove by clear and convincing evidence that there is some teaching or suggesting in the references to support their use in a particular claimed invention.

*5 3/21/05 Tr. at 51-52. After the Court so instructed the jury, Agere requested, at sidebar, an additional instruction on motivation to combine, which prompted the Court to inform the jury of

the difficulty that attaches through all honest attempts to answer the question of obviousness can be attributed to the strong temptation to rely on hindsight ... it is wrong to use Agere's patents as guides through the maze of prior art references, [combining] certain references in a way so as to achieve the result of the claims in suit.

*Id.* at 65.The Court fails to see how its instruction, taken as a whole, did not fairly and adequately submit the issue of motivation to combine to the jury. The missing sentence cited by Agere is merely duplicative of concepts contained in the Court's instruction and its omission was legally insignificant.

Agere's second objection to the Court's instruction on obviousness is the Court's failure to include one of Agere's proposed instruction on secondary considerations of non-obviousness, which read that "Thus, even if you find the prior available art shows each of the elements of the claims at issue, objective evidence of one or more of these factors tends to show non-obviousness of the claims at issue. Not all of the factors have to apply to make a claim valid."Agere argues that the exclusion of these two sentences was prejudicial and legally incorrect because a Japanese patent known at trial as the "Hitachi patent," proffered by Atmel as prior art, teaches all the steps in Agere's '827 patent, though in a different order. Agere therefore requests a new trial on the obviousness of the '827 patent.

The Court's instruction on secondary factors included a recitation of the seven indicia of non-obviousness

as agreed-upon by the parties, using the disjunctive "or" to indicate to the jury that it was not necessary to find all of the indicia to reach a conclusion of non-obviousness. 3/21/05 Tr. at 52. The Court went on to state, as the parties requested, "the evidence might indicate to you that what the inventors did was obvious to try ... obvious to try is not the standard. The standard is whether the invention as a whole would have been obvious to a person of ordinary skill in the field at the time the invention was made."*Id.* at 52-53.While Agere's suggested instruction might have highlighted for the jury the exact factual scenario created by a comparison of Hitachi and the '827 patent, the jury was clearly instructed on how to use evidence of secondary factors in its determination of obviousness. Agere's motion for a new trial on the '827 patent on this ground must fail.

The Court can find no prejudicial error in its jury instructions on obviousness and invalidity. As a general matter, a party is entitled to a jury instruction that accurately and fairly sets forth the current status of the law. See*McPhee v. Reichel,* 461 F.2d 947, 950 (3d Cir.1972) ("It is the responsibility of the trial judge to provide the jury with a clear and accurate statement of the law...."). This does not provide a litigant with the right to a jury instruction "of its choice, or precisely in the manner and words of its own preference."*Douglas v. Owens,* 50 F.3d 1226, 1233 (3d Cir.1995) (citing *Heller Int'l Corp. v. Sharp,* 974 F.2d 850, 860 (7th Cir.1992); *Anderson v. Branen,* 17 F.3d 552, 559-60 (2d Cir.1994)). Agere received instructions that complied with the Court's duty to explain to they jury, in a dispassionate and accurate way, the current state of the law on obviousness and invalidity, though it did not do so using each and every word that Agere proposed to the Court. Neither party received precisely the jury charge that it requested, but that is not proper grounds for a new trial absent prejudicial legal error. For the foregoing reasons, Agere's motion for a new trial based on the Court's jury charge is denied.

## II. AGERE'S MOTIONS FOR NEW TRIAL BASED ON ERRONEOUS EVIDENTIARY RULINGS

*6 Agere asserts that the Court made four separate legal rulings regarding the admissibility of evidence that were so erroneous and prejudicial as to warrant a new trial. Motions for a new trial based on the improper introduction or exclusion of evidence are

Not Reported in F.Supp.2d                                                                                                   Page 5
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

subject to the harmless error standard of Federal Rule of Civil Procedure 61:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61; Becker v. Arco Chem. Co., 207 F.3d 176, 180 (3d Cir.2000). Keeping the Rule's mandate in mind, the Court will examine Agere's contentions in turn.

A. Agere has waived its objection to Dr. Rana's testimony regarding inventive activity at IBM.

At trial, Dr. Virenda Rana, the inventor of the '335 patent, testified to certain inventive activity at IBM, and his assessment of that activity's effect on the validity of the '335 patent. Agere claims that the admission of this testimony was erroneous because Dr. Rana was not disclosed as an expert witness and because he had no personal knowledge of the IBM processes to which he testified. Agere contends that the introduction of this testimony was prejudicial and warrants a new trial on the anticipation of the '335 patent.

Prior to Dr. Rana's appearance in court, Agere moved twice to preclude his testimony. First, Agere made a pre-trial motion in limine to prevent Dr. Rana from testifying based on the theory of assignor estoppel, Doc. No. 202 (Sixth Mot. in Limine dated Feb. 10, 2005); the Court denied this motion in writing on February 24, 2005. Doc. No. 256 (Order dated Feb. 24, 2005). To the extent that Agere seeks to resuscitate its objection to Dr. Rana's testimony on that ground, see Doc. No. 338 at 15 n.8 (Pl.'s Memo. of Law dated Apr. 22, 2005), that motion is denied for the reasons articulated in the Court's Order of February 24, 2005. See Doc. No. 256.

Second, Agere moved to preclude Dr. Rana's testimony on March 8, 2005, after Atmel informed

the Court that he would be testifying live at trial, rather than by videoconference, and that he would testify to his opinion that the '335 patent was invalid in light of the prior inventive work at IBM. See Doc. No. 292 (Mot. to Preclude dated Mar. 8, 2005). The grounds for Agere's trial motion to preclude are identical to those it advances in its current motion. After Agere's second motion was filed, the Court engaged counsel in several on-the-record conversations at trial with respect to Dr. Rana's testimony. Several of these conversations took place at sidebar and were not, for some reason, adequately recorded by the Court's electronic recording system. See, e.g., 3/14/05 Tr. at 191-97. Nevertheless, the trial record bears out that the parties argued the overall admissibility of Dr. Rana's testimony and that the Court ultimately allowed him to take the stand for direct examination by counsel for Atmel. 3/15/05 Tr. at 5-10. The portions of the record that do exist also indicate that, with respect to the permissible scope of Dr. Rana's testimony, conversations between the Court and counsel focused on the fact that it should properly be limited to those areas in which he had personal knowledge-his invention as it was memorialized by the '335 patent and his awareness of the state of the prior art at the time of his invention. Id.; 3/14/05 Tr. at 194-97. At the August 4, 2005 hearing on these motions, counsel for Agere recalled the substance of these conversations to be consistent with this description. 8/4/05 Hrng. Tr. at 7.

*7 At trial, Dr. Rana's initial testimony centered on the content of his invention as encapsulated by the '335 patent and the state of the prior art at the time of the invention. Rana 3/14/05 Tr. at 13-19. Dr. Rana also testified, on direct examination, as to his knowledge of IBM Processes A and B at the time the '335 patent was being developed and filed with the USPTO; he further examined an IBM invention disclosure dated October 22, 1985 (Trial Exhibit 1111) and compared his invention with that described in the IBM document. Id . at 19-26.Then, approximately halfway through Dr. Rana's testimony, the following exchange took place between counsel and the Court, after counsel for Atmel asked Dr. Rana, "In Process A [as described in Trial Exhibit 1111] here can you tell us what you believe, as you understand your invention, is the glue layer?":

Agere Counsel: Object, your honor, I think this is beyond what we discussed in the context of what Dr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: **Not Reported** in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

Rana could testify to.

Court: Any answer?

Atmel Counsel: I think it's what he's testified about, what his invention is and what he understands. He's referred to this as what he thought was-

Court: All right, it's overruled, it's overruled, go ahead sir.

*Id.* at 26-27.This was the only contemporaneous objection made by Agere's counsel during Dr. Rana's testimony that even remotely relates the subject of the instant motion.

The Court finds that Agere failed to preserve its present objections to Dr. Rana's testimony by entering contemporaneous objections at trial. Federal Rule of Evidence 103(a) requires that a timely objection be made in order to preserve an issue for appeal. While the Court recognizes that the Third Circuit has noted that Rule 103(a) must be read in conjunction with Federal Rule of Civil Procedure 46, which states that formal exceptions are unnecessary, this is not a case in which Agere would have merely been required to lodge a formal objection. *Am. Home Assur. Co. v. Sunshine Supermarket*, 753 F.2d 321, 324 (3d Cir.1985). The Court made clear to counsel that Dr. Rana's testimony would be admissible as a whole, but as to issues which ventured into expert testimony territory or to which he had no personal knowledge, "It depends upon the question-the way the question is phrased." 3/14/05 Tr. at 196. Agere writes in its reply brief that "Atmel spend roughly double the amount of time questioning Dr. Rana on matters pertaining to the IBM Processes than questions regarding the '335 patent, and cites nine full pages of trial testimony that it alleges is improper. Doc. No. 350 at 18 n.16 (Pl.'s Reply dated Jun. 6, 2005). Yet, Agere made only one, very general, objection to this testimony at trial. Agere's failure to object as Atmel's counsel further questioned Dr. Rana on a comparison between his invention and the IBM Processes is especially egregious, as Agere well knew what the substance of Dr. Rana's testimony would be on that subject.

*8 Agere cites the Third Circuit's opinion in *American Home* in support of its contention that its Motion in Limine was sufficient to preserve its

objection for appeal. The Court notes that, in *American Home*, the Third Circuit found it decisive that the trial court had issued a "definitive oral ruling with no suggestion that it would reconsider the matter at trial."Under these circumstances, the Third Circuit declined to require counsel to formally object to the introduction of the evidence at trial, as such objection would be unnecessary under Rule 46. *Am.Home*, 753 F.2d at 326. The instant case is not in the same posture as *American Home*.The Court was clear with the parties that Dr. Rana's testimony would be admissible on a question-by-question basis. Agere allowed Atmel's attorney to improperly question Dr. Rana for approximately one quarter of his direct testimony without specific objection. Because the Court's rulings on Dr. Rana's testimony were not sufficiently final to excuse Agere's obligation to properly bring its objection to the Court's attention and to provide the Court an opportunity to resolve those issues, the Court finds that Agere has not preserved the issue for appeal.

**B. Atmel did not improperly argue a legally erroneous "stand or fall" theory to the jury.**

Agere points to three separate places in the record where it claims that Atmel impermissibly advanced the argument to the jury that all the dependent claims of the '335 patent "stand or fall" with independent claim 1. Agere argues that these statements are in clear contravention of the presumption of validity that each claim enjoys under 35 U.S.C. § 282 and that the Court's failure to stop Atmel from making these arguments was so prejudicial as to warrant a new trial. Atmel responds that it merely pointed out that the inventors of the '335 patent told the USPTO that their dependent claims stood or fell with claim 1 and that it never argued to the jury that it should only consider the validity of the independent claim rather than considering the validity of all claims, independent and dependent.

Atmel's contention at trial was that the only "invention" contained in the '335 patent was the use of titanium nitride as a glue layer; this theory was based on a statement made by the inventors of the '335 patent to the USPTO that "Only claim 1 will be argued, and the dependent claims will stand or fall with claim 1." [FN2] 3/3/05 Tr. at 165. Agere objects to Atmel's repetition of the inventors' statement at trial, as well as the testimony it elicited on the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 7
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

consequences of that statement. The statements in dispute are as follows. During opening arguments, counsel for Defendant stated, during his discussion of the '335 patent's prosecution history, that when the inventors of the '335 patent appealed the examiner's decision that the patent should not issue, they "said the dependent claims, which are now 2 through 11, stand or fall with claim 1, stand or fall. What that means-and here we've put up the regulation that governs this-is it means that the stand or fall together unless the inventors made an arguments as to why the individual patent claims are separately patentable." 3/2/05 Tr. at 13. Atmel cross-examined Agere's expert, Dr. Reif, on the meaning of this statement in the context of a patent prosecution as well as probing its own expert, Dr. Thomas, on that same issue. Reif 3/3/05 Tr. at 165-66; Thomas 3/16/05 Tr. at 75-76.

> FN2. Claim 1 teaches a "method of fabricating an integrated circuit chip" in which a glue layer comprised of "at least one member selected from the group consisting of conducting nitrides" is situated between a patterned dielectric and CVD tungsten.

*9 The Court finds that these statements were not inappropriate. Placed in context, these statements do no more than reveal the position that Agere took while prosecuting its patent and what effect that position had on the way the USPTO patent examiners approached their evaluation of that patent. Moreover, as Atmel point out, the statements of the '335 inventors are relevant to the issue of whether the dependent claims of the '335 patent are invalid as obvious, because they bear upon the scope and content of the known art at the time. To the extent that the jury might have been confused by Atmel's discussion of the Patent Office's procedure for evaluating dependent and independent claims, the Court's instruction on the validity of Agere's patents and Atmel's heavy burden in showing the invalidity of each claim of those patents was sufficient to cure any such confusion.

As Atmel's presentation on the '335 inventors "stand or fall" statement was neither improper nor prejudicial to Agere, Agere's challenge to the jury's verdict that claims 1 through 6 and claim 11 of the '335 patent were invalid fails.

C. There was no error in the Court's exclusion of Dr. Kohl's testing results.

Agere has moved for a new trial on the infringement of the '269 patent based on the Court's exclusion of certain testing performed by Dr. Paul Kohl on the issue of whether Atmel's semiconductor packaging packaging contains deformation absorbing members that infringe claims 6 and 9 of the '269 patent. As will be explained in more detail later in this memorandum, the mounting of a semiconductor chip requires that a structure known as a "paddle" be pressed downwards, which often causes attached structures known as "paddle support arms" to be deformed. The invention of the '269 patent is a structure known as a "deformation absorbing member," which acts to minimize the deformation to the paddle support arms.

At trial, Atmel claimed that its packaging process did not infringe the '269 patent because its process uses a "clamping" step to isolate the paddle support arms from any deformation, negating the need for a deformation absorbing member as taught in the '269 patent. Agere sought to introduce the testimony of Dr. Kohl, whose testing lead him to conclude that Atmel's clamping process could not totally isolate the paddle support arms from the strain that causes deformation. Atmel filed a motion *in limine* to exclude Dr. Kohl's testing prior to trial, which the Court denied based on its conclusion that report and the methodologies and reasoning contained therein were reliable and that Defendant would have a full opportunity at trial to cross-examine Dr. Kohl on any weaknesses in his methodologies and conclusions. *See* Doc. Nos. 223 (Mot. in Limine dated Feb. 10, 2005); 260 (Order dated Feb. 24, 2005).

At trial, when Dr. Kohl began to testify about the results of his testing, counsel for Atmel objected to the instruction of that testimony on relevance grounds; namely, that Dr. Kohl's testing was not performed on any Atmel product or any lead frame on an Atmel product. Kohl 3/ 7/05 Tr. at 208. The Court permitted Agere's counsel to attempt to build a foundation for the admissibility of the testing results; after a second objection was lodged, the Court held a conversation at sidebar with the parties, during which Agere's counsel confirmed that Dr. Kohl had performed his tests using Agere lead frames, rather than Atmel's, leading the Court to sustain the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

objection on relevance grounds. *Id.* at 211-12.A similar objection to testimony regarding Dr. Kohl's test results was sustained later in his direct examination. *Id.* at 219-20.

**\*10**Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony in federal court:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. The Rule's three requirements are well known to litigants: (1) the proffered witness must be a qualified expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. *See*Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir.1997); *see also*Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Supreme Court in *Daubert* emphasized the district court's "gatekeeping" function to protect against the admission of expert testimony that is unreliable or unhelpful to the trier of fact.*Daubert, 509 U.S. at 592-95.*

The Court's rejection of Dr. Kohl's testimony at trial was premised on Rule 702's requirement that the evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."As the Supreme Court noted in *Daubert,*"this condition goes primarily to relevance," which was Atmel's ground for objection. *Id.* at 591.The Court found that Dr. Kohl's testing of Atmel's clamping process, which was conducted on lead frames belonging to Plaintiff, was not relevant to the question of whether Defendant's process is capable of totally isolate the paddle support arms *on the lead frames used by Defendant* from the strain that causes deformation. While Agere is understandably distressed that the Court reconsidered its original ruling that testimony regarding Dr. Kohl's testimony was admissible, the Court finds no legal error in its determination at trial that his testimony's lack of relevance rendered it inadmissible.

In its response to Plaintiff's motion, Atmel offers a variety of other rationales for the exclusion of Dr. Kohl's testimony regarding his test results, one of which the Court believes merits mentioning. At trial, Dr. Kohl testified that, before he began the testing at issue, he had already reached the conclusion that Atmel's process infringed the asserted claims; this conclusion was based on a review of documentary evidence. Kohl 3/7/05 Tr. at 207, 210. He stated that he performed the testing only for confirmatory purposes. *Id.* at 210.Counsel was free to examine Dr. Kohl as extensively as they wished on his documentary review, his personal knowledge on the subject of semiconductor packaging, and the conclusions that he drew from the combination thereof. As such, the Court believes that even if its ruling that Dr. Kohl's testimony on his clamping tests was erroneous, it was the kind of error that should be disregarded as harmless under Rule 61.[FN3]Agere's motion for a new trial on the infringement of the asserted claims of the '269 patent is therefore denied.

> FN3. Agere claims that the prejudice resulting from the Court's exclusion of Dr. Kohl's testing results was compounded by the Court's action in allowing Atmel's expert, Dr. Prince, to testify accompanied by a seven-and-a-half minute animation showing what clamping during a paddle downsetting process would look like. Dr. Prince, who was qualified as an expert in packaging and lead frame design, developed this animation after consultation with Atmel's lead frame manufacturer's in the Far East. Prince 3/10/05 Tr. at 161, 163-64. Given Dr. Prince's educational and professional experience in the packaging area and his consultation with Atmel's actual lead frame manufacturer's, the Court finds that the admission of his animation was not improper.

D.    Atmel    did    not    improperly    argue    claim construction to the jury.

**\*11** Agere alleges that this Court committed prejudicial error in allowing Atmel to argue a claim interpretation to the jury regarding the following limitation of claim 6 of the '126 patent: "exposing said layer of material to WF.sub.6, thereby forming a tungsten plug which completely fills said opening,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

and forming a tungsten layer which covers said dielectric." Specifically, Agere argues that Atmel improperly advanced theories of invalidity and non-infringement that depended on constructions of the terms "completely fills" and "thereby" not sanctioned by this Court. Agere also argues that Atmel's expert, Dr. Thomas, improperly offered testimony on the proper construction of those two terms. As a result of these alleged prejudicial errors, Agere requests a new trial on the invalidity and infringement of claim 6 of the '126 patent.

The Court begins by noting that, at the *Markman* hearing on this matter, neither party offered any proposals or evidence regarding the construction of any of the '126 patent claims. Because no terms were disputed, the Court did not construe any of the terms in the '126 patent. *See* Doc. No. 63 (Cl. Construction Order dated May 27, 2003); *see also* *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope ..."). Prior to trial, both parties moved this Court to preclude their opponent from advancing certain constructions of the terms "thereby" and "completely fills" because they claimed that the other party's presentation on the issue would depart from the plain and ordinary meaning of the terms. *See* Doc. No. 205 (Agere Mot. in Limine dated Feb. 10, 2005); Doc. No. 217 (Atmel Mot. in Limine dated Feb. 10, 2005). Agere also requested that the Court preclude Atmel from presenting any evidence on the scope and meaning of those terms. In its motion, Agere wrote that it "respectfully requests that the Court deny any request by Defendant at this late hour for the Court to construe the claims of the '126 patent." *Id.* at 3. The Court denied both parties' motions, stating that it would "provide both Plaintiff and Defendant with the opportunity to, in the Defendant's own words, 'to present its case to the jury based on its belief as to what the plain and ordinary meaning of the patents' language is.' " Doc. No. 270 at 3 (Order dated Feb. 28, 2005). Consistent with this mandate, in its charge to the jury, after a recitation of the claims that were construed by the Court at the request of the parties, the Court explained its obligations with respect to the interpretation of both construed and unconstrued claims:

[T]hose [construed] terms are the meaning of the words in the patent as a matter of law .... those

meanings are binding upon you ... And to the extent that words are not defined as a matter of law then obviously they have the ordinary meaning that you understand the words to mean.

*12 3/21/05 Tr. at 28-29.

Agere charges that, despite the presence of this instruction, the Court impermissibly allowed Atmel to elicit testimony from Dr. Thomas that improperly construed the two terms at issue. The Court has examined the portions of Dr. Thomas' testimony that Agere alleges improperly construe the terms "thereby" and "completely fills." The cited testimony consists of Dr. Thomas describing the steps in the accused Atmel process, then rendering his expert opinion as to whether that process infringes the claims of the '126 patent. Thomas 3/16/05 Tr. at 95-100. The Court can find no testimony by Dr. Thomas that could be considered impermissible claim construction and notes that Agere failed to object even once during the cited testimony.

Agere next argues that the Court should have precluded Atmel from making any invalidity and infringement arguments at trial, because it waived those arguments by failing to dispute the meaning and scope the '126 claim. The only applicable case law cited by Agere in support of this contention is *Monsanto Co. v. Trantham*, 156 F.Supp.2d 855 (W.D.Tenn.), in which the Western District of Tennessee. In that case, the court found that because the Defendant waived any arguments of invalidity through claim construction at a status conference, it was estopped from arguing patent invalidity and non-infringement at trial.*Id.* at 867.That case, however, was based on its specific facts, which are not present in this case, and the Court can find no other federal case law and no binding precedent from the Federal Circuit that supports this result.

Lastly, Agere makes the argument that the Court, after denying its pre-trial Motion in Limine, had an obligation to construe the claims and instruct the jury on their proper meaning and that it committed legal error by failing to do so. This position on the construction of the cited claims of the '126 patent is directly opposed to the one that Agere has maintained for almost two years. Agere itself, in its Motion in Limine, specifically asked the Court *not* to construe the terms at issue, a position that it maintained at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim construction, then again in October 2003 in its opposition to a motion for summary judgment filed by Agere. *See* Doc. No. 115 at 17 (Opp'n to Mot. for S.J. dated 10/13/03, stating that "the time for claim construction has passed"); Doc. No. 205 Tr. at 3 (Mot. in Limine dated 2/10/05, stating that a request for claim construction "would be untimely, procedurally improper, and unfairly prejudicial to Agere"). Agere is therefore estopped from making the argument that the Court erred in doing exactly what Agere asked it to do. *See, e.g.,Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 116 (3d Cir.1992) ("When a litigant takes an unequivocal position at trial, he cannot on appeal assume a contrary position simply because the decision in retrospect was a tactical mistake, or perhaps a candid but regretted concession.").

*13 Moreover, the cases cited by Agere in support of this proposition, *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) and *Sulzer Textil A.G. v. Picanol N.V.,* 358 F.2d 1356 (Fed.Cir.2004), do not stand for the proposition that a court must construe claim terms on the eve of trial when both parties have previously agreed to allow the terms to have their plain and ordinary meaning. Rather, these cases stand for the proposition that a trial court has the obligation to give the jury "guidance that can be understood and given effect by the jury once it resolves the issues of fact which are in dispute,"*Markman,* 517 U.S. at 388, and that "it is the duty of the trial courts in patent cases in which claim construction rulings on disputed claim terms are made prior to trial and followed by the parties during the course of the trial to inform jurors both of the court's claim construction rulings on all disputed claim terms and of the jury's obligation to adopt and apply the court's determined meanings of disputed claim terms to the jury's deliberation of the facts."*Sulzer Textil,* 358 F.2d at 1366. The Court believes that the record and the jury instruction cited above reflect that the Court did exactly that.

In short, the parties did not dispute the scope and meaning of these terms at claim construction. As such, the Court did not construe the claims. The Court then permitted each party at trial, to present expert testimony on the steps in their claimed and accused processes. The Court then submitted the factual question of whether Atmel's accused process, which exposes silicon to tungsten hexafluoride

("WF6" or "WF.sub.6") and other gases, meets the limitation of claim 6 of the '126 patent: "exposing said layer of material to WF.sub.6, thereby forming a tungsten plug which completely fills said opening, and forming a tungsten layer which covers said dielectric."The jury was properly instructed to give the language of claim 6 its plain and ordinary meaning. The Court can find no reversible error in that series of events. As such, Agere's motion for a new trial on this ground is denied.

### III. MOTIONS FOR NEW TRIAL AND JMOL

Agere and Atmel have moved for a judgment as a matter of law ("JMOL") pursuant to Rule 50 of the Federal Rules of Civil Procedure. Agere has renewed its motions for JMOL on the following issues: (1) the anticipation of the asserted claims of the '335 patent; (2) the anticipation of claim 6 of the '269 patent; and (3) the obviousness of claim 6 of the '126 patent. Atmel has renewed its motions for JMOL on the following issues: (1) the non-enablement and the indefiniteness of the '126 patent; (2) the non-infringement of the asserted claims of the '335 patent; and (3) the obviousness of the asserted claims of the '335 patent. Agere has additionally moved for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. Agere has requested a new trial on the following issues: (1) the anticipation of the asserted claims of the '335 patent; (2) the obviousness of the asserted claims of the '335 patent; (3) the anticipation of claim 6 of the '126 patent; (4) the obviousness of claim 6 of the '126 patent; (5) the infringement of claim 6 of the '126 patent; (6) the anticipation of claim 6 of the '269 patent; and (7) the obviousness of the asserted claims of the '827 patent.

*14 The parties' motions for JMOL and Agere's motions for new trial will be addressed patent-by-patent. With respect to Agere's motions for JMOL, Atmel argues that certain of these motions are procedurally barred, as Agere failed preserve them prior to the jury's verdict. This argument will be addressed as the Court considers the motions related to each patent-in-suit.

#### A. Standards of Law

*1. Motion for Judgment as a Matter of Law*

A court may properly grant a motion for judgment as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

a matter of law only where "there is no legally sufficient evidentiary basis for a reasonable jury" to find in favor of the non-moving party. Fed.R.Civ.P. 50(a)(1). In making this determination, a court is bound to review the record as a whole and to "draw all reasonable inferences in favor of the non-moving party." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In conducting its review of the evidence, a court may not make credibility determinations, weigh the evidence, or develop its own version of the facts, as these functions are within the province of the jury and not the judge. *Id.;see also Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993). With respect to what, exactly, constitutes a legally sufficient evidentiary basis for a jury's verdict, the Third Circuit has stated: "Federal courts do not follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1993) (internal quotations omitted). The presence of contrasting evidence from which different and conflicting conclusions might be drawn is not sufficient to overturn a jury's verdict, as the jury is presumed to have evaluated that contradictory evidence and to have properly decided the matter one way or another. *Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1178 (3d Cir.1976). The sole question for the court is whether the record contains a "minimum quantum of evidence from which a jury might reasonably afford relief." *Id.* (citing *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir.1969).

Where the moving party bears the burden of proof, the Third Circuit applies a different standard. *See Fireman's Fund,* 540 F.2d at 1177. This standard "requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect," meaning that he or she must be able to say "not only that there is sufficient evidence to support the finding even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding." *Id. See also, Mentor H/S, Inc. v. Med. Device Alliance, Inc.,* 244 F.3d 1365, 1375 (Fed.Cir.2001) (stating that a defendant moving for JMOL on invalidity grounds must show that "[it] has established its case by evidence that the

jury would not be at liberty to disbelieve and the only reasonable conclusion is in its favor.").

*15 As a threshold matter, Federal Rule of Civil Procedure requires that, in order to preserve an issue for judgment as a matter of law pursuant to Rule 50(b), a party must timely move for judgment as a matter of law at the close of the non-moving party's case pursuant to Rule 50(a). Fed.R.Civ.P. 50(b). In addition to requiring that a pre-verdict motion be timely, Rule 50(a) also mandates that a party "specify the judgment sought and the law and the facts" upon which the movant relies. A party's failure to abide by these requirements leaves a reviewing court with a problem of constitutional proportions: "Absent a motion in accordance with Federal Rule of Civil Procedure 50(a), judicial reexamination of the evidence abridges [a party's] right to a trial by jury." *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1173 (3d Cir.1993). Thus, the Third Circuit has stated that a motion for judgment as a matter of law pursuant to Rule 50(b) must be preceded by a Rule 50(a) motion "sufficiently specific to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient." *Id.* (citing *Acosta v. Honda Motor Co.,* 717 F.2d 828, 831-32 (3d Cir.1983)). Such a motion properly places the non-movant and the court on notice of the movant's claims.

*2. Motion for a New Trial*

A court may grant a motion for a new trial pursuant to Rule 59, either upon the motion of a party or *sua sponte,* "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). While the Rule is not precise in its language as to the grounds for a new trial, case law has established that a court has the clear authority to order a new trial where, among other things, the verdict was against the weight of the evidence, where the size of the verdict was too large or too small, where new evidence has been discovered, where the judge or any attorney has engaged in misconduct, and where a prejudicial error of law was made. *See* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2805, at 38 (1973).

The applicable standard for ordering a new trial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 12
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

where the verdict was against the weight of the evidence differs from the standard for granted a motion for JMOL discussed above. A court should order a new trial when, in its opinion, the verdict is contrary to the "great weight of the evidence." *Roebuck v. Drexel Univ., 852 F.2d 715, 736 (3d Cir.1988).* This is a less stringent standard than that for the grant of a JMOL and a new trial may be granted even when granting a JMOL would be inappropriate. *Id.* at 715. This is not to say, though, that the threshold for the grant of a new trial on this ground is a low one. As the Third Circuit has said, "new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir.1991); see also Roebuck, 852 F.2d at 736.* In so determining, a court is permitted to consider the credibility of witnesses and to weigh the evidence. *Blakey v. Continental Airlines, Inc., 992 F.Supp. 731, 734 (D.N.J.1998)* (citing *Hurley v. Atlantic City Police Dep't, 933 F.Supp. 396, 403 (D.N.J.1996)*). A court may not, however, grant a new trial merely because it would have reached a different verdict than the jury.

**\*16** As discussed above, a party who fails to move for judgment as a matter of law under Rule 50(a) at the close of all evidence wholly waives the right to mount any post-trial attack on sufficiency of evidence grounds. *Yohannon v. Keene Corp., 924 F.2d 1255, 1262 (3d Cir.1991)* (citing *Gebhardt v. Wilson Freight Forwarding Co., 348 F.2d 129, 132 (3d Cir.1965)*). Where a challenge is made to the weight of the evidence, as opposed to its sufficiency, a court may exercise its discretion and grant a new trial regardless. *Greenleaf v. Garlock, Inc., 174 F.3d 352, 365 (3d Cir.1999).*

B. The '335 Patent

The '335 patent, like the '126 and the '827 patents, is directed to a process used in semiconductor fabrication. The fabrication of a semiconductor begins with a thin wafer made of a semiconductor material, the most common of which is silicon. During the fabrication process a large number of microscopic components are layered onto the wafer and a series of electrical interconnections are made between these layers so that the resulting semiconductor chip will function properly. To prevent charged particles from "leaking" between layers, an insulating material called a "dielectric" is used. Because a layer of dielectric is often situated between layers of components that must be electrically linked to each other, it is necessary to remove portions of the dielectric through a multi-step process known as "etching." The result of the etching process is a "contact hole" in the dielectric.

After the etching process is completed, the desired electrical connectivity is achieved by the creation of "contacts" between the layers of components. The first step in creating contacts requires the opening in the dielectric created by the etching process to be filled with a conductive material, such as a metal. Then, an additional layer of metal is deposited over the entire wafer, including the remaining dielectric. Undesired portions of this second metal layer are subsequently removed via the same multi-step etching process mentioned above. This process of creating openings, contacts, and interconnections creates a single layer of a semiconductor wafer; the process may be repeated several times to create a single, electrically interconnected semiconductor wafer with multiple layers. Once all the necessary layers have been formed, the wafer is cut into multiple and identical rectangular chips.

As explained in the Court's claim construction order, the invention claimed in the '335 patent addresses a certain problem that arose in establishing the required contacts between layers. *See* Doc. No. 63 at 10 (Cl. Construction Order dated May 27, 2003). One of the metals used to fill contact holes in the dielectric is tungsten, which has the advantage of being able to be used in smaller openings, thus creating the ability to make smaller chips. Tungsten, however, does not naturally adhere well to the dielectric. Thus, the '335 patent teaches a process by which a "glue layer" is deposited between the dielectric and the tungsten, providing the necessary adherence between the two. In order to maintain the electrical connectivity between layers, the inventors specified that the "glue layer" must be comprised of an electrically conducting material and the precise invention of the '335 patent is the use of a conducting nitride, specifically, titanium nitride (TiN), as the primary component of the glue layer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 13
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

**\*17** As stated above, claims 1 through 6 and claim 11 of the '335 patent were submitted to the jury on the questions of infringement and invalidity. The jury found that Atmel literally infringed all the asserted claims of the '335 patent, but that the infringement was not willful and that the asserted claims of the '335 patent were invalid due to anticipation.

*1. IBM Process B was a separate factual, not a legal, basis for the jury's finding of the anticipation of the asserted claims of the '335 patent and Agere's motion for JMOL based on deficiencies in that factual basis must fail.*

The only proper Rule 50 motion preserved by Agere at the close of the evidence with respect to the '335 patent was for a judgment that IBM Processes B and C were not prior art and therefore insufficient to show that the '335 patent was invalid as anticipated. 3/18/05 Tr. at 128. Agere has renewed its motion on this point with respect to IBM Process B, arguing that, if the Court finds that Process B is not prior art to the '335 patent as a matter of law, that it must order a new trial on the issue of anticipation, because the jury returned only a general verdict of anticipation without specifying which prior art reference offered by Atmel at trial it was basing that verdict upon.

At trial, Atmel offered multiple pieces of prior art, including IBM Process B, to support its contention that the asserted claims of the '335 patent were invalid as anticipated. The jury returned a verdict of invalidity with respect to the asserted claims of the '335 patent, but did not identify which prior art reference or references it believed invalidated the claims. Agere argues that, because IBM Process B was presented by Atmel as a separate legal theory of anticipation, the jury's verdict on anticipation cannot stand if Atmel failed to prove that IBM Process B was prior art because "[w]here a jury has returned a general verdict and one theory of liability is not sustained by the evidence or legally sound, the verdict cannot stand because the court cannot determine whether the jury based its verdict on an improper ground." *Wilburn v. Maritrans GP Inc.,* 139 F.3d 350, 361 (3d Cir.1998).

Even if IBM Process B does not qualify as "prior art" as defined by Congress and the courts, Agere's motion must fail. The Federal Circuit recently confronted an identical request to Agere's in *Northpoint Technology, Ltd. v. MDS America, Inc.,* 413 F.3d 1301, 2005 WL 1514258 (June 28, 2005). In that case, the defendants relied on five different prior art references and plaintiff, in its post-trial motion, claimed that a failure of proof with respect to one of the prior art references necessitated a new trial. The Federal Circuit squarely rejected this contention because the five prior art references were actually separate factual bases for the jury to consider with regard to defendant's overall theory of anticipation. *Id.* at \*9.

Where a jury's general verdict rests on several different factual grounds, and one of those grounds is later shown to be inadequate, a reviewing court should let the jury verdict stand by assuming that the jury convicted on the factually sufficient theory. *See United States v. Griffin,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). Though a court presumes that a jury is able to distinguish factually sufficient evidence from factually insufficient evidence, it cannot presume that the jury has the competence to distinguish accurate statements of law from factually inaccurate ones. *Id.* at 59. Though the Supreme Court's holding in *Griffin* took place in the context of a criminal appeal, as the Federal Circuit recognized in *Northpoint Technology,* that principle is equally applicable in the civil context. *Northpoint Tech.,* 413 F.3d 1301, 2005 WL 1514258 at \*9-10 (citing *Walther v. Lone Star Gas Co.,* 952 F.2d 119, 126 (5th Cir.1992); *Sandberg v. Va. Bankshares, Inc.,* 891 F.2d 1112, 1122 (4th Cir.1989), *rev'd on other grounds,* 501 U.S. 1081 (1991); *McCord v. Maguire,* 873 F.2d 1271 (9th Cir.1989); *Baumler v. State Farm Mut. Auto. Ins.,* 493 F.2d 130, 134 (9th Cir.1974)).

**\*18** As in *Northpoint,* Agere argues only that one of the factual bases for the jury's verdict of anticipation was insufficient. The Court is bound to presume, however, that the jury's verdict rests on a factually sufficient ground. As such, the Court rejects Agere's contention that the jury's finding of invalidity must be set aside because Atmel failed to offer sufficient evidence that IBM Process B anticipated the '335 patent.

*2. The jury's finding that the asserted claims of the '335 patent are anticipated by the prior art is supported by the great weight of the evidence.*

Agere argues that the jury's finding that claims 4 and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

Page 14

5 of the '335 patent are anticipated is against the great weight of the evidence, because Atmel failed to produce any evidence at trial that a single prior art reference discloses each and every limitation of the '335 patent. Both of these claims are dependent upon claim 1, the sole independent claim of the '335 patent. The relevant claim language is as follows:

1. A method of fabricating an integrated circuit comprising the steps of: patterning a dielectric layer to form holes which expose the underlying material, said exposed underlying material comprises an electrically conducting material; depositing a glue layer covering said dielectric and said exposed underlying material;

depositing a tungsten layer by chemical vapor deposition, said tungsten layer covering said glue layer on said dielectric and said exposed material; CHARACTERIZED IN THAT said glue layer comprises at least one member selected from the group consisting of conducting nitrides.

....

4. A method as recited in claim 1 further comprising etching said tungsten and said glue layer to form a planar surface of said dielectric and said tungsten in said hole, said tungsten being etched before said glue layer.

5. A method as recited in claim 4 in which said conducting nitride consists essentially of TIN.

'335 Patent at col. 5:22 through col. 6:7; col. 6:11 through col. 6:16.

As stated above, under 35 U.S.C. § 282, patents are presumed valid. 35 U.S.C. § 282; see e.g.,Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530 (Fed.Cir.1983). The party claiming a patent's invalidity must first establish a prima facie case of invalidity and must carry the burden of persuasion until the final decision. Id. at 1534.Such a party bears an especially heavy burden because of the deference given to decisions of the patent examiner.Am. Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1359, (Fed.Cir.), cert. denied,469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). One method of establishing that a patent is invalid is to show that it was

anticipated by the prior art. Anticipation is the disclosure in the prior art of something substantially identical to the claimed invention. 35 U.S.C. § 102(b). A patent claim is anticipated in the prior art "only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."Verdegaal Bros., Inc. v. Union Oil Co., 814 F.2d 628, 631 (Fed.Cir.), cert. denied,484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); see alsoHoover Group, Inc. v. Custom Metalcraft, 66 F.3d 299, 302 (Fed.Cir.1995). Proving anticipation is therefore a rigorous task-prior art that discloses "almost" the same elements and limitations of a claimed invention, though it may yet render a claim invalid under another theory, does not render the claim invalid for anticipation. Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1548 (Fed.Cir.1983). The question of whether a prior art reference anticipates a claimed invention is one of fact.Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1281 (Fed.Cir.2000).

*19 At trial, Atmel bore the burden of showing invalidity by clear and convincing evidence. It introduced seven references that it claimed rendered the asserted claims of the '335 patent invalid-IBM Processes A and B, the Suguro reference, the Blewer reference, the Asahina reference, the Thomas '004 patent, and the Thomas '071 patent. In its response to Agere's motion, Atmel relies upon IBM Process A and the Suguro reference as proof that the weight of the evidence was sufficient for a jury finding of anticipation.

a. The weight of the evidence supports a finding that IBM Process A claims 4 and 5 of the '335 patent are anticipated by IBM Process A.

Agere argues that Atmel's proofs with respect to IBM Process A were deficient because it does not include the step of "depositing a glue layer ... compris [ing] at least one member selected from the group consisting of conducting nitrides" as required by claims 1, 4 and 5 of the '335 patent. Agere cites to the testimony of Drs. Rana, Cronin, and Reif in support of its contention that the great weight of the evidence and testimony at trial established that IBM Process A did not anticipate the '335 patent because Process A deposited a titanium layer, which was then annealed to the titanium layer to form titanium nitride. Agere contends that a person in the ordinary skill in the art

Not Reported in F.Supp.2d                                                                Page 15
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

would have understood the term "depositing" as used in the '335 patent not to encompass annealing and that this contention is supported by the weight of the evidence introduced at trial.

There is no question that IBM Process A involves the formation of a layer of titanium nitride to act as an adhesive between the dielectric and the substrate; the distinction drawn by Agere has to do with how that layer of titanium nitride is created. According to internal IBM documents, IBM Process A uses a "thermal annealed [titanium nitride] on top of pure [titanium]," meaning that IBM Process A used a two-step process in which a layer of titanium was deposited, then reacted with a gas to form an overlying layer of titanium nitride. Def. Tr. Ex. 1111 at 3; Cronin 3/15/05 Tr. at 91. In contrast, the '335 patent uses a single step deposition of titanium nitride.

Though the techniques used by the two sets of inventors differ, the evidence at trial clearly supports a finding that the difference was not meaningful to an analysis of anticipation, as a reasonable jury could well have found annealing is one category of "depositing," as that term is used in the '335 patent. Dr. Rana testified that annealing is "the process converting titanium to titanium nitride" by using a nitrogen gas. Rana 3/15/05 Tr. at 23. He testified that his invention "talked about titanium nitride" and that annealing is one of several ways "of getting titanium nitride ... [annealing] is one, one of the ways." Id. at 23-24. He testified that the critical part of his invention was "getting titanium nitride at the top before you deposit tungsten" and that IBM Process A accomplished that task by annealing. Id. at 24. Dr. Rana confirmed this testimony in describing certain testing he had performed in developing the titanium nitride glue layer, which used an annealing process, while Dr. Chittipeddi, the co-inventor of the '126 patent also confirmed that, under certain conditions, one method of depositing titanium nitride was to deposit titanium, then anneal it. Id. at 36; Chittipeddi 3/2/05 Tr. at 177. Lastly, Atmel's expert Dr. Thomas walked the jury through IBM Process A to demonstrate how that invention met each and every limitation of claim 1 of the '335 patent, including the step in which the titanium nitride glue layer is deposited. Thomas 3/16/05 Tr. at 10-12. The only testimony at trial regarding annealing that is contrary to that cited above was the testimony of Agere's

expert, Dr. Reif. Dr. Reif testified that, in his opinion, annealing is not equivalent to depositing, because depositing involves the creation of a layer that did not previously exist, while annealing merely transforms the surface of an existing layer into something else without the addition of another layer. Reif 3/17/05 Tr. at 175-78. There is no doubt that there was conflicting evidence on the issue of whether annealing is the equivalent of depositing; however, the Court cannot say that the jury's resolution of this question in Atmel's favor was against the great weight of the evidence. The jury's finding has adequate support in the trial record and must stand.

*20 Agere further argues that the IBM Process A cannot anticipate the '335 patent because it does not combine the steps recorded in claims 4 and 5 of "depositing a glue layer ... compris[ing] at least one member selected from the group of conducting nitrides" and "etching said tungsten and said glue layer to form a planar surface of said dielectric and said tungsten in said hole." Agere argues that the only testimony that a planarization step is implicitly present in IBM Process A was from Dr. Cronin, one of the IBM inventors who worked on Process A, and that such testimony, uncorroborated, is insufficient to support a jury finding of anticipation.

Agere is correct that Dr. Cronin's testimony must be corroborated in order for this Court to find that Atmel has met its burden of proving anticipation by clear and convincing evidence. A party seeking to prove conception via the oral testimony of an alleged prior inventor must proffer evidence corroborating that testimony. See, e.g., Singh v. Brake, 222 F.3d 1362, 1367 (Fed.Cir.2000). Corroborating evidence "may consist of testimony of a witness, other than an inventor, to the actual reduction to practice or it may consist of evidence of surrounding facts and circumstances independent of information received from the inventor." Hahn v. Wong, 892 F.2d 1028, 1032-33 (Fed.Cir.1989) (quoting Reese v. Hurst v. Wiewiorowski, 661 F.2d 1222, 1225 (C.C.P.A.1981)). As the Federal Circuit has explained:

[A] "rule of reason" analysis is applied to determine whether an inventor's testimony regarding reduction to practice has been sufficiently corroborated. The rule requires an evaluation of all pertinent evidence when determining the credibility of an inventor's testimony. In order to corroborate a reduction to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 16
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

practice, it is not necessary to produce an actual over-the-shoulder observer. Rather, sufficient circumstantial evidence of an independent nature can satisfy the corroboration requirement.

*Cooper v. Goldfarb, 154 F.3d 1321, 1330 (Fed.Cir.1998)* (internal citations omitted).

At trial, Atmel offered the above-described IBM invention disclosure statement dated October 22, 1985 to corroborate Dr. Cronin's testimony, as well as Trial Exhibit 1120. The IBM invention disclosure statement clearly does not expressly reflect the etching of the tungsten plug. Cronin 3/15/05 Tr. at 97. Thus, the only available document to Atmel for corroboration purposes is Exhibit 1120, which describes the IBM process of record ("POR") as of February 5, 1986; Mr. Cronin testified that the purpose of the document was to memorialize the current process for manufacturing semiconductor chips and to see if the process could be further streamlined and refined. Def. Tr. Ex. 1120; Cronin 3/15/05 Tr. at 120. The POR reflects that IBM Process A was being used as part of the POR; it also reflects that the POR contains a step described as "W-blanket etch," which follows the step in which tungsten is deposited on sputtered titanium. Def. Tr. Ex. 1120. Dr. Cronin testified that this represented an etch step in which the tungsten was removed all the way back to the surface of the dielectric, leaving the tungsten and titanium in the contact holes flush with the surface of the dielectric. Cronin 3/15/05 Tr. at 134. The Court finds that the documentary evidence introduced at trial is sufficient to corroborate Dr. Cronin's testimony under the "rule of reason" standard as articulated by the Federal Circuit.

**\*21** For all the foregoing reasons, the Court finds that a new trial is not warranted on the grounds that the weight of the evidence does not support the jury's finding on the issue of the anticipation of the '335 patent with respect to IBM Process A. First, the jury heard multiple skilled and credible witnesses testify to the issue of whether thermal annealing, as described in IBM Process A, is equivalent to the way that "depositing" is used in the '335 patent. Second, the Court finds that Dr. Cronin's testimony on the point of whether Process A contained a step in which the tungsten was etched back to create a planar surface to be sufficiently corroborated. The Court cannot say, after reviewing the testimony and the

accompanying documentary evidence that the jury's conclusion that the asserted claims of the '335 patent was anticipated by IBM Process A was against the great weight of the evidence.

*a. The weight of the evidence supports a finding that Suguro anticipates claims 4 and 5 of the '335 patent.*

As stated above, where a jury's general verdict rests on several different factual grounds, and some of those grounds are sufficient to support the jury's findings, but others are not, a reviewing court should let the jury verdict stand by assuming that the jury convicted on the factually sufficient theory or theories. See*United States v. Griffin,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). The Court will nevertheless address the parties' arguments on the Suguro reference as an alternative ground for a finding of anticipation. Agere argues that Suguro cannot anticipate because it does not disclose the formation of a conducting nitride glue layer between tungsten and the dielectric and because it does not disclose the formation of a tungsten plug over a conducting nitride glue layer. The Court finds that there was sufficient evidence at trial that Suguro does indeed disclose those limitations of claims 4 and 5 of the '335 patent and that the jury's determination of anticipation also rests comfortably on that reference as well.

Claim 4 of the '335 patent requires that the tungsten overlying the glue layer be etched back to form a planar surface with the dielectric. Suguro clearly depicts, in figure 1, the process by which the contact hole is filled by tungsten, including the step in which the tungsten is etched back to form a tungsten plug. *Id.* at 2, Figure 1. Claim 5 of the '335 patent requires that the glue layer contain a conducting nitride, specifically TiN, which Dr. Reif testified was the crucial invention of the '335 patent. Reif 3/3/05 Tr. at 22. Atmel presented evidence at trial that Suguro discloses "a novel W/TiN/TiSi2, structure" for use in the manufacture of semiconductor chips; this structure clearly contains TiN, the conducting nitride specifically claimed as the invention of the '335 patent. In Suguro, this structure is achieved by sputtering of titanium nitride (TiN) and titanium disilicide (TiSi2) on top of silicon, then filling the remainder of the contact hole with tungsten by means of chemical vapor deposition. Def.'s Opp'n, Ex. 9 at 1. The invention discloses that the TiN/TiSi2 layer is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 17
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

used to prevent the subsequently annealed tungsten from forming a silicide, which is a possibility when tungsten is reacted with silicon at certain temperatures. *Id.* at 2.

**\*22** At trial, Dr. Thomas testified about the steps found in Suguro outlined above, describing each step in response to a question about which other art, at or prior to the time the '335 patent was filed, was teaching the use of titanium nitride layers under tungsten and between tungsten and the dielectric. Thomas 3/16/05 Tr. at 63-64. Dr. Reif attempted to draw a distinction between the process described in Suguro and that disclosed in the '335 patent by offering testimony as to why, in his opinion, the TiN/ TiSi2 layer might only exist in the contact hole and not both in the contact hole and over the dielectric, as is required by the '335 patent. Reif 3/17/05 Tr. at 183. Dr. Reif's testimony, however, was merely hypothetical and does not compel the conclusion that the overwhelming weight of the evidence was that Suguro did not anticipate. Because Atmel produced sufficient evidence at trial that Suguro discloses each and every limitation of the asserted claims of the '335 patent, Agere's motion for a new trial on the issue of the anticipation of the '335 patent is denied.

*3. Atmel's motion for JMOL on the obviousness of the asserted claims of the '335 patent must be granted, as that verdict is not supported by the evidence produced at trial.*

Both parties agree that the jury's verdict that the asserted claims of the '335 patent are invalid as anticipated is irreconcilable with its verdict that the asserted claims of the '335 patent are not invalid for obviousness. The Federal Circuit has been clear that jury verdicts that patent claims are anticipated but not obvious are inconsistent with the principle that "anticipation is the epitome of obviousness." *Structural Rubber Prods. Co. v. Park Rubber Co.,* 749 F.2d 707, 716 (Fed.Cir.2003) (quoting *In re Fracalossi,* 681 F.2d 792, 794 (C.C.P.A.1982). Agere therefore argues that a new trial is mandated on the questions of anticipation and obviousness. For its part, Atmel moves for a JMOL on obviousness based on the jury's finding that the asserted claims were anticipated, as well as based on the substantive evidence of obviousness it introduced at trial.

"Inconsistent jury verdicts are an unfortunate fact of

life in law, and should not, in and of themselves, be used to overturn otherwise valid verdicts."*Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 407 (3d Cir.2000). However, the Third Circuit has been clear that a Court may not simply direct a verdict for one party on one claim based solely on its inconsistency with the jury's verdict on another claim. *Mosley v. Wilson,* 102 F.3d 85, 90-91 (3d Cir.1996). Indeed, in the Third Circuit, a fundamental inconsistency among jury verdicts is grounds for a new trial. *Riley v. K-Mart Corp.,* 864 F.2d 1049, 1054 (3d Cir.1988); *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.,* 734 F.2d 133, 145 (3d Cir.1984). However, the Federal Circuit, in applying Third Circuit precedent on this issue, has also said that "if a jury returns a verdict that contains portions that may be inconsistent, the law does not state that the verdict must be thrown out immediately and a new trial ordered. Instead, the district court is first instructed to carefully review the different portions of the jury's verdict for a means to reconcile them."*Mycogen Plant Sci. v. Monsanto Co.,* 243 F.3d 1316, 1326 (Fed.Cir.2001). Thus, the Court will first address Atmel's motion for JMOL on the issue of obviousness, in an attempt to see whether the Court can indeed reconcile the inconsistent verdicts. *See id.*At 1326 (stating that all motions for JMOL should be considered prior to revisiting the question of inconsistent verdicts). If, however, the trial record contains evidence from which a reasonable jury could have concluded that the asserted claims of the '335 patent were anticipated and that the asserted claims of the '335 patent were not obvious, a new trial must be granted. *See Riley,* 864 F.2d at 1054 (stating a new trial is warranted where "there is no way of judging which [verdict], if either, is the more reasonable").

**\*23** Thus, the Court must review the jury's verdict of non-obviousness to see whether that verdict is without a legally sufficient evidentiary basis for the jury's factual findings as to (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any objective evidence of nonobviousness. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The jury's finding of non-obviousness applies to claims 1 through 6 and claim 11 of the '335 patent, which obviously includes the claim language quoted above. For ease of analysis, the Court will reproduce the asserted claims in their entirety here:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 18
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

1. A method of fabricating an integrated circuit comprising the steps of: patterning a dielectric layer to form holes which expose the underlying material, said exposed underlying material comprises an electrically conducting material; depositing a glue layer covering said dielectric and said exposed underlying material;

depositing a tungsten layer by chemical vapor deposition, said tungsten layer covering said glue layer on said dielectric and said exposed material;

CHARACTERIZED IN THAT said glue layer comprises at least one member selected from the group consisting of conducting nitrides.

2. A method as recited in claim 1 in which said material comprises said silicon surface.

3. A method as recited in claim 1 in which said material comprises a metallic silicide.

4. A method as recited in claim 1 further comprising etching said tungsten and said glue layer to form a planar surface of said dielectric and said tungsten in said hole, said tungsten being etched before said glue layer.

5. A method as recited in claim 4 in which said conducting nitride consists essentially of TiN.

6. A method as recited in claim 1 in which said dielectric comprises silicon dioxide.

...

11. A method as recited in claim 1 further comprising the step of patterning said tungsten and said glue layer.

'335 Patent at col. 5:22 through col. 6:18; col. 6:28 through col. 6:29.

The Court finds that an application of the *Graham* test to the evidence presented at trial leads to the legal conclusion that the '335 patent would have been obvious to a person have ordinary skill in the manufacture of semiconductors at the time the invention was made.

The problem faced by the inventors of the '335 patent was the lack of adhesion between the dielectric and tungsten; the solution embodied in that patent is the use of a "glue layer" comprised of a conducting nitride. The inventors noted, in their patent, that the use of a glue layer composed of "elemental metals, such as Ti, and metallic silicides, such as WSi2" had previously been proposed as a solution to the problem. '335 patent, col. 2:33 through 2:36. Thus, a person of ordinary skill in the art would have known to try a glue layer to solve the adhesion problem-Agere's invention was to construct that glue layer using a conducting nitride, such as TiN. The question, then, is whether Atmel presented evidence of prior art that would lead to the presumption that a person of ordinary skill in the art would have known to use a glue layer containing primarily TiN to solve the adhesion problem.

*24 As stated above, claim 1 is the only dependent claim of the '335 patent. Atmel claims that it produced clear and convincing evidence that each of the limitations of claim 1 were within the scope and content of the prior art, including IBM Processes A and B, the Suguro reference, the Blewer reference, the Asahina reference, the Thomas '004 patent, and the Thomas '071 patent. Agere argues that each of these references fails to disclose at least one element of claim 1, that Atmel failed to produce clear and convincing evidence that any combination of these prior art references discloses all the limitations of claim 1, and that the prior art teaches away from the '335 patent.

Claim 1 requires the use of a conducting nitride layer between a patterned dielectric and CVD tungsten; dependent Claim 5 requires that the conducting nitride layer consist essentially of TiN. At trial, Atmel presented evidence that, by at least October 1985, IBM had noted that "LPCVD tungsten requires an adhesion layer to adhere to [an insulating layer]." Tr. Ex. 1111. As a result, IBM developed Processes A and B, which taught the use of two new structures, each of which contained a conducting nitride and was primarily comprised of TiN-W/TiN (Process B) and W/TiN/Ti (Process A)-to improve adhesion and contact resistance in the manufacture of semiconductor chips. Tr. Ex. 1111. The main difference between Process A and the '335 patent is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

the use of an annealing process for the deposition of TiN/Ti. However, as the Court found above, the evidence at trial showed that a person of ordinary skill in the art would have understood annealing to be equivalent to depositing, as that term is used in the '335 patent; therefore, it would have been obvious for a person of ordinary skill in the art to try an alternative method of depositing the TiN. Even assuming that the difference was a material one, as Atmel points out, the evidence of a motivation to combine can be found in the IBM invention disclosure itself, as Process B describes a sputtering, rather than an annealing step, for the deposition of a titanium nitride layer to achieve the same result-better adhesion in the formation of semiconductor chips. The IBM invention statement itself notes that both structures "resolve[ ] the previous adhesion ... problems." Tr. Ex. 1111. A person of ordinary skill, then, looking at IBM Processes A and B would have understood that the adhesion problem could have been solved by the use of TiN as a glue layer and that the TiN glue layer could be deposited by either an annealing step or a sputtering step. This evidence, along with other prior art introduced at trial,[FN4] clearly establishes that persons of ordinary skill in the art, prior to the filing of the '335 patent, had identified the use of a conducting nitride comprised primarily of TiN in a glue layer to solve the issue of properly adhering the tungsten and the dielectric in semiconductor manufacturing.

FN4. Suguro disclosed, in August 1986, the use of a TiSi2/TiN layer between tungsten and a dielectric, with the tungsten being deposited by CVD. 3/17/05 Tr. at 182. The Thomas '004 patent, which was filed in April of 1984, taught the use of a TiN layer, deposited into the contact holes and over the remaining dielectric, which was then covered by tungsten. Tr. Ex. 1166; 3/16/05 Tr. at 30-37. Though the '004 patent does not teach the deposition of tungsten by CVD, as is required by the '335 patent, Dr. Thomas offered uncontroverted testimony that a person of ordinary skill in the art, at the time the '335 patent was filed, would have known to deposit tungsten by CVD, as it was "the dominant tungsten deposition technique at that time." 3/16/05 Tr. at 37. In addition, an article published in November 1986 stated that "titanium nitride ... [has] been found effective" as an adhesion-

promoting layer. Def.'s Tr. Ex. 1544; Thomas 3/16/05 Tr. at 69.

Thus, an examination of the scope and content of Processes A and B, the differences between Processes A and B and the claims 1 and 5 of the '335 patent, and the level of ordinary skill in the art at the time the '335 patent was filed, leads the Court to find that no reasonable jury could have found that the IBM Processes does not render claim 1 and 5 of the '335 patent obvious. The question remains, however, whether claims 2 through 4, claims 6 and 11 are likewise obvious in light of the prior art and whether Atmel presented evidence of a motivation to combine the variations laid out in those claims with the use of a conducting nitride layer between a patterned dielectric and CVD tungsten.

*25 With respect to claims 2, 3, and 6, Agere's own expert, testified that, at the time the '335 patent was invented, persons of ordinary skill in the art were exploring the use of a glue layer over silicon surfaces, specifically over metallic silicides, though he was not one hundred percent sure about the latter statement. Reif 3/3/05 Tr. at 133; see also Cronin Tr. at 67-68 (stating that IBM was using silicon substrates in mid-1983). Dr. Thomas testified that IBM Process A used a metallic silicide, which confirms Dr. Reif's recollection of the use of metallic silicides. 3/16/05 Tr. at 13-14. As to claim 6, Dr. Reif further testified that engineers were using silicon dioxides as a dielectric material long before the filing of the '335 patent; this is confirmed by IBM Process A, which uses layer containing silicon dioxide known as "BPSG" or "boro-phosphorous silicate glass." Reif 3/3/05 Tr. at 133; Thomas 3/16/05 Tr. at 14; Cronin 3/15/05 Tr. at 93. With respect to Claim 4, Dr. Thomas testified, in his explanation of the IBM POR incorporating Process A, that people within the industry were etching back tungsten to form a planar surface after tungsten was deposited in the contact holes in the dielectric. Thomas 3/16/05 Tr. at 14-16. Thomas 3/16/05 Tr. at 20-21. As discussed above, Dr. Cronin testified to the IBM POR as of October 1986, which incorporated IBM Process A and which featured a step referred to as "W blanket etch," referring to the process by which the CVD tungsten is removed all the way back to the surface of the BPSG dielectric. Tr. Ex. 1120; Cronin 3/15/05 Tr. at 122-23. Lastly, Claim 11 requires a patterning of the tungsten and glue layer. Dr. Thomas testified that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 20
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

persons of ordinary skill in the art were patterning the tungsten and the underlying glue layer at the time the '335 patent was invented; this testimony is buttressed by an article published in November 1986 by Robert S. Blewer, to which Dr. Thomas testified, and which summarized the work being done in the semiconductor manufacturing industry at the time. Thomas 3/16/05 Tr. at 73. The Blewer article discusses not only the patterning of tungsten, but also the use of TiN an adhesion layer (as required by Claim 1) over a silicon substrate (as required by Claim 2), but also the etching of tungsten (as required by Claims 4 and 5). Def.'s Tr. Ex. 1544 at 125; Thomas 3/16/05 Tr. at 68-69.

The above evidence of the obviousness of the dependent claims of the '335 patent is not exhaustive, but is illustrative of the fact that the evidence at trial overwhelmingly pointed to the fact that the limitations described in those dependent claims were well known to those of ordinary skill in the art at the time the '335 patent was filed. Moreover, the testimony and evidence presented at trial was that persons of ordinary skill in the industry were working diligently towards finding a solution to the dielectric-CVD tungsten adhesion problem. Reif 3/17/05 Tr. at 186. Thus, if the use of TiN as an adhesive was known to a person of ordinary skill in the art, and the remainder of the steps recited in the '335 patent were known to one of ordinary skill in the art, such a person would have been clearly motivated, as the inventors at IBM actually were motivated, to meld that knowledge into a manufacturing process incorporating TiN and the steps articulated in claims 2 through 6 and 11.

*26 The last factor in the *Graham* analysis is the presence of any objective evidence of nonobviousness, which Agere argues trumps the evidence of obviousness detailed above. Specifically, Agere points to the long-felt need for its invention and industry acceptance and licensing of its invention as objective evidence that could lead a jury to properly determine that the '335 patent was not obvious at the time of its invention. The Federal Circuit has stated that a "trial court may conclude that a patent claim is obvious, even in the light of strong objective evidence tending to show non-obviousness." *Motorola, Inc. v. Interdigital Tech. Corp.,* 121 F.3d 1461, 1472 (Fed.Cir.) (citing *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 768-69

(Fed.Cir.1988). There is no doubt that Agere has enjoyed substantial commercial success in licensing its invention. Reif 3/17/05 Tr. at 186; DeBlasi 3/7/05 61-65. The Court, however, finds that the overwhelming evidence of obviousness put forward by Agere negates the effect of this evidence of commercial success under the *Graham* test. *See, e.g.,EWP Corp. v. Reliance Universal, Inc.,* 755 F.2d 898, 907-08 (Fed.Cir.1985) (Davis, J. concurring) (stating that a strong case of obviousness based on the prior art may overcome evidence of a strongly felt need in the industry and a wildly successful licensing program of the patented technology).

Atmel has met the heavy burden placed upon a party who seeks a JMOL on an issue as to which it bears the ultimate burden of proof. The evidence presented on the obviousness of the '335 patent at trial is indeed overwhelming and leads to no reasonable conclusion other than that finding the asserted claims of the '335 patent invalid as obvious. This finding resolves the inherent conflict between the jury's findings that the asserted claims were anticipated but not obvious. The Court therefore denies Agere's motion for a new trial on the obviousness of the '335 patent. Agere's motion for JMOL on the obviousness for obviousness is granted.

*4. The jury's verdict of the infringement of the asserted claims of the '335 patent has a legally sufficient evidentiary basis .*

Atmel argues that Agere failed to carry its burden in showing, by a preponderance of the evidence, that its accused processes infringed claims 4 and 5 of the '335 patent. Specifically, Atmel argues that Agere failed to show that the Atmel processes contained a step in which the tungsten and the glue layer are etched "to form a planar surface" of the dielectric and the tungsten that has, at that point, been formed in the contact hole. Atmel argues that the testimony of Dr. Reif that Almel's processes result in surfaces that are only "substantially planar" is not sufficient to meet Agere's burden of proving infringement under either a theory of literal infringement or infringement under the doctrine of equivalents.

Determining infringement is a two-step process. First, a court must first correctly construe the asserted claims; second, the court must compare the properly construed claims to the allegedly infringing devices,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

Page 21

systems, or methods. _Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp._, 149 F.3d 1309, 1315 (Fed.Cir.1998). With respect to the first step, long before trial, the parties stipulated to the following construction for the term "planar," as it is used in the '335 claim language: "substantially two dimensional or flat." Doc. No. 46 at 2 (Sec. Rev. Jt. Statement of Disputed Cl. Terms dated Dec. 6, 2002). Thus, the question before the court is whether there was sufficient evidence before the jury such that their comparison of claims 4 and 5 of the '335 patent, using the parties' construction of the term "planar," with Atmel's accused processes could properly result in a finding of infringement.

*27 At trial, Dr. Reif first testified that perfect planarity of the dielectric and the tungsten plug cannot be expected within the context of semiconductor fabrication because "nothing is perfectly flat" in manufacturing. Reif 3/3/05 Tr. at 77. This reality is reflected in the parties' agreement to include the modifier "substantially" in their definition of the term "planar." Further, Dr. Reif testified repeatedly that the accused Atmel plasma and chemical mechanical polishing processes result in a surface that meets the parties' agreed-upon definition of "planar." Reif 3/3/05 Tr. at 73-74, 76-77. In addition, Atmel's expert, Dr. Thomas, also testified that a particular tungsten plug of Atmel's met the Court's definition of planar. Thomas 3/16/05 Tr. at 209-10.

Given the construction of the term "planar" agreed upon by the parties and the above testimony and evidence, the Court finds that Agere produced the "minimum quantum of evidence from which a jury might reasonably afford relief" on the question of the infringement of claims 4 and 5 of the '335 patent. The parties agreed that the claims do not require perfect planarity and Agere presented sufficient testimony on the planarity resulting from Agere's processes to show that those processes infringed the claims as construed. As such, Atmel's motion for JMOL on the issue of infringement is denied.

C. '269 Patent

After a semiconductor chip is fabricated, it must be "packaged" to protect it from damage and to establish a connection between the chip circuitry and the device in which it is ultimately used. Doc. No. 63 at

47-48 (Cl. Construction Order dated May 27, 2003). The '269 patent describes a package in which a surface known as a "paddle" is connected to an "external mounting frame" by "paddle support arms." The semiconductor chip is mounted onto the paddle, which is pressed down to mount the chip. During this process, the pressure from the downsetting process may create an undesirable deformation in the paddle support arms. The '269 patent claims the invention of a "deformation absorbing member" located on the paddle support arms; these deformation absorbing members act to minimize the deformation that occurs during downsetting.

Claims 6 and 9 of the '269 patent were submitted to the jury on the questions of validity and infringement; the jury returned a verdict of non-infringement and invalidity due to anticipation. Claims 6 and 9 set forth:

6. A semiconductor integrated circuit package comprising:

a semiconductor integrated circuit chip;

a paddle on which said chip is mounted;

a plurality of paddle support arms, said paddle being connected to said paddle support arms;

a plurality of fingers;

electrical connections from said chip to said fingers;

CHARACTERIZED IN THAT said paddle support arms comprise a deformation absorbing member, said paddle being depressed with respect to at least a portion of said fingers, said deformation absorbing member localizing deformation during paddle downsetting and maintaining desired physical characteristics.

*28 9. A semiconductor integrated circuit package as recited in claim 6 in which deformation absorbing member comprises an annular member.

'269 Patent at col. 4:13 through col. 4:36.

_1. The jury's verdict that claim 6 of the '269 patent is invalid as anticipated has a legally sufficient_

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 22
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

*evidentiary basis.*

Agere has moved for JMOL on the issue of whether claim 6 of '269 patent is invalid as anticipated in light of the Sano reference. Agere argues that there was insufficient evidence at trial that the prior art discloses each and every limitation of claim 6 and that Dr. Prince's testimony on Sano was merely conclusory and not an appropriate basis for a finding of anticipation. Atmel argues that the testimony of Dr. Prince, in combination with the contents of the Sano reference, and the prosecution history of the '269 patent, was sufficient to overcome the statutory presumption of validity.

Atmel introduced only one piece of prior art against the '269 patent at trial-the Sano patent application ("Sano") dated July 23, 1982. The Sano reference was introduced during the testimony of Atmel's expert, Dr. Prince, who testified that the inventors of the '269 patent disclosed the existence of Sano to the examiner during the patent prosecution of the '269 patent. 3/10/05 Tr. at 193. During a discussion of the distinctions that the inventors drew for the patent office between their invention and the Sano reference, Dr. Prince testified that Sano showed a process in which a paddle is downset and pointed the jury to Figure 1 of the Sano reference, in which he identified the figures that corresponded to the '269 patent's paddle, paddle support arms, fingers, and deformation absorbing members. *Id.* at 193-95.Dr. Prince further testified that the main difference that the inventors of the '269 patent saw between their invention and Sano was the alleged presence of clamping in the Sano process, which the inventors claimed isolated the paddle support arms from the downsetting process, which the inventors argued meant that the paddle support arm did not contain a deformation absorbing member.*Id.* at 194-95.On cross-examination, Dr. Prince further identified the deformation absorbing members in Sano and stated that it did not contain a reference to clamping. *Id.* at 212, 215.

Taking all of the above evidence in the light most favorable to Atmel, the Court finds that Agere's motion for JMOL must be denied. Given the Sano reference itself, and Dr. Prince's testimony on that reference, the jury had sufficient evidence before it to find that Sano disclosed each and every limitation of claim 6 the '269 patent and that claim 6 was invalid

as anticipated.

*2. The jury's verdict of the anticipation of the asserted claims of the '269 patent is supported by the weight of the evidence.*

Agere has moved this Court to find that the jury's verdict that the '269 patent was anticipated was against the weight of the evidence introduced at trial. Agere claims that the testimony offered by Atmel's expert, Dr. Prince, was insufficient to overcome the strong statutory presumption of validity, especially in light of the fact that the Sano reference was examined by the PTO during the prosecution of the '269 patent. Atmel relies upon the same proofs cited above in the Court's discussion of Agere's motion for JMOL on this same issue.

**\*29** The Court's examination on the evidence presented at trial on the issue of the '269 patent's invalidity, as discussed above, leads it to conclude that the jury's verdict does not "shock the conscience" or result in a miscarriage of justice. Moreover, the jury's verdict on the issue of Atmel's non-infringement of the '269 patent, as Atmel details in its brief, is well-supported by the record, particularly the testimony of Dr. Prince on the use of clamping in Atmel's processes and his testimony, reiterated by Atmel employee Julius Kovats, that the shape of the accused Atmel structures is not consistent with use as a deformation absorbing member. *See* Def.'s Opp'n at 86-88 (Doc.Nos.347, 349). Thus, even if the jury's verdict on the issue of anticipation had been against the weight of the evidence, a new trial on that issue, without infringing conduct by Atmel, would be an empty exercise.

**D. The '126 Patent**

The '126 patent addresses two problems that arise during the process in which tungsten is deposited into contact holes. There are two methods of depositing tungsten into a contact hole-"blanket tungsten," which involves the reaction of tungsten hexaflouride and silane on the underlying dielectric to form a blanket tungsten layer, and "selective tungsten," which involves the reaction of tungsten hexaflouride (WF6) with a silicon substrate. Each of these methods has its problems-the use of selective tungsten results in the creation of "worm holes" filled with WF6 form in the silicon, while the use of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 23
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

blanket tungsten results in the creation of "volcanoes," or buildups of WF6 on the underlying dielectric and glue layer. The '126 patent teaches the use of a monolayer of silicon to prevent the formation of worm holes and volcanoes; this layer is formed in the contact hole in the dielectric and then is exposed to WF6. The exposure to WF6 then forms the desired tungsten plug.

At trial, the jury found that claim 6 of the '126 patent, the only claim of that patent asserted, was not literally infringed by Atmel and was invalid due to anticipation. The language of claim 6 depends on the language of claim 5, which in turn depends on the language of claim 1 of the '126 patent:

1. A method of semiconductor integrated circuit fabrication comprising forming a dielectric upon a substrate;

forming an opening in said dielectric, exposing said substrate;

forming a layer of material chosen from the group consisting of polysilicon and amorphous silicon within said opening, and overlying all of the exposed portion of said substrate and said dielectric, said layer not completely filing said opening;

exposing said layer of material to WF6, thereby forming a tungsten plug which completely fills said opening, and forming a tungsten layer which covers said dielectric;

etching said tungsten layer.

....

5. The method of claim 1 in which a layer of refractory metal is formed within said opening prior to formation of said layer of material

*30 6. The method of claim 5 in which a layer of material chosen from the group consisting of titanium nitride, titanium tungsten and zirconium nitride is formed upon said layer of refractory metal prior to formation of said layer of material.

'126 Patent at col. 3:12 through 3:27; col. 4:9 through 4:17.

*1. Agere is precluded from moving for JMOL on the anticipation of claim 6 of the '126 patent.*

Agere has moved for JMOL that claim 6 of the '126 patent was not invalid as anticipated. However, at the close of trial, Agere moved only for JMOL on the ground that claim 6 of the '126 patent was not invalid as obvious. In *Duro-Last, Inc. v. Custom Seal, Inc.,* 321 F.3d 1098 (Fed.Cir.2003), the Federal Circuit stated "In a pre-verdict JMOL motion on anticipation is not sufficient to support a post-verdict JMOL on obviousness; obviousness and anticipation are related, but are legally distinct and separate challenges to a patent's validity." *Id.* at 1107 (citing *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,* 308 F.3d 1167, 1188 (Fed.Cir.2002)). Though the grounds for the pre- and post-verdict JMOL motions are reversed in this case, the Court sees no reason that the Federal Circuit's holding would not apply here. As such, Agere is precluded from making a post-trial motion for JMOL on the anticipation of claim 6 of the '126 patent. The Court will analyze Agere's motion for a new trial based on the weight of the evidence regarding the anticipation of claim 6 below.

*2. Agere's motion for JMOL that claim 6 of the '126 patent is not invalid as obvious is moot.*

Agere has renewed its motion, made at the close of all the evidence at trial, that claim 6 of the '126 patent was not invalid as obvious in light of the prior art. Agere argues that Atmel presented no evidence at trial on the issue of whether the '126 patent was obvious in light of the prior art, as the testimony provided by Dr. Thomas related solely to Atmel's contentions that the '126 patent was invalid as anticipated and not enabled. The agreed-upon verdict form submitted to the jury in this matter did not include the question of whether the '126 patent was invalid as obvious and therefore, there are no findings of fact for the Court to review on the obviousness of the '126 patent. This motion is therefore denied as moot. *SeeAm. Standard, Inc. v. York Internat'l Corp.,* 244 F.Supp.2d 990, 996 (W.D.Wis.2002) (denying JMOL on issue not submitted to jury as moot).

*3. The jury's verdict that claim 6 of the '126 patent is invalid as anticipated is supported by the great weight of the evidence.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 24
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

Agere disputes that Atmel carried its burden at trial of showing, by clear and convincing evidence, that claim 6 of the '126 patent was invalid as anticipated. Specifically, Agere argues that Atmel failed to prove that Miyamoto discloses the formation of a layer of refractory metal within an opening in the dielectric and the formation of a layer of material chosen from the group consisting of titanium nitride, titanium tungsten, and zirconium nitride upon the layer of refractory metal prior to the formation. Atmel argues that a new trial is inappropriate, as the evidence produced at trial with respect to the Miyamoto reference, specifically the testimony of its expert, Dr. Thomas, and that of Agere's expert, Dr. Reif, shows that it discloses each and every element recited in claim 6 of the '126 patent.

*31 Neither party disputes that Miyamoto discloses the formation of a refractory metal, but rather whether the testimony at trial was sufficient to support a finding that the refractory metal was formed within an opening in the dielectric. During Atmel's direct examination of Dr. Thomas, he was shown Figure 5 of the '126 patent, which the patent shows as an embodiment of the invention, alongside Figure 1-B from Miyamoto, which that patent shows as a sectional view of its invention. 3/16/05 Tr. at 105. Dr. Thomas testified that Figure 5 shows one way to describe a layer of refractory metal being formed within the opening in the dielectric in a way that is consistent with the language of claim 5 of the '126 patent, upon which claim 6 depends. *Id.* at 106-07. He then testified specifically how Miyamoto Figure 1-B shows the same process as encapsulated in Figure 5, walking through the steps in both Miyamoto and the '126 patent-the formation of a layer of polysilicon or amorphous silicon, forming that layer within the opening in the dielectric such that it touches the underlying substrate, the filling of the opening with WF6, and the final etching of the tungsten layer. *Id.* at 107-111; 119-124.

Atmel also cites the testimony of Agere's expert, Dr. Reif, as supporting its jury verdict on anticipation. On cross-examination, Dr. Reif also viewed Figure 5 of the '126 patent and Figure 1-B of the '126 patent side-by-side. 3/17/05 Tr. at 194. He testified that it was his opinion that the layer of titanium in Miyamoto was not formed within the opening as taught by the '126 patent. *Id.* Nevertheless, he also testified that a comparison of the documents reveals that the inventors of the '126 patent chose to submit an illustrative drawing of their claims that is similar to the embodiment submitted by the inventors of the Miyamoto patent and to describe that figure as embodying the relevant claim language. *Id.* at 194-95.

In this case, the jury heard substantial, conflicting, competent, and believable expert testimony as to whether the Miyamoto patent described a layer of titanium that was formed within the opening in the dielectric. The jury resolved this question of fact in favor of Atmel. While Agere alleges that Dr. Thomas's testimony merely amounts to testimony that the figures in Miyamoto and the '126 patent were "similar," the Court finds that assertion to be unsupported by the record. The Court finds that the jury's finding that Miyamoto discloses a layer of refractory metal formed within an opening in the dielectric to be warranted by the weight of the evidence.

Agere next argues that Dr. Thomas's testimony on the above language of claim 6 is not adequate to support a finding that Miyamoto meets all the limitations of that claim. Specifically, Agere states that Dr. Thomas failed to testify that the titanium nitride layer in Miyamoto is formed "upon" the layer of refractory metal and that, instead, he testified that the titanium nitride layer is formed on the dielectric. Atmel argues that the testimony of Dr. Thomas is sufficient to support the jury's finding of anticipation.

*32 At trial, Dr. Thomas testified that Miyamoto discloses that a titanium nitride layer is formed "above the insulating film [dielectric] on the sunken substrate, but below the ... silicon-based film." 3/16/05 Tr. at 119. Agere contends that this testimony establishes only that the titanium nitride layer is formed above the remaining dielectric but that it does not establish that the titanium nitride layer is formed within the contact hole, in which the layer of refractory metal resides. Dr. Thomas went on to testify that he read the language of paragraphs 10 and 11 of Miyamoto to mean that the layer of refractory metal "is attached to the TI nitride or TI tungsten film at all points along the surface." *Id.* at 120. He testified that Miyamoto clearly states that the purpose of the invention reflected therein was to improve the adhesion of the tungsten in the upper part of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

contact hole through the use of the titanium nitride layer. *Id.* at 121.Thus, Atmel contends that the testimony at trial is certainly sufficient to support a finding that Miyamoto must show the use of a titanium nitride layer within the contact hole, upon the layer of refractory metal, because the jury could find that it would be nonsensical for Miyamoto to state that the titanium nitride layer improves adhesion in the contact hole if the titanium nitride layer exists only on top of the dielectric and not inside the contact hole.

The Court agrees with Atmel. The combination of the testimony at trial given by Dr. Thomas and the Miyamoto reference itself are sufficient to support a jury finding that all the limitations of claim 6 are found in Miyamoto and that claim 6 is therefore anticipated by the prior art. Agere's reliance on a drawing contained in Miyamoto does little more than highlight the fact that there was some conflicting evidence in the trial record for the jury to consider. The overwhelming weight of the evidence, though, does not mandate a new trial on this issue. Agere's motion for a new trial on this point is denied.

*4. The clear weight of the evidence supports the jury's finding that Atmel's accused processes did not infringe the limitations of claim 6 of the '126 patent.*

Agere claims that the weight of the evidence at trial shows that Atmel's accused processes meet the limitations "forming a layer of material chosen from the group consisting of polysilicon and amorphous silicon within said opening, and overlying all of the exposed portion of said substrate and said dielectric, said layer not completely filing said opening" and "exposing said layer of material to WF.sub.6, thereby forming a tungsten plug which completely fills said opening, and forming a tungsten layer which covers said dielectric."Agere bore the burden of establishing Atmel's infringement of these limitations of claim 6 by a preponderance of the evidence. *S. Bravo Sys., Inc. v. Containment Techs. Corp.,* 96 F.3d 1372, 1376 (Fed.Cir.1996). To that end, it offered the testimony of Dr. Reif and Atmel engineer Kim Schwechel, as well as the information contained in Atmel's own documents. Agere argues that given this testimony and documentary proofs, it has established that the clear weight of the evidence points to a verdict of infringement. Therefore, Agere argues that a new trial on the issue of whether Atmel's accused

processes infringe the '126 patent is warranted. Atmel responds that the testimony of its expert, Dr. Thomas, was sufficient for the jury to conclude that its processes do not meet the limitations of claim 6 recited above.

**\*33** Again, the two-step infringement analysis of claim construction and comparison of the construed claims and the allegedly infringing devices, systems, or method applies. *Ethicon EndoSurgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed.Cir.1998). As the Court has stated and restated, the parties agreed to let the '126 claims have their plain and ordinary meaning. Therefore, the only analysis for the Court is whether the jury's finding of non-infringement is supported by the weight of the evidence presented on a comparison of the plain and ordinary meaning of the '126 terms and the accused Atmel processes.

At trial, the parties presented conflicting expert testimony as to whether the accused Atmel processes met the limitation of claim 6 of "forming a layer of material chosen from the group consisting of polysilicon and amorphous silicon within said opening, and overlying all of the exposed portion of said substrate and said dielectric, said layer not completely filling said opening."The testimony at trial revealed that step 9 of the accused Atmel processes involved the exposure of the wafer to a silane gas that also contains a certain amount of hydrogen. Thomas 3/16/05; Reif 3/3/05 Tr. at 104. Dr. Thomas explained that the silane gas contains a "substantial" amount of hydrogen-four parts hydrogen to one part silane. Thomas 3/3/05 Tr. at 84. The result of the exposure of the wafer to this gas was the main factual dispute at trial with regard to whether the Atmel process meets the limitation of claim 6 that requires the formation of a monolayer of silicon.

Both Dr. Reif and Dr. Thomas agreed that, in order for Atmel's process to result in a monolayer of silicon, the hydrogen atoms would have to separate from the silane atoms during the heating process so that one uniform layer of silicon could form on the substrate and the dielectric. Reif 3/3/05 Tr. at 93; Thomas 3/16/05 Tr. at 83-85. Dr. Reif testified that, in his opinion, the deposition testimony of Atmel engineer Kimberely Schwechel and Atmel's internal documents showed that Atmel's process resulted in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 26
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

this separation and thus produced the required monolayer of silicon. Reif 3/3/05 Tr. at 99-102; JTX 2089. In rebuttal, Dr. Thomas testified, in detail, as to why he believed that the process used by Atmel could not result in the required monolayer of silicon. First, he testified that the relatively large amount of hydrogen present in the silane gas used by Atmel would retard the growth of a monolayer of silicon. Thomas 3/3/05 Tr. at 83-85. Second, Dr. Thomas testified that, even if the substantial amount of hydrogen present in Atmel's process did not suppress the formation of a layer of silicon, that the resulting layer of silicon would be at least one quarter silicon nitride because the silicon atoms would bond to the nitrogen atoms in the underlying layer of titanium nitride; such a situation, he testified would not be consistent with the formation of a monolayer of silicon. *Id.* at 90-91.

*34 The jury heard testimony on this point from two credible and experienced expert witnesses who reached differing opinions as to the consequences of Atmel's use of a large amount of hydrogen in the silane gas to which the wafer is exposed. The jury resolved this question in favor of Dr. Thomas. The Court's review of the record does not indicate that this resolution shocks the conscience. As such, the Court finds that the jury's verdict of non-infringement should stand.

As the Court finds that Atmel presented sufficient evidence to support the jury's verdict of non-infringement of the limitation of claim 6 that requires "forming a layer of material chosen from the group consisting of polysilcon and amorphous silicon within said opening, and overlying all of the exposed portion of said substrate and said dielectric, said layer not completely filling said opening," the Court will not reach Agere's argument that the evidence at trial was not sufficient to support a finding that its processes did not meet the limitation of claim 6 that requires "exposing said layer of material to WF6, thereby forming a tungsten plug which completely fills said opening, and forming a tungsten layer which covers said dielectric."

*5. The jury's verdict on the invalidity of claims 1, 5, and 6 of the '126 patent due to lack of enablement is not supported by legally sufficient evidence; however, the jury's verdict that the '126 patent is not invalid as indefinite is supported by legally sufficient evidence.*

Again, Atmel bore the burden at trial of showing facts supported by clear and convincing evidence to prove the '126 patent invalid. The jury found that claims 1, 5, and 6 of the '126 patent was invalid as anticipated, but failed to find, as Atmel requested, that the claims were invalid as nonenabled and invalid as indefinite. Atmel now renews its motion for JMOL that the asserted claims of the '126 patent are invalid on these grounds.

The Court preliminarily notes that Atmel bears the burden of proof on this matter and so it must show that it has established its case for the nonenablement and indefiniteness of the '126 patent using evidence that no jury would be at liberty to disbelieve. The Court finds that while the jury's finding that the evidence that claims 1, 5, and 6 are not inoperable as nonenabled regarding the formation of "a monolayer of silicon" is legally sufficient, as is its determination that those claims are not invalid as indefinite regarding the filling of "said opening." However, the Court also finds that the jury's finding that claims 1, 5, and 6 are not inoperable as nonenabled with respect to the claim of "exposing said layer of material to WF6, thereby forming a tungsten plug" does not have a legally sufficient evidentiary basis and therefore will grant JMOL in favor of Atmel on that issue.

Atmel argues that the jury did not apply the plain and ordinary meaning of the words "thereby" and "said opening" recited in claim 1 of the '126 patent in reaching its conclusions on the nonenablement of dependent claim 6 and that a proper interpretation would have lead the jury to conclude that claims 1, 5, and 6 are nonenabled because they are inoperable. Indeed, in their moving papers and responses on this point, both parties engage in a great deal of argument as to the meaning of the words "thereby" and "said opening," as those terms are used in the '126 patent. Like the jury, the Court will afford these terms their plain and ordinary meaning in considering whether the evidence at trial was sufficient to sustain the jury's verdict that Atmel did not carry its burden of proof.

*35 Like obviousness, the absence of enablement is a legal conclusion based on underlying factual inquiries. The presumption of validity that attaches to all patents includes a presumption that the patent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

Page 27

complies with 35 U.S.C.A. § 112, which states that

[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112 ¶ 1. The enablement requirement of § 112 mandates that, given what is already known, the specification teaches those in the art enough that they can make and use the full scope of the claimed invention without "undue experimentation." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed.Cir.2003). The scope of the claims must be less than or equal to the scope of the enablement, which is defined as "that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation."*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys.*, 166 F.3d 1190, 1196 (Fed.Cir.1999). The requirement that the level of experimentation be "undue" does not preclude a finding of enablement in situations where some experimentation is necessary to achieve an undescribed embodiment. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed.Cir.1996).

Moreover, the utility requirement of 38 U.S.C. § 101 requires that the invention itself be operable to achieve useful results and specifically that the described result must be able to be obtained by the means described in the patent. *See Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 958 (Fed.Cir.1983); *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1571 (Fed.Cir.1992); *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1358 (Fed.Cir.1999). It is only when the claimed invention has a total incapacity to achieve what is claimed that it may be deemed inoperable.*Raytheon*, 724 F.2d at 956. The Federal Circuit has held that where a claim is inoperative, it not only fails to meet the utility requirement of § 101, but it also fails to meet the enablement requirement of § 112, because a person skilled in the art cannot practice the invention. *Process Control*, 190 F.3d at 1358.

First, Atmel argues that the '126 patent is invalid as inoperable because it is impossible to fill the opening in the dielectric with tungsten by exposing the polysilicon or amorphous silicon layer to WF6 alone. Neither party disputes that the use of a single-gas process is insufficient to fill the contact hole with tungsten and Agere's own inventor and expert testified to this fact at trial. At trial, Dr. Chittipeddi described the process by which the layer of refractory metal at the bottom of the contact hole in the dielectric is exposed to WF6, which leads to the formation of a tungsten flood that completely fills that contact hole and forms a tungsten layer that completely covers the dielectric. 3/2/05 Tr. at 160. He explained that the exposure of the metal layer to the WF6 initially creates a "nice nucleating layer" and that the tungsten then starts growing, *alongside another gas*, to fill the contact hole all the way to the top. *Id.* (emphasis added). Agere's own expert, Dr. Rana also testified that "there is no way that you can form a tungsten plug by just reacting WF6 in a monolayer of silicon."Rana 3/3/05 Tr. at 100.

**\*36** The jury was therefore given this indisputable fact and asked to apply it to the claim limitation "exposing said layer of material to WF6, thereby forming a tungsten plug which completely fills said opening, and forming a tungsten layer which covers said dielectric."The Court finds that no reasonable jury, having heard the undisputed testimony of Drs. Rana and Chittipeddi, could have found that claim 6 is operable. The only means by which the jury could have made such a finding would be by interpreting "exposing said layer to WF6" to mean "exposing said layer to WF6 and another gas," an interpretation that the Court finds no reasonable jury could accept. Agere argues that the jury could have accepted its testimony and argument that the claim language encompassed not only the use of WF6, but also another gas in combination with WF6. That, however, is not the invention it claimed in the '126 patent, which refers to a reaction between WF6 and the layer of amorphous or polysilicon. The patentee must contend with the consequences of the claim it actually wrote, rather than the one they, in hindsight, might wish they had written. *See*Chef Am., Inc. v. Lamb-Weston, Inc., 358 F.3d 1371, 1375 (Fed.Cir.2004). Atmel's motion for JMOL that claim 6 of the '126 patent is invalid as inoperable is granted.

Second, Atmel argues that the '126 patent does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 28
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

teach one of ordinary skill in the art to form a monolayer of silicon. In support of its motion, Atmel cites to the testimony of Dr. Thomas in which he states that he "was not aware of any article or technique that said that [the inventors] could controllably generate one layer of [polysilicon or amorphous silicon]." 3/16/05 Tr. at 125. Atmel also cites to the videotaped deposition testimony of Dr. Chittipeddi played at trial, in which he states that he and the other inventors of the '126 patent were not aware of performing a silane soak, which is one method of forming a monolayer of silicon. 3/ 7/05 Tr. at 134. Atmel states that Agere presented no evidence to contradict this testimony and presented no evidence that a person of ordinary skill in the art would have known how to form a monolayer of silicon without undue experimentation and that, as such, JMOL must be granted on the issue of invalidity for lack of enablement.

The Court has reviewed Dr. Thomas's testimony on this point, as well as the statements by Dr. Chittipeddi, and concludes that Atmel did not offer evidence of non-enablement such that the only reasonable conclusion that can be drawn from that evidence is one in Atmel's favor. First, though Dr. Chittipeddi testified that he was not aware of one method of forming a monolayer of silicion, it is clear that an inventor need not "correctly set forth, or even know, how or why the invention works" so long as the patent teaches how to achieve the claimed result. *Newman v. Quigg*, 877 F.2d 1575, 1581-82 (Fed.Cir.1989). In addition, though Dr. Thomas's testimony is not as conclusory as Agere suggests, it remains insufficient to show that the trial and error required to practice the invention described in the '126 patent would be "unduly laborious or beyond the reach of one of ordinary skill in the art." *Koito Mfg. Co., Ltd. v. Turn-Key-Tech,LLC*, 381 F.3d 1142, 1155 (Fed.Cir.2004). Moreover, as Agere rightly points out, the burden fell upon Atmel to overcome the statutory presumption of validity enjoyed by the '126 patent; Atmel cannot point to Agere's failure to rebut its testimony as evidence that JMOL is warranted on this issue.

*37 Lastly, Atmel moves for JMOL on the theory that the '126 patent is invalid as indefinite. A further requirement of 35 U.S.C. § 112 is that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."35 U.S.C. § 112, ¶ 2. Definiteness requires the language of the claim to set forth clearly the domain over which the applicant seeks exclusive rights, as a failure to do so deprives other persons and entities of notice as to what constitutes infringement of the patent. The test for whether a claim meets the definiteness requirement is "whether one skilled in the art would understand the bounds of the claim when read in light of the specification."*Personalized Media Communications v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed.Cir.1998).

Atmel argues that the '126 patent is invalid as indefinite because it is impossible to determine to what "said opening" in claim 6 of the '126 patent refers, and that, if "said opening" must be construed as meaning the original volume of the contact hole, the claim must be held invalid as inoperable because it is impossible to fill the entire original volume after the additional layers required by claim 1 of the patent have been added. Again, Atmel bore the burden at trial of showing that the '126 patent was indefinite by clear and convincing evidence.

The Court will start with Atmel's argument that the '126 patent is invalid as inoperable because it is impossible to fill the entire contact hole as initially defined in claim 1 ("an opening in said dielectric") with the tungsten plug described later in claim 1 ("completely fills said opening"). Atmel argues that, because claim 1 describes additional layers that must be inserted after the contact hole is initially formed, namely a layer of refractory metal as required by claim 5 and a layer of titanium nitride as required by claim 6, the tungsten plug cannot possibly fill the entire original volume or capacity of the contact hole. Atmel cites to the testimony of Dr. Chittipeddi, who confirmed that the references to "said opening" used throughout claims 1, 5 and 6 refers to the original volume of the contact hole. Chittipeddi 3/2/05 Tr. at 188-89, 191, 192.

It is clear that the jury, in rejecting Atmel's contention that the claim was invalid as inoperable, read the plain and ordinary meaning of the claim language to mean that the tungsten plug fills the remaining volume of the original contact hole after it has been partially filled by the layer of refractory metal and the layer of titanium nitride. Dr. Chittipeddi testified that this was the understanding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

Page 29

of the inventors as well, stating that the patent language is "saying fill the hole completely beyond the empty portion of the contact hole, that's what it's saying."*Id.* at 197.The jury heard both parties' theories as to what "completely fills" means in the context of the '126 patent and had legally sufficient evidence to conclude that the plain and ordinary meaning of "completely fills" requires that the tungsten plug completely fill whatever volume of the original contact hole remained after the layers of refractory metal and titanium nitride were placed in the contact hole.

**\*38** Second, Atmel argues that if the jury's verdict that the '126 patent is not invalid as inoperable on this point is supportable, it must find that the jury's verdict that the '126 patent is not invalid as indefinite is not supportable, because it becomes impossible to ascertain what "said opening" means. The Court rejects this contention. The jury could well have found that the claim language, when read by a person of ordinary skill in the art, taught that "said opening," as used in the claims of the '126 patent, referred back to the original opening created in the dielectric. Moreover, the jury could have found that the plain and ordinary meaning of "said opening" required only that the deposition of tungsten fill whatever volume remained in the opening in the dielectric taught in claim 1, not that the deposition of tungsten will the entire original volume of the original opening. A careful reading of the claims of the '126 patent fully supports the jury's verdict on this point and Atmel's motion is therefore denied.

**E. The '827 Patent**

The '827 patent addresses two problems that can arise during the etching of a dielectric. First, during the fabrication of a semiconductor chip, a layer of silicide is often placed over the substrate in order to minimize contact resistance and to improve electrical connections. When a layer of dielectric is placed over the silicide and subsequently selectively removed to create a contact opening, there is a potential for the loss of a part of the silicide layer. The '829 patent teaches a method of depositing a silicide-forming material into a newly-created contact hole in order to replenish any silicide that was lost in the etching of the dielectric. Second, openings etched into the dielectric sometimes fail to align properly with the desired underlying contact region. The '827 patent

teaches a method in which dopants are implanted into the contact region in order to extend that region laterally, such that any misalignment is cured.

At trial, the jury found that Atmel literally infringed claims 1 through 3 of the '827 patent, but that the claims were invalid due to obviousness. Claims 1 through 3 are set forth in the '827 patent as follows:

1. In the manufacture of semiconductor integrated-circuit devices, a method for making electrical contact to at least one contact region on a semiconductor body, said method comprising the steps of depositing a dielectric layer on said body, etching an opening into said dielectric layer, said opening exposing an area which comprises at least a portion of said contact region, said contact region comprising a silicide formed before said etching step, implanting phosphorous after depositing said dielectric layer and etching said opening, depositing silicide-forming material after etching and implanting, heating in a non-oxidizing atmosphere, and depositing a metal layer.

2. The method of claim 1 in which said contact region comprises titanium silicide.

**\*39** 3. The method of claim 1 in which said silicide-forming material comprises titanium.

'827 Patent at col. 4:45 through col. 4:65.

The only prior art offered by Atmel in support of its contention that the asserted claims of the '827 patent were invalid was the Hitachi patent. *See* Def.'s Ex. JTX 2117. The Federal Circuit has held that a single prior art reference can render a claim obvious. *See, e.g.,SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.,* 225 F.3d 1349, 1356 (Fed.Cir.2000). The party offering the prior art, however, must still make a showing of a suggestion or motivation to modify the teachings of that reference to the claimed invention.*Id.;see also B.F. Goodrich v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582 (Fed.Cir.1996). The proponent of the prior art may rely upon prior art reference itself, the knowledge of one of ordinary skill in the art, or the nature of the problem to be solved. *Neurosciences, Inc.,* 225 F.3d at 1356 (citing *Motorola, Inc. v. Interdigital Tech. Corp.,* 121 F.3d 1461, 1472 (Fed.Cir.1997) ("[T]he suggestion to combine may

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 30
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.))

come from the prior art, as filtered through the knowledge of one skilled in the art.")).''The showing of a motivation to combine must be clear and particular, and it must be supported by actual evidence.''*Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1334 (Fed.Cir.2002)* (citing *In re Dembiczak, 175 F.3d 994, 999 (Fed.Cir.1999)*).

The parties agree that the Hitachi patent teaches all the steps found in the '827 patent,[FN5] but in a different sequence. Specifically, the '827 patent reverses the order of two steps disclosed in the Hitachi sequence, namely the implantation of phosphorus dopants into a contact hole and the deposition of a silicide forming metal. In the Hitachi sequence, the latter process is performed first; in the '827 patent, the former process is performed first. Thomas 3/16/05 Tr. at 135. The sequence of these two steps is irrelevant to the end result of the overall process, but Hitachi's developed sequence requires an additional heating step after the implantation of the phosphorus. Thomas 3/16/05 Tr. at 136, 166.

> FN5. The Hitachi patent and the '827 patent both teach a solution to the problem that arises in semiconductor fabrication when a contact hole cut in the dielectric is ''misaligned.''

The parties agree that the main, if not the only, factual inquiry for the jury to resolve on the issue of the obviousness of the '827 patent is whether it would have been obvious to a person of ordinary skill in the art to reverse the steps in the Hitachi patent in order to arrive at the steps taught by the '827 patent. Agere argues that Atmel's only evidence on this point was the testimony of Atmel's expert, Dr. Thomas, which was insufficient to sustain Agere's burden as it was impermissibly based on hindsight. Atmel argues that Dr. Thomas's testimony was proper and further reinforced by the testimony of Atmel engineer Michael Whiteman.

It is clear that in order to prevail on the question of obviousness, Atmel was required to produce evidence of a suggestion or motivation to modify the teachings of the Hitachi reference; namely to transpose the two steps and thereby eliminate the heating step. The only testimony offered on this point at trial was that of Dr. Thomas and Mr. Whiteman. Dr. Thomas, testified that, in his opinion, it would have been obvious to a person of ordinary skill in the art to reverse the sequence of steps in the Hitachi patent, because ''people are always trying to eliminate steps if they can.''Thomas 3/16/05 Tr. at 135, 137. Mr. Whiteman testified that, generally speaking, engineers would prefer a semiconductor fabrication process with fewer steps, as fewer steps leave fewer opportunities for imperfections to creep into the fabrication process. Whiteman 3/14/05 Tr. at 56. This testimony merely expresses a general desire to eliminate steps in the process of semiconductor fabrication as opposed to a specific motivation to eliminate this particular heating step. The law of obviousness requires evidence of the latter to render a patent invalid; the weight of the evidence at trial therefore does not support a finding that the '827 patent is invalid as obvious. Agere's motion for a new trial on the issue of the obviousness of the '827 patent is granted.

## IV. CONCLUSION

*40 The various post-trial motions filed by Agere and Atmel in this matter are granted in part and denied in part. Agere's motion for a new trial on the invalidity of the '827 patent is granted and the remainder of its motions for JMOL and a new trial are denied. Atmel's motions for JMOL on the invalidity of the '126 patent as nonenabled and the invalidity of the '335 patent as obvious are granted and the remainder of its motions for JMOL are denied. An appropriate Order follows.

E.D.Pa.,2005.
Agere Systems, Inc. v. Atmel Corp.
Not Reported in F.Supp.2d, 2005 WL 2994702 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Trial Transcript - Day 8 (Rana; Cronin)

page

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

AGERE SYSTEMS, INC.,          : CIVIL ACTION NO. 02-864

    Plaintiff          :

                  :

    v.          : Philadelphia, Pennsylvania

             : March 15, 2005

ATMEL CORPORATION,          : 9:36 o'clock a.m.

    Defendant          :

. . . . . . . . . . . . . . . .

AMENDED TRANSCRIPT OF JURY TRIAL - DAY EIGHT

BEFORE THE HONORABLE LEGROME D. DAVIS

UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiff:   DAVID CALLAHAN, ESQUIRE

        MICHAEL BREGENZER, ESQUIRE

        WILLIAM E. DEVITT, ESQUIRE

        BARRY F. IRWIN, ESQUIRE

        Kirkland & Ellis

        153 East 53rd Street

        New York, NY   10002

For the Defendant:   ROBERT T. HASLAM, ESQUIRE

        PAUL ALEXANDER, ESQUIRE

        NITIN SUBHEDAR, ESQUIRE

        Heller Ehrman White & McAuliffe LLP

        275 Makefield Road

Menlo Park, CA   94025-3506

- - -

Audio Operator:   Sharon Carter

Transcribed by:   Tracey J. Williams, CET

Grace Williams, CET

Paula Curran, CET

Diane Gable

Laws Transcription Service

(Proceedings recorded by For the Record Gold digital sound recording; transcript provided by AAERT-certified transcribers.)

page

Trial Transcript - Day 8 (Rana; Cronin)

page 27

1  beyond what we discussed in the context of what Dr. Rana

2  could testify to.

3      THE COURT:  Any response?

4      MR. HASLAM:  I think it's what he's testified about,

5  what his invention is and what he understands.  He's referred

6  to this as what he thought was --

7      THE COURT:  All right, it's overruled, it's

8  overruled, go ahead, sir.

9      THE WITNESS:  Could you repeat your question,

10  please?

11  BY MR. HASLAM:

12  Q  As you look at Process A --

13  A  Mm-hmm.

14  Q  -- as you described your invention what do you consider

15  to be, if anything there, the glue layer?

16  A  Both titanium and titanium nitride are glue layers so

17  it's a composite here.

18  Q  So you consider to be the glue layer the titanium and the

19  titanium nitride?

20  A  They're both, it's a composite glue layer.  Instead of

21  being a single layer it's a composite.

22  Q  Now you believe that you were the first to come up with

23  the titanium nitride as a glue layer, correct?

24  A  Yes.

25  Q  Do you still believe that today?

page 27

Trial Transcript - Day 8 (Rana; Cronin)

page 28

1  A  Yes.

2  Q  Notwithstanding having seen Exhibit 1111?

3  A  Yes, because when I filed my patent my work was

4  completely done so I started long before my patent.  And I

5  don't have any paperwork with me to show when I started, I

6  left all that with my company, that's the requirement really

7  was that, so I don't know when I started this but when I

8  filed the patent our work was completely done, was shown

9  (indiscernible) device and everything.  So I started long

10  before that and I don't have that date.  I do not have a date

11  to compare with this document.  So the date I started my work

12  I do not know what that date is so that I can compare with

13  this document.

14  Q  All right.

15  A  So not having that date, I believe that I was the first

16  one to invent that.

17  Q  And this document is dated -- is signed in October 1985

18  and November of 1985, do you see that on the first page?

19  A  Yes.

20  Q  And your patent application was filed on November 10th,

21  1986, a year later, correct?

22  A  Yes.

23  Q  So you would agree with me, wouldn't you, that if you

24  started your work --

25  A  Mm-hmm.

page 28

Trial Transcript - Day 8 (Rana; Cronin)

page 29

1  Q  -- after this date then as shown in here somebody you

2  would agree at least drew what you considered to be your

3  invention before you began your work?

4      MR. CALLAHAN:  It's leading, your Honor.  It's a

5  cross-examination question.

6      THE COURT:  It's overruled and it's an objected fact

7  one way or another, it's innocuous.  You can answer the

8  question.

9      THE WITNESS:  You can repeat the question.  I want

10  to make sure I remember it with the objection.

11  BY MR. HASLAM:

12  Q  If your earliest work --

13  A  Yes.

14  Q  -- was after the date shown on Exhibit 1111--

15  A  Yes.

16  Q  -- would you agree with me that somebody at least drew

17  what you considered to be your invention prior to your

18  beginning your work?

19  A  Yeah, if it is proven after looking at my notebooks in

20  my-- at our company, if my notebooks show that I started my

21  work after that date then, yes, then they are the inventors,

22  yes.

23  Q  Let me ask you to look at Exhibit 1141.  Is that an

24  article on which you were a co-author?

25  A  Yes.

page 29

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| AGERE SYSTEMS INC., ET AL. | : | CIVIL ACTION |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| ATMEL CORPORATION | : | |
| | : | |
| Defendant | : | NO. 2:02-CV-00864-LDD |

CIVIL JUDGMENT

Before the Honorable Legrome D. Davis

AND NOW, this 28th day of March, 2005 in accordance with the jury

verdict,

IT IS ORDERED that Judgment be and the same is hereby entered in favor of

Defendant Atmel Corporation and against Plaintiffs Agere Systems Inc..


BY THE COURT


/s/
Legrome D. Davis, J

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ATMEL CORPORATION, | : | NO. 02-CV-864 |
| Defendant. | : | |

ORDER

AND NOW, this  13th  day of December 2005, upon consideration of Plaintiff's

Motion to Certify for Appeal or Sever Claims and Counterclaims that Have Been Resolved

Before This Court (Doc. No. 363) and Defendant's Response thereto (Doc. No. 364), it is hereby

ORDERED that Plaintiff's Motion is DENIED.

I.      FACTUAL AND PROCEDURAL HISTORY

This case involves five patents procured from the United States Patent and Trademark

Office ("USPTO") by Plaintiff Agere Systems, Inc. ("Agere"): U.S. Patent Nos. 6,323,126 ("the

'126 patent"); 34,269 ("the '269 patent"); 5,227,335 ("the '335 patent"); 5,149,672 ("the '672

patent"); and 5,102,827 ("the '827 patent").  The '126, '335, '672 and the '827 patents each

recite specific steps used in the process of semiconductor fabrication, the process by which a

wafer of silicon, also known as a "substrate," is transformed into a semiconductor chip that can

be used in a variety of electronic devices.  The '269 patent recites a method for packaging

semiconductor chips after they have been fabricated.

On February 20, 2002, Agere initiated this action against Atmel, setting forth claims for

1

infringement of the '126, '269, '335, '672 and '827 patents. Atmel brought counterclaims against Agere, seeking declaratory judgments of non-infringement and invalidity on all five patents. On April 30, 2004, this Court granted summary judgment in favor of Atmel on Agere's claim for infringement of the '672 patent. The claims regarding the '126, '269, '335 and '827 patents proceeded to trial.

The jury found that Atmel literally infringed all the asserted claims of the '335 patent; that the infringement was not willful; that claims 1 through 6 and claim 11 of the '335 patent were invalid as anticipated but not as obvious; and that claim 2 of the '335 patent was not invalid as indefinite. With respect to the '126 patent, the jury found that Atmel did not literally infringe claim 6; that claim 6 was invalid due to anticipation; and that claim 6 was not invalid as indefinite or nonenabled. The jury further found that Atmel literally infringed all the asserted claims of the '827 patent, but that the infringement was not willful and that the claims were invalid as obvious. Lastly, the jury found that Atmel did not literally infringe claims 6 and 9 of the '269 patent and that claim 6 of the '269 patent was invalid as anticipated.

Agere filed a post-trial motion seeking judgment as a matter of law ("JMOL") or, in the alternative, a new trial. Atmel filed a post-trial motion seeking judgment as a matter of law. Agere's motion for a new trial on the invalidity of the '827 patent was granted. Atmel's motions for JMOL on the invalidity of the '126 patent as nonenabled and the invalidity of the '335 patent as obvious were granted.

Agere now seeks to separate the '827 patent, the one patent for which a new trial was granted, from the other four patents. Agere requests that this Court certify entry of final judgment under Federal Rule of Civil Procedure 54(b) or, in the alternative, sever the claims and

counterclaims that have yet to be resolved.

II.    MOTION TO CERTIFY FOR APPEAL

A.    Legal Standard

"When more than one claim for relief is presented in an action ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed. R. Civ. P. 54(b). A district court must make two determinations before directing the entry of a final judgment under Rule 54(b). Curtiss-Wright -Corp. v. General Electric Co., 446 U.S. 1, 7-8 (1980) (citing Sears, Roebuck & Co. v. Mackey, 351 U.S. 427 (1956)). First, the court must determine that a final judgment has been reached on the claims at issue. Curtiss-Wright, 446 U.S. at 7. Second, the court must determine whether there is any just reason for delay. Id. at 8.

The burden is on the party moving for certification to demonstrate that the case warrants it. Allis-Chalmers Corp. v. Philadelphia Electric Co., 521 F.2d 360, 365 (3d Cir. 1975). A showing must be made by the party desiring an immediate appeal in order to overcome the normal rule that no appeal will be heard until the entire case has been completed. See 10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure § 2659, at 109-10 (1998). Rule 54(b) orders are not to be entered into "routinely or as a courtesy or accommodation to counsel." Panichella v. Pennsylvania Railroad Co., 252 F.2d 452, 455 (3d Cir. 1958).

B.    Final Judgment on the '126, '269, '335 and '672 Patents

In the current case, there is no doubt that a final judgment has been reached on the '126,

3

'269, '335 and '672 patents. All four of these patents have been found to be invalid and/or not infringed.

C.    Just Reason for Delay

District courts have "substantial discretion in determining when there is no just cause for delay." Intergraph Corp. v. Intel Corp., 253 F.3d 695, 699 (3d Cir. 2001). In making this determination, the district court "must take into account judicial administrative interests as well as the equities involved." Curtiss-Wright, 446 U.S. at 8.

1.    Judicial Administrative Interests

Consideration of the judicial administrative interests is necessary to ensure that application of Rule 54(b) effectively "preserves the historic federal policy against piecemeal appeals." Id. (citing Sears, Roebuck & Co., 351 U.S. at 438). It is therefore proper for the district court to "consider such factors as whether the claims under review [are] separable from the others remaining to be adjudicated and whether the nature of the claims already determined [is] such that no appellate court would have to decide the same issues more than once even if there [are] subsequent appeals." Id.

In the current case, Agere argues that the claims relating to the '827 patent are "completely separate" from the claims relating to the patents that have been fully litigated because the '827 patent claims focus on a different patent that addresses different aspects of Atmel's processes and has different prior art references. Pl.'s Mot. at 7. Atmel disagrees, arguing that the '827 patent pertains to the same portion of the semiconductor manufacturing process as the '126 and '335 patents. Def.'s Mot. at 7-8. The '126, '335 and '827 patents all recite specific steps used in the process of semiconductor fabrication. While the claims associated with the '827

4

patent are separable from those associated with the other patents, the expert witnesses and the testimony regarding the semiconductor manufacturing process overlap.[1] See Curtiss-Wright, 446 U.S. at 8 ("[n]ot all final judgments on individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims").

Agere argues that the Federal Circuit will not have to decide the same issues more than once in this case. Pl.'s Mot. at 7-8. However, Atmel notes that, in the post-trial motions, Agere contested jury instructions that are applicable to the '827 patent and the other patents at issue in this case. Def.'s Mot. at 8-9. This presents the very real possibility that Agere may contest the jury instructions in two separate appeals. Since subsequent appeals in this case may involve some of the same issues, it would be inefficient and against judicial administrative interests for this Court to certify the adjudicated claims for appeal.

2.    Balance of the Equities

This Court must also balance "the equities involved." Curtiss-Wright, 446 U.S. at 8. In support of its argument that the equities involved favor an immediate appeal, Agere argues that the delay associated with having a new trial on the '827 patent has the potential to "impede unjustly" Agere's efforts to license its patent portfolio. Pl.'s Mot. at 9. Agere fears that if this Court does not certify the adjudicated claims for appeal, the resolution of this case will be unreasonably delayed. Contrary to Agere's fears, the "meat of this case" will not be put "on ice indefinitely." See id. Rather, a new trial on the "one narrow issue" will occur in a timely manner. See id. ("one narrow issue ... still requires this Court's resolution"). This Court does not plan to

---

[1] During the trial, Dr. Reif, Agere's expert witness, and Dr. Thomas, Atmel's expert witness, both testified in detail about the '126, the '335 and the '827 patents.

allow this case to languish "indefinitely" on its docket.

Atmel argues that the balance of equities weighs in favor of keeping the claims together. Atmel notes that it was Agere that used the liberal joinder rules to its benefit, strategically structuring the case to include the five patents. Def.'s Mot. at 11-12. Atmel also argues that its witnesses should not be burdened with multiple trials.[2] Id. at 10-11.

On balance, this Court finds that Agere, the party advocating certification for appeal, has not demonstrated that the equities involved support separating the claims. This Court believes that the retrial on the remaining claims will occur in a timely manner and that neither party will be greatly affected by the slight delay this will entail. This Court has no doubt that this case will be appealed. Rather than burden the appellate court with multiple appeals on related, and potentially overlapping, issues, this Court denies Agere's request to certify the adjudicated claims for appeal.

III.     MOTION TO SEVER CLAIMS AND COUNTERCLAIMS

Federal Rule of Civil Procedure 21 provides that "[a]ny claim against a party may be severed and proceeded with separately." Fed. R. Civ. P. 21. In determining whether a claim should be severed under Rule 21, the district court should consider several factors, including the convenience of the parties, avoidance of prejudice to either party, and the expeditious resolution of the litigation. See Official Committee of Unsecured Creditors v. Shapiro, 190 F.R.D. 352, 354 (E.D. Pa. 2000). As this Court believes that the remaining claims in this matter will be resolved expeditiously, allowing the parties to appeal all aspects of this matter simultaneously, this Court

---

[2] If the adjudicated claims are certified for appeal, the '827 claims are appealed and both appeals result in remands, two trials will be necessary, while if the claims remain together, there is only the potential for one trial upon remand.

6

will not sever the '827 patent claims.

IV.    CONCLUSION

Accordingly, this Court denies Plaintiff's Motion to Certify for Appeal or Sever Claims and Counterclaims that Have Been Resolved Before This Court.


BY THE COURT:


/s/
_____Legrome D. Davis, J.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ATMEL CORPORATION, | : | NO. 02-CV-864 |
| Defendant. | : | |

ORDER

AND NOW, this 19th day of June 2006, upon consideration of the parties' Stipulation

and [Proposed] Order to Vacate and Dismiss with Prejudice filed with the Court on June 16,

2006, it is hereby ORDERED as follows:

1.    This action is hereby DISMISSED with prejudice, each side to bear its own

       attorneys' fees and costs.

2.    The Court's summary judgment orders, jury verdicts, and judgments based

       thereon, including the March 28, 2005 Order of Civil Judgment and the

       underlying jury verdict, are hereby vacated.

3.    The Court retains jurisdiction to enforce the provisions of the Settlement

       Agreement and the related Confidential Settlement & Patent License Agreement

       referred to therein.

BY THE COURT:

/S/LEGROME D. DAVIS

_____
Legrome D. Davis, J.

# EXHIBIT 8

Trial Transcript - Day 13 (jury questions; jury verdict)

page

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

AGERE SYSTEMS, INC.,      : CIVIL ACTION NO. 02-864

    Plaintiff    :

             :

    v.        : Philadelphia, Pennsylvania

             : March 22, 2005

ATMEL CORPORATION,     : 9:30 o'clock a.m.

    Defendant   :

. . . . . . . . . . . . . . . .

### JURY TRIAL - DAY THIRTEEN
### BEFORE THE HONORABLE LEGROME D. DAVIS
### UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiff:  DAVID CALLAHAN, ESQUIRE

           MICHAEL BREGENZER, ESQUIRE

           WILLIAM E. DEVITT, ESQUIRE

           BARRY F. IRWIN, ESQUIRE

           Kirkland & Ellis

           153 East 53rd Street

           New York, NY  10002

For the Defendant:  ROBERT T. HASLAM, ESQUIRE

           PAUL ALEXANDER, ESQUIRE

           NITIN SUBHEDAR, ESQUIRE

           Heller Ehrman White & McAuliffe LLP

           275 Makefield Road

Menlo Park, CA   94025-3506

- - -

Audio Operator:      Sharon Carter

Transcribed by:      Paula Curran, CET

Laws Transcription Service

(Proceedings recorded by For the Record Gold digital sound

recording; transcript provided by AAERT-certified

transcribers.)


page

Trial Transcript - Day 13 (jury questions; jury verdict)

page 21

1      THE CLERK:  And you have circled?

2      THE FOREPERSON:  Literal.

3      THE CLERK:  If your answer to any part of questions

4  one, two or three above is yes, do you find that Atmel's

5  infringement of the '335 patent was willful?

6      THE FOREPERSON:  No.

7      THE COURT:  Validity of the '335 patent, do you find

8  by clear and convincing evidence that the following claims of

9  the '335 patent are invalid due to anticipation?  Claim one?

10      THE FOREPERSON:  Yes.

11      THE CLERK:  Claim two?

12      THE FOREPERSON:  Yes.

13      THE CLERK:  Claim three?

14      THE FOREPERSON:  Yes.

15      THE CLERK:  Claim four?

16      THE FOREPERSON:  Yes.

17      THE CLERK:  Claim five?

18      THE FOREPERSON:  Yes.

19      THE CLERK:  Claim six?

20      THE FOREPERSON:  Yes.

21      THE CLERK:  Claim 11?

22      THE FOREPERSON:  Yes.

23      THE CLERK:  Do you find by clear and convincing

24  evidence that the following claims of the '335 patent are

25  invalid due to obviousness?  Claim one?

page 21

Trial Transcript - Day 13 (jury questions; jury verdict)

page 22

1       THE FOREPERSON:  No.

2       THE CLERK:  Claim two?

3       THE FOREPERSON:  No.

4       THE CLERK:  Claim three?

5       THE FOREPERSON:  No.

6       THE CLERK:  Claim four?

7       THE FOREPERSON:  No.

8       THE CLERK:  Claim five?

9       THE FOREPERSON:  No.

10      THE CLERK:  Claim six?

11      THE FOREPERSON:  No.

12      THE CLERK:  Claim 11?

13      THE FOREPERSON:  No.

14      THE CLERK:  Do you find by clear and convincing

15  evidence that the following claim of the '335 patent is

16  invalid due to indefiniteness?

17      THE FOREPERSON:  No.

18      THE CLERK:  Infringement of Chen '827 patent.  Do

19  you find by a preponderance of the evidence that the accused,

20  Atmel Colorado Springs invoked tungsten processes that

21  implant phosphorous literally infringed the following claims

22  of the '827 patent?  Claim one?

23      THE FOREPERSON:  Yes.

24      THE CLERK:  Claim two?

25      THE FOREPERSON:  Yes.

page 22

# EXHIBIT 9

LEXSEE 2007 US DIST LEXIS 86302



Analysis
As of: Jul 07, 2008

**ASUSTEK COMPUTER INC. and ASUS COMPUTER INTERNATIONAL, Plaintiffs, v. RICOH COMPANY, LTD., Defendant.**

**No. C 07-01942 MHP**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 86302*

**November 21, 2007, Decided
November 21, 2007, Filed**

**PRIOR HISTORY:** *Ricoh Co. v. ASUSTeK Computer, Inc., 481 F. Supp. 2d 954, 2007 U.S. Dist. LEXIS 25047 (W.D. Wis., 2007)*

**CORE TERMS:** patent, counterclaim, infringement, collateral estoppel, prior litigation, asserting, issue preclusion, preclusive effect, invalidity, indefinite, pendency, invalid, Patent Act, stay proceedings, stay pending appeal, pending resolution, declaratory judgment, patent infringement, reasons stated, currently pending, judicial notice, judicial economy, legal theory, competing interests, citation omitted, actually litigated, necessary part, duplication, cognizable, deposition

**COUNSEL:** [*1] For Asustek Computer, Inc., ASUS Computer International, Plaintiffs: Ronald Scott Lemieux, LEAD ATTORNEY, Shanee Y. W. Nelson, Vidya Ratna Bhakar, Paul, Hastings, Janofsky & Walker LLP, Palo Alto, CA.

For Ricoh Company, Ltd, Defendant: John Christopher Rozendaal, Mark C. Hansen, Michael E. Joffre, Richard H. Stern, LEAD ATTORNEYS, Kellogg Huber Hansen Todd, Evans & Figel, PLLC, Washington, DC; Donald P. Gagliardi, Bergeson, LLP, San Jose, CA.

For Ricoh Company, Ltd, Counter-claimant: John Christopher Rozendaal, Mark C. Hansen, Michael E.

Joffre, Richard H. Stern, LEAD ATTORNEYS, Kellogg Huber Hansen Todd, Evans & Figel, PLLC, Washington, DC; Donald P. Gagliardi, Bergeson, LLP, San Jose, CA.

**JUDGES:** MARILYN HALL PATEL, United States District Court Judge.

**OPINION BY:** MARILYN HALL PATEL

**OPINION**

**MEMORANDUM AND ORDER**

**Re: Ricoh's Motion for a Stay Pending Appeal and Asustek's Motion to Dismiss Ricoh's Third Counterclaim**

On April 6, 2007 plaintiffs ASUSTek Computer Inc. and ASUS Computer International (collectively, "Asustek") brought this action against defendant Ricoh Company Ltd. ("Ricoh") seeking a declaratory judgment of non-infringement and/or invalidity of four of Ricoh's patents, including *U.S. Patent No. 6,631,109 ("the '109 Patent")*. [*2] On September 17, 2007 Ricoh filed its answer and asserted counterclaims against Asustek alleging infringement of the same four patents. Asustek now moves to dismiss Ricoh's third counterclaim, which

Case 5:08-cv-00775-JW    Document 34-10    Filed 07/08/2008    Page 3 of 6

Page 2
2007 U.S. Dist. LEXIS 86302, *2

alleges infringement of the *'109 Patent*. Concurrently, Ricoh moves for a stay of this action pending the resolution of its appeal before the Federal Circuit filed in an action involving the *'109 Patent*. Having considered the arguments and submissions of the parties, and for the reasons stated below, the court rules as follows.

## BACKGROUND

On August 24, 2006 Ricoh filed a complaint for patent infringement in the Western District of Wisconsin (the "Wisconsin action"). Complaint PP 2 & 16. On April 3, 2007 Asustek was dismissed from the Wisconsin action for lack of personal jurisdiction. Id. P 2. At the time of the dismissal, very little discovery had been taken by the parties. Williams Dec. PP 5-6. Ricoh's appeal of that judgment is currently pending before the Federal Circuit. Def.'s Opp. to Pl.'s Motion to Dismiss at 1.

After Asustek's dismissal, Ricoh continued to press its claims in the Wisconsin action against the remaining defendants. Id. The remaining defendants moved for summary judgment [*3] and the district court found claims 1 and 4 of the *'109 Patent* invalid as obvious in light of the prior art. Pl.'s Request for Judicial Notice, Exh. A at 7-11. [1] Ricoh's appeal of that judgment is currently pending before the Federal Circuit. Def.'s Opp. to Pl.'s Motion to Dismiss at 1.

> 1   Pursuant to *Rule 201 of the Federal Rules of Evidence*, plaintiff has requested that the court take judicial notice of two documents filed in the Wisconsin action, namely, the court's: (1) Opinion and Order, filed August 27, 2007; and (2) Judgment in a Civil Case, filed August 24, 2007. This request is uncontested by defendant. Plaintiff's request is hereby granted.

## LEGAL STANDARD

### I. Motion to Stay

A court may stay proceedings as part of its inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co., 299 U.S. 248, 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936)*. Use of this power "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Id. at 254-55*. It is within a district court's discretion to grant or deny such a stay. See *Lockyer v.*

*Mirant Corp., 398 F.3d 1098, 1105 (9th Cir. 2005)*.

### II. [*4] Motion to Dismiss

A motion to dismiss should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, U.S.    , 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)*. Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)*. Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996)*. The court need not, however, accept as true allegations that are conclusory, legal conclusions, unwarranted deductions of fact or unreasonable inferences. See *Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994)*.

## DISCUSSION

### I. Motion to Stay

Ninth Circuit, rather than Federal Circuit, law governs this motion to stay because motions to stay are not within the exclusive purview of Federal Circuit jurisdiction. *Robinson v. Fakespace Labs., Inc., No. 02-1152, 2003 U.S. App. LEXIS 3914, 2003 WL 858911, at *4 (Fed. Cir. Mar. 5, 2003)* [*5] (per curiam). District courts have long retained substantial discretion to stay civil actions where "it is efficient for [the court's] docket and [where it is] the fairest course . . . pending resolution of independent proceedings which bear upon the case." *Yong v. I.N.S., 208 F.3d 1116, 1119 (9th Cir. 2000)* (citation omitted). The Ninth Circuit has recognized that where "there is even a fair possibility that [a] stay . . . will work damage to some one else, the stay may be inappropriate absent a showing by the moving party of hardship or inequity." *Dependable Highway Express, Inc. v. Navigators Ins. Co., 498 F.3d 1059, 1066 (9th Cir. 2007)* (citation and internal quotations omitted). Additionally, "[a] stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time." *Leyva v. Certified Grocers of California, Ltd., 593 F.2d 857, 864 (9th Cir. 1979)*. Thus, the touchstone consideration in determining whether to grant a motion to stay is the district court's obligation to "weigh competing interests and maintain an even

balance." *Landis, 299 U.S. at 254-55.*

Ricoh moves for a stay of this litigation pending appeal of Asustek's dismissal [*6] from the Wisconsin action before the Federal Circuit in order to conserve judicial resources and avoid duplication of effort. Ricoh argues that any work done in this action will be rendered moot if Ricoh wins at the Federal Circuit. A motion to stay, however, does not hinge only on considerations of judicial economy. It is also this court's charge to consider prejudice or harm which a stay may impose on others. See *Landis, 299 U.S. at 255.* Indeed, it is well-settled that "case management standing alone is not necessarily a sufficient ground to stay proceedings." *Dependable Highway, 498 F.3d at 1066.*

Allowing the litigation to commence will involve minimal duplication because Asustek was dismissed at such an early stage in the litigation. Indeed, Asustek was a party to the Wisconsin action for only seven months prior to being dismissed. See Williams Dec. P 5-6. Prior to dismissal, Asustek had not taken even a single deposition of Ricoh, Ricoh had taken only one *30(b)(6)* technical deposition of Asustek and Ricoh had produced only 1,244 documents. Id. P 5.

Staying the litigation would also be prejudicial to Asustek. Even Ricoh's most optimistic estimate would leave the parties in the lurch [*7] at least until February 2008. Def.'s Reply in Support of Motion for Stay at 1. Awaiting Ricoh's appeal in these circumstances would be highly prejudicial to Asustek, which has been living in the shadow of Ricoh's threatened patent litigation since August 2006. Complaint P 16. Asustek brought this action for declaratory relief to escape that shadow and to have this court determine the merits of the matter. The prejudice and inefficiency resulting from a stay would greatly outweigh any gains.

Moreover, the Ninth Circuit has acknowledged that a stay pending appeal is of dubious character and may result in indefinite delay. In Yong, for example, the Ninth Circuit found that the district court had abused its discretion in staying a prisoner's habeas corpus petition "pending resolution of the appeal" of a separate case before the Circuit "because the issues raised in Yong's petition were to be considered in that case". *208 F.3d at 1117.* Although the stay had only lasted five months at the time of its opinion, the court held that the term of the stay was indefinite because, in the event that the Supreme Court granted certiorari to review the Ninth Circuit's

decision in Ma, "the stay could [*8] remain in effect for a lengthy period of time, perhaps . . . years." *Id. at 1119.* The Ninth Circuit further noted that "a single justice of the Supreme Court may stay the mandate of the Court of Appeals pending an application for certiorari to the Supreme Court." Id. n.2. (citing *28 U.S.C. § 2101(f)*; *Sup. Ct. R. 23.2*). Likewise, the court noted that *Federal Rule of Appellate Procedure 41(d)* grants circuit courts the power to "stay the issuance of a mandate pending review by the Supreme Court." Id. Admittedly, Yong was a habeas case where urgency is critical. Nonetheless, the principles of *Yong* have been applied to other less compelling situations. See, e.g., *Dependable Highway, 498 F.3d at 1066 (9th Cir. 2007)*(breach of insurance contract); *Lockyer v. Mirant Corp., 398 F.3d 1098, 1105 (9th Cir. 2005)*(divestiture under Clayton Act). Thus, the court finds that it would be imprudent to condition its stay on anything as uncertain and indefinite as the pendency of Ricoh's appeal before the Federal Circuit, especially in light of the Supreme Court's recent interest in patent cases. Accordingly, defendant's motion for stay is denied.

II. Motion to Dismiss

To avoid the risk of inconsistent verdicts [*9] and to advance judicial economy, issue preclusion (also called collateral estoppel) prevents parties from relitigating an issue of fact or law that was already determined in prior litigation. See *Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1114 (9th Cir. 1999); Bates v. Jones, 131 F.3d 843, 857 (9th Cir. 1997),* cert. denied, *523 U.S. 1021, 118 S. Ct. 1302, 140 L. Ed. 2d 468 (1998).* The party invoking issue preclusion must demonstrate that: (1) the issue at stake is identical to an issue raised in the prior litigation; (2) the issue was actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation was a necessary part of the judgment in that action. *Littlejohn v. United States, 321 F.3d 915, 923 (9th Cir. 2003).*

As a threshold issue, the court must determine whether Asustek has met its initial burden as described in *Littlejohn.* In the Wisconsin action, the court addressed the questions presented by defendant's third counterclaim, namely, the validity of claims 1 and 4 of the '109 Patent. Likewise, the validity of those claims was actually litigated and was a necessary part of the judgment in that action. Ricoh, for its part, does not attempt to dispute the preclusive effect [*10] of the Wisconsin court's finding

of invalidity here. If Ricoh has a good faith argument that the Wisconsin action does not preclude them from asserting those claims, the time to raise them has come and gone. As such, this court will start from the premise that Ricoh is collaterally estopped from asserting claims 1 and 4.

Prior to addressing the primary issue at hand, the court must dispense with a second preliminary matter. Asustek, anticipating that Ricoh would argue the point, has asserted that the mere existence of an appeal does not affect the finality of the Wisconsin court's holding for purposes of collateral estoppel. Indeed, the Ninth Circuit has made clear that the pendency of an appeal does not prevent application of the doctrine of collateral estoppel. *Tripati v. Henman, 857 F.2d 1366, 1367 (9th Cir. 1988)*; see also *Pharmacia Upjohn Co. v. Mylan Pharms., Inc., 170 F.3d 1373, 1379 (Fed. Cir. 1994)*. The decision in the Wisconsin action was a final determination on the merits and must be given preclusive effect. The pendency of Ricoh's appeal before the Federal Circuit does not, therefore, alter the court's foregoing analysis.

The court now turns to whether Ricoh's third counterclaim [*11] asserting infringement of the *'109 Patent* must be dismissed. Asustek contends that the doctrine of collateral estoppel compels dismissal of the entire *'109 Patent*. Yet, the Patent Act requires that "[e]ach claim of a patent. . . shall be presumed valid independently of the validity of other claims." *35 U.S.C. § 282*. Moreover, Congress anticipated this problem and squarely addressed it in *section 288 of the Patent Act. 35 U.S.C. § 288* ("Whenever . . . a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid"). Asustek has failed to show how dismissal is permissible in light of these clear congressional mandates. Indeed, the primary case upon which Asustek relies, Pharmacia, indicates that only the individual claims which themselves have been invalidated can have preclusive effect. In Pharmacia, the Federal Circuit stated that "once the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of *those claims* may reap the benefit of the invalidity decision under the principles of collateral estoppel." *170 F.3d at 1379* (citation omitted) (emphasis added). [*12] That language does not require dismissal here, because Ricoh does not assert only claims 1 and 4. Instead, Ricoh asserted that Asustek has infringed the *'109 patent*-- a patent with ten claims. Complaint, Exh. C.

Ricoh's counterclaims are also entirely consistent with the mandates of *Rule 8 of the Federal Rules of Civil Procedure*. Although it would be a simple matter for Ricoh to amend its pleading to reflect the specific claim on which they now intend to rely, the notice pleading standard of the Federal Rules of Civil Procedure does not require this level of precision. See *Conley v. Gibson, 355 U.S. 41, 47-48, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. Thus, given *Rule 8(f)*'s clear directive that "all pleadings shall be so construed as to do substantial justice," this court finds that Ricoh has set forth sufficient allegations so as to put Asustek on notice of their claims under the *'109 Patent. Fed. R. Civ. P. 8(f)*. Moreover, parties claiming patent infringement are required under this district's patent rules, *Patent Local Rule section 3-1*, to disclose, within ten days of the initial case management conference ("CMC"), each claim of each patent-in-suit that is allegedly infringed. Since Ricoh asserted its counterclaims [*13] after the initial CMC, the court orders Ricoh's "Disclosure of Asserted Claims and Preliminary Infringement Contentions," as required by *Patent Local Rule section 3-1*, be produced within ten days of this order. Additionally, in light of this court's ruling as to issue preclusion, Ricoh is estopped from asserting claims 1 and 4 of the *'109 Patent* in that disclosure. Accordingly this court denies Asustek's motion to dismiss Ricoh's third counterclaim. [2]

> 2  As a practical matter, this court's holding may in fact result in a dismissal of the *'109 Patent* from this action in its entirety. Although it is unclear from the record, it appears that Ricoh only saw fit to assert claims 1 and 4 of the *'109 Patent* against Asustek in the Wisconsin action. Consequently, if we are to believe Ricoh's assertion that "this declaratory judgment is a 'mirror-image' of [its] suit in Wisconsin," then the matter may be at an end. See Docket Entry 31 at 4.

CONCLUSION

For the reasons stated above, the court DENIES Asustek's motion to dismiss and DENIES Ricoh's motion to stay.

IT IS SO ORDERED.

Dated: November 21, 2007

/s/ Marilyn Hall Patel

2007 U.S. Dist. LEXIS 86302, *13

MARILYN HALL PATEL                         Northern District of California

    United States District Court Judge

# EXHIBIT 10

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22005839 (D.Del.)
(Cite as: 2003 WL 22005839 (D.Del.))

Page 1

**H**Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
TRUTH HARDWARE CORPORATION, Plaintiff,
v.
ASHLAND PRODUCTS, INC., Defendant.
**No. Civ.A. 02-1541 GMS.**

Aug. 19, 2003.

Rick S. Miller, Ferry, Joseph & Pearce, P.A.,
Wilmington, DE, for Plaintiff.

Jeffrey B. Bove, Connolly, Bove, Lodge & Hutz,
Wilmington, DE, for Defendant.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

*1 On October 15, 2002, the plaintiff, Truth Hardware Corporation ("Truth") filed the instant action against Ashland Products, Inc. ("Ashland") alleging patent infringement of its U.S. Patent No. 6,385,911 ("the '911 patent").

On December 12, 2002, Judge John W. Darrah of the United States District Court for the Eastern District of Illinois held that the '911 patent's parent, U.S. Patent No. 5,765,308 ("the '308 patent"), was invalid as anticipated and obvious. Judge Darrah subsequently conducted a three-day bench trial on the issue of whether the '308 patent's inventors intended to deceive the Patent and Trademark Office ("PTO") by withholding ten prior art references. On July 3, 2003, Judge Darrah ruled that "[i]t is clear that the Truth Inventors were aware of the prior art and knew of its materiality," and that "there was clearly an intent to mislead the PTO by the Inventors."

Following this ruling, the court in the present case ordered the parties to submit letter briefs containing their contentions with regard to the effect of Judge Darrah's ruling on the '911 patent. After having considered the parties' arguments, and for the

following reasons, the court finds the '911 patent unenforceable in accord with Judge Darrah's decision.

II. DISCUSSION

It is well-settled that a patentee's inequitable conduct renders unenforceable all patent claims having "an immediate and necessary relation" to that conduct, regardless of whether the claims are contained in a single patent or a series of related patents. *See Keystone Driller Co. v. General Excavator Co.,* 290U.S. 240, 245-46, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elec. Co., Ltd.,* 24 F.Supp.2d 537, 543-44 (E.D.Va.1998). Indeed,

a patent that issues from a divisional or continuation application may be held unenforceable where (i) there is inequitable conduct with respect to the prosecution of an earlier related application in the chain leading to the challenged patent and (ii) the inequitable conduct relates to the asserted claims of that [divisional or continuation] patent. Were this not the rule, a party committing inequitable conduct could avoid the consequences of that conduct through a scheme of divisional and continuation applications. The law does not countenance such a manipulation of the patent process.

*Semi-Conductor Energy,* 24 F.Supp.2d 543-44 (citing *Baxter Int'l, Inc. v. McGaw,* 149 F.3d 1321, 1332 (Fed.Cir.1998)); *see also Bristol-Meyers Squibb Co. v. Ben Venue Labs.,* 90 F.Supp.2d 522, 537-38 (D.N.J.2000).

In the present case, Truth maintains that the requirements for "infectious unenforceability" have not been met for essentially two reasons. First, Truth argues that the '308 patent and the '911 patent are different patents with different claims. Second, it argues that it cured any prior inequitable conduct during the prosecution of the '911 patent. For the following reasons, the court must disagree with Truth on both counts.

*2 With regard to Truth's first contention that the '308 patent and the '911 patent are unrelated, this argument must fail on its face. The Manual for Patent

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22005839 (D.Del.)
**(Cite as: 2003 WL 22005839 (D.Del.))**

Examining Procedure ("MPEP") states that a continuation patent cannot include new information and must rely on the same specification. [FN1]*See* MPEP § 201.07; *see also Baxter Int'l. Inc. v. McGaw, 149 F.3d 1321, 1332 (Fed.Cir.1998)* (noting that "inequitable conduct with respect to one claim renders the entire patent unenforceable."). As such, Truth's argument wholly ignores the fact that the '911 patent must necessarily share the same specification, the same priority date, and the same claimed "slot" feature as the '308 patent invention. [FN2] Additionally, Judge Darrah found that the '308 patent's specification contained the false assertion that "[a] window operator typically has a mounting base with a flat planar bottom secured to a corresponding flat planar surface on a sill of the frame." This statement is also contained in the '911 patent specification.

> FN1. Importantly, while a divisional application relates to inventions separate and distinct from those claimed in a parent application, the present action does not concern such an application.

> FN2.The '911 patent's Claim 9 is directed to a "slotted" operator much like the "slotted" operators found to have been intentionally withheld from the PTO by the Truth inventors. According to both the '308 and '911patent specifications, the "slot" interfaces with a "raised surface" on the windowsill to prevent air and/or water from entering the home.

In spite of these irrefutable facts, Truth asserts that the '911 patent examiner "specifically considered and found immaterial all of the prior art that Ashland contends should have been disclosed in the '308 Patent application...." The record belies this assertion, however. The notation in the '911 patent prosecution history relied upon by Truth--"[f]ails to constitute prior art"--was made by the Examiner with regard to a Truth summary entitled, "THE ALLEGATIONS." There is no indication that this notation was made with regard to any of the specific prior art references previously withheld by the inventors. Thus, Truth cannot rely on this statement to save the '911 patent from the inequitable conduct which rendered the '308 patent invalid.

Truth additionally contends that its inventors cured any inequitable conduct by disclosing the previously withheld prior art references when prosecuting the '911 patent. However, merely disclosing such previously withheld references is insufficient. Indeed, in *Rohm and Haas Co. v. Crystal Chem. Co.,* the Federal Circuit set forth the basic requirements for curing inequitable conduct:

> [t]he first requirement to be met by an applicant aware of misrepresentation in the prosecution of his application and desiring to overcome it, is that he expressly advise the PTO of its existence, stating specifically wherein it resides. The second requirement is that, if the misrepresentation is of one or more facts, the PTO be advised what the actual facts are, the applicant making clear that further examination in light thereof may be required if any PTO action has been based on misrepresentation. Finally, on the basis of the new and factually accurate record, the applicant must establish patentability of the claimed subject matter.

*722 F.2d 1556, 1572 (Fed.Cir.1983).* The Federal Circuit further stated that,

> [i]t does not suffice that one knowing of misrepresentations in the application or in its prosecution merely supplies the examiner with accurate facts without calling his attention to the untrue or misleading assertions sought to be overcome, leaving him to formulate his own conclusions.

*Id.

In the present case, Judge Darrah found that the Truth inventors consistently misrepresented the state of the window operator art and the availability of material prior art to both their counsel and the PTO. Truth argues that it cured this inequitable conduct by offering the Examiner some of the previously secreted prior art. Notably, Truth did not inform the Examiner that the '911 patent's specification contained the false statement that, "[a] window operator typically has a mounting base with a flat planar bottom secured to a corresponding flat planar surface on a sill of the frame." Furthermore, the record is devoid of any indication that Truth explained to the Examiner why the statement regarding the "typical" operators was false in light of the commercially-available "slotted" operators previously withheld by the Truth inventors.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22005839 (D.Del.)
**(Cite as: 2003 WL 22005839 (D.Del.))**

Notwithstanding these omissions, Truth asserts in its defense that it is confident that Judge Darrah's findings will be reversed on appeal. The court need only give this argument short shrift as the simple fact remains that this court is bound by his finding that the '911 patent's parent is invalid due to inequitable conduct. [FN3]*See Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.,* **170 F.3d 1373, 1379-82 (Fed.Cir.1999)** (holding that an inequitable conduct ruling is entitled to a collateral estoppel effect).

> FN3. The court recognizes that the principle of collateral estoppel may not apply where the patentee did not have the full and fair opportunity to litigate the issues. *See Pharmacia,* **170 F.3d at 1379**. However, because Truth has not asserted that it did not have a fair and full opportunity to litigate the validity of its patent in the Illinois action, the court need not reach this issue.

III. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:
   1. As a continuation of the '308 patent, the '911 patent is likewise unenforceable due to inequitable conduct.
   2. The Clerk of the Court is directed to close this case.

Not Reported in F.Supp.2d, 2003 WL 22005839 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 11

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1444883 (S.D.N.Y.)
(Cite as: 2004 WL 1444883 (S.D.N.Y.))

COnly the Westlaw citation is currently available.

United States District Court,
S.D. New York.
PURDUE PHARMA L.P., the Purdue Frederick
Company, the P.F. Laboratories, Inc.,
the Purdue Pharma Company, Plaintiffs and
Counterclaim Defendants,
v.
TEVA PHARMACEUTICALS USA, INC.,
Defendant and Counterclaim Plaintiff,
v.
EUROCELTIQUE S.A., Counterclaim Defendant.
No. 01 Civ. 8507(SHS), 01 Civ. 11212(SHS), 03
Civ. 2312(SHS).

June 28, 2004.

*MEMORANDUM ORDER*

STEIN, J.

*1 Defendant Teva Pharmaceuticals USA, Inc. made an Abbreviated New-Drug Application in May of 2001, seeking FDA approval to manufacture and sell generic equivalents of the popular analgesic OxyContin in 80 milligram dosage. In response, plaintiffs, Purdue Pharma L.P. and its affiliates, (collectively "Purdue") brought the instant actions, seeking an injunction against Teva on the basis of infringement on Purdue's patents Nos. 5,549,912, 5,508,042 and 5,656,295 (the "patents in suit"). Teva has also sought FDA approval to market generic equivalents of the 10-mg, 20-mg, 40-mg, and 160-mg dosages of OxyContin, which led to additional infringement claims brought by Purdue that are consolidated here. Relying upon this Court's January 5, 2004 Opinion and Order in *Purdue Pharma L.P. v. Endo Pharms., Inc.,* holding the patents in suit invalid due to Purdue's inequitable conduct before the Patent and Trademark Office ("PTO"), Teva has moved for summary judgment with respect to Purdue's patent infringement claims. Purdue opposes that motion and also seeks a stay of proceedings.

For the reasons set forth below, Purdue's request for a stay of proceedings is denied and Teva's motion for

summary judgment is granted.

*Background And The Proceedings In Purdue Pharma, L.P. v. Endo Pharms, Inc.*

On January 5, 2004, this Court issued an Opinion and Order, following a bench trial, in *Purdue Pharma L.P. v. Endo Pharms., Inc.,* a patent infringement action brought by Purdue against another generic drug manufacturer that also involved the patents in suit. *SeePurdue Pharma L.P. v. Endo Pharms., Inc., 2004 WL 26523, 70 U.S.P.Q.2d 1185 (S.D.N.Y. Jan.5, 2004).* Specifically, this Court found that Endo had proven, by clear and convincing evidence, that patents in suit were invalid because Purdue had engaged in inequitable conduct during its prosecution of those patents before the PTO. *Seeid, 2004 WL 26523 at *25-27.* Furthermore, an injunction was granted enjoining Purdue from enforcing those patents. *Seeid., 202004 WL 26523 at *27.*

A week later, Purdue appealed from the finding as to the invalidity of the patents in suit contained in the January 5th Opinion and Order. Purdue also moved for a stay of enforcement of that judgment pending appeal, asserting that it had a substantial likelihood of success on appeal and it also faced irreparable harm unless a stay was granted. This Court denied Purdue's motion for a stay, holding that Purdue failed to show a substantial likelihood of success upon appeal and that Purdue's potential losses were not irreparable and did not outweigh the public interest in "prompt access to generic equivalents of a widely used analgesic." *SeePurdue Pharma L.P. v. Endo Pharms., Inc., 2004 WL 306591 at *2 (S.D.N.Y. Feb.17, 2004).* Purdue's subsequent motion for a stay pending appeal was also denied, on similar grounds, by the United States Court of Appeals for the Federal Circuit on March 18, 2004.

*2 Five days later, the FDA approved Teva's application to manufacture and sell a generic equivalent of OxyContin in 80-mg dosage. Teva's other applications, relating to 10-mg, 20-mg, 40-mg and 160-mg dosages, remain under FDA review. Furthermore, because Endo enjoys an 180-day exclusivity period under the Hatch-Waxman regulatory scheme, Teva will not be able to market its

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1444883 (S.D.N.Y.)
**(Cite as: 2004 WL 1444883 (S.D.N.Y.))**

generic versions of the 10-mg, 20-mg, and 40-mg dosages of OxyContin until 180 days after Endo launches its generic equivalents of those dosages. *See*21 U.S.C. § 355(j)(5)(B)(iv).

*Purdue Is Not Entitled To A Stay Of Proceedings*

Purdue seeks a stay of proceedings in this action, asserting that it faces irreparable harm unless a stay is granted. Although granting such a stay is within a district court's discretion, this Court declines to do so here. In considering whether to stay a civil proceeding, this Court looks to the dictate of the interests of justice and balances the following set of interests: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." *See*Volmar Distributors, Inc. v. New York Post Co., Inc., 152 F.R.D. 36, 39 (S.D.N.Y.1993).

Here, the balancing inquiry largely mirrors the one this Court had already conducted in considering Purdue's motion for a stay of judgment pending appeal in *Purdue Pharma L.P. v. Endo Pharms., Inc .* In that instance, this Court held that the interests of Endo and the public outweighed Purdue's interests in staying the injunction against enforcement of the patents in suit. *See*Purdue Pharma L.P. v. Endo Pharms., Inc., 2004 WL 306591 at *2-3. For substantially similar reasons, Purdue's interests in obtaining a stay are outweighed by the interests of the public and the burden on Teva. Accordingly, Purdue's request for a stay of proceedings is denied.

*Purdue Is Not Entitled To Relitigate The Validity Of Its Patents*

It is well established that "once the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under the principles of collateral estoppel." *See*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc., 170 F.3d 1373, 1379 (Fed.Cir.1999) (summarizing the holding in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)). Therefore, because Purdue's infringement claims in this action pertain to the same patents declared invalid by this Court in *Purdue Pharma L.P. v. Endo Pharms., Inc.* following a bench trial, Teva is entitled to preclude Purdue from relitigating the same issue, and consequently summary judgment, unless Purdue can demonstrate that it lacked a full and fair opportunity to litigate the issue in the earlier proceeding. *See*Pharmacia & Upjohn Co. ., 170 F.3d at 1379-80;In re Freeman, 30 F.3d 1459, 1465 (Fed.Cir.1994). It cannot do so.

**\*3** Purdue's reliance upon a Third Circuit decision, Bailey v. Ness, 733 F.2d 279 (3rd Cir.1984), to support its contention that this Court should decline to apply collateral estoppel because its January 5th Opinion and Order has been appealed, is entirely misplaced. As another Court in this District has observed, the Third Circuit had so held due to "uncertain state law as to whether a Pennsylvania judgment should command preclusive effect pending appeal." *See*Waever Corp. v. Kidde, Inc., 701 F.Supp. 61, 66 (S.D.N.Y.1988). This action, in contrast, presents no perplexing issue of state law. Accordingly, *Bailey* bears no relevance here. Cf. ***Pharmacia & Upjohn Co.,*** **170 F.3d at 1381** ("the law is well settled that the pendency of an appeal has no effect on the finality or binding effect of a trial court's holding); SSIH Equipment S.A. v. U.S. Int'l Trade Commission, 718 F.2d 365, 370 (Fed.Cir.1983).

The record is also clear that Purdue had the opportunity to litigate fully and fairly the issue of inequitable conduct before the PTO in its infringement against Endo, including a lengthy bench trial. *See*Purdue Pharma L.P. v. Endo Pharms., Inc., 2004 WL 26523 at *1, 21-26 (describing evidence presented at trial on the issue of inequitable conduct). Moreover, because Purdue's patent infringement claims against Endo was also litigated before this Court, there are no additional procedural opportunities available to Purdue in this action to which it had not been entitled in the earlier proceeding or any other compelling circumstances counseling against the application of collateral estoppel. *See*In re Freeman, 30 F.3d at 1467-68.

As Purdue cannot demonstrate why collateral estoppel should not be applied to this Court's earlier determination of the invalidity of the patents in suit,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1444883 (S.D.N.Y.)
**(Cite as: 2004 WL 1444883 (S.D.N.Y.))**

Page 3

it will be precluded from relitigating that issue.
Therefore, Teva is entitled to summary judgment as
to the patent infringement claims asserted by Purdue.
Its motion for summary judgment is hereby granted.

 Not Reported in F.Supp.2d, 2004 WL 1444883
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.